**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHARLES GOLBERT, Cook County Public Guardian, on behalf of Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B.,

Plaintiffs,

v.

AURORA CHICAGO LAKESHORE HOSPITAL, LLC, *et al.*,

Defendants.

Case No. 19-cv-08257

Judge Mary M. Rowland

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charles Golbert, acting on behalf of minors Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., brings this action against the Defendants alleging federal and state law violations arising from the children's time at Chicago Lakeshore Hospital. Defendants Signature Healthcare Services, LLC and Aurora Chicago Lakeshore Hospital, LLC move to dismiss the Amended Complaint for failing to state a claim. For reasons stated herein, their Motion to Dismiss [160] is denied.

## I. Background

The following factual allegations are taken from the Amended Complaint (Dkt. 135) and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

**A. The Lakeshore Allegations**

Charles Golbert brings this suit against Aurora Chicago Lakeshore Hospital, Lakeshore's parent company Signature, several employees and executives of Lakeshore, and several officers and employees of DCFS, in their personal capacity. Golbert is the Cook County Public Guardian. Appointed by the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court, he represents children who are subjects of abuse, neglect, and dependency petitions filed in the juvenile court. Dkt. 135 ¶ 11. In this case, he represents seven children who were in DCFS custody and were involuntarily placed in the Chicago Lakeshore Hospital between 2017 and 2018. *Id.* at ¶¶ 12-18, 66.

Chicago Lakeshore Hospital is an Illinois limited liability company located in Chicago, where it also operates a "Children's Pavilion." *Id.* at ¶ 19. Lakeshore is in turn owned by Signature, a Michigan limited liability company. *Id*. Along with Lakeshore and Signature, Golbert lists ten other executives and employees of Lakeshore as defendants. *Id.* at ¶¶ 23, 31-39. He also brings suit against nine officials and employees of DCFS, the Illinois agency responsible for the care of children dependent on the state. *Id.* at ¶¶ 21-22, 24-29, 30, 40.

Golbert's allegations arise from the plaintiffs' treatment while at Lakeshore's children's hospital. DCFS is required to house children in the least restrictive setting that is in the child's best interest. *Id.* at ¶ 41. As part of this care, children sometimes needed inpatient care at a psychiatric hospital. *Id.* at ¶ 42. Due to budget constraints,

DCFS had developed a reputation among Chicago-area hospitals for keeping children in inpatient care for longer than medically beneficial and failing to promptly pay hospitals for care provided. *Id.* at ¶ 47-48. As a result, most psychiatric hospitals were hesitant to admit children in the care of DCFS. *Id.* at ¶ 49.

The one exception was Lakeshore. Due to its own financial pressures, it admitted children in the care of DCFS. *Id.* at ¶ 62. As a result of Lakeshore's limited funds and aggressive management by Signature, its children's psychiatric hospital lacked the proper facilities and staff to safely operate. *Id.* at ¶¶ 51-58. Lakeshore had a history of allegations of inadequate or dangerous care, including a 2011 report by the Mental Health Policy Program of the University of Illinois at Chicago finding patterns of sexual abuse. *Id.* at ¶¶ 119, 121. DCFS, however, was dependent on Lakeshore because it was one of the few hospitals that would accept children in the department's charge. *Id.* at ¶ 64. As a result, DCFS wanted to ensure that Lakeshore remained in business even if it did not provide adequate care. *Id.*

During their stay at Lakeshore, the plaintiffs were subjected to serious sexual, physical, and emotional abuse. *Id.* at ¶ 67. DCFS was aware of serious complaints against Lakeshore and worked to bury and discredit the allegations. *Id.* at ¶ 104. The situation only changed in 2018 when the federal Department of Health and Human Services surveyed Lakeshore to evaluate its compliance with Medicare regulations. *Id.* at ¶ 114. The surveys found that Lakeshore's administration of the children's hospital violated federal regulations and endangered patient health and safety. *Id.* at ¶ 115. As a result, the Department terminated its provider agreement with the

hospital, cutting off federal funding. *Id.* at ¶ 125. DCFS removed all the children in its custody out of Lakeshore at around the same time. *Id.* at ¶ 125.

The abuse the children suffered at Lakeshore continues to cause them physical and emotional pain. *Id.* at ¶ 130. Golbert filed the instant lawsuit on December 18, 2019 to recover for the damage caused.

**B. Lakeshore and Signature**

Lakeshore and Signature (the "institutional defendants") have jointly filed a motion to dismiss Golbert's Complaint as it applies to them. Signature is the parent company and owner of Lakeshore, and at the time they shared the same CEO, David Fletcher-Janzen. *Id.* at ¶¶ 20, 23.[1] In 2017, Signature entered into a sale and leaseback of Lakeshore's property. *Id.* at ¶ 51. The resulting lease agreement put intense financial pressure on Lakeshore and Signature to keep Lakeshore operating. *Id.* at ¶ 52. Signature sought to extract as much profit from Lakeshore as possible while keeping costs low. *Id.* at ¶ 53. To that end, Signature limited spending necessary to ensure Lakeshore's safety, including prohibiting the installation of functional video surveillance; requiring the facility to operate with insufficient staff; and refusing funds to properly vet or train employees. *Id.* at ¶¶ 54-57. These limitations foreseeably created safety risks for the patients at Lakeshore. *Id.* Through these actions, the Complaint alleges that Signature directed and controlled Lakeshore's activities. *Id.* at ¶ 50.

---

[1] Defendants say they did not share a CEO. At the motion to dismiss stage, however, the Court accepts the plaintiff's well-pleaded allegations as true. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).

Lakeshore's leadership was regularly informed of the abuse taking place through regular "FLASH Meetings" and their personal involvement in the operations. *Id.* at ¶¶ 98-99. Instead of addressing the issues, they sought to cover up the evidence of abuse. *Id.* at ¶ 105. Signature was also aware of the abuse taking place at the hospital and refused to take any steps to stop it. *Id.* at ¶ 58. Lakeshore facilitated and hid the abuse of the plaintiffs in several ways, including by failing to fix video cameras; destroying evidence; failing to allow timely medical exams of victims; failing to discipline the responsible staff; and failing to place appropriate restrictions on sexually aggressive patients. *Id.* at ¶¶ 105, 108. As a result, the plaintiffs suffered serious physical, mental, and emotional harm.

## II. Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations",

but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

## III. Analysis

In their Motion to Dismiss, the institutional defendants argue that Signature cannot be held liable as the parent company; that they are not state actors liable under § 1983; and that the Complaint fails to state a claim against them.

### A. Signature May Be Held Liable for Lakeshore's Actions

A parent company is generally not liable for the acts of its subsidiaries. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Under both federal and Illinois law, however, a company can be liable for its subsidiary when the parent company had control over or was involved in the subsidiary's misconduct. *Id.* at 64; *Northbound Grp., Inc. v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015) (quoting *Phillips v. WellPoint Inc.*, 2012 WL 6111405, at *9 (S.D. Ill. Dec. 10, 2012)). Under direct

participant liability, "a parent company may be liable for the alleged wrong of its subsidiary when the 'alleged wrong can seemingly be traced to the parent through the conduct of its own personnel and management.'" *Norvax*, 795 F.3d at 651. A wrong can be so traced when a "parent company specifically directs an activity, where injury is foreseeable . . . . Similarly, if a parent company mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken, it can be liable for foreseeable injuries." *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290, 864 N.E.2d 227, 237 (2007).

Applying direct participant liability can be tricky because one must distinguish a parent company's inappropriate meddling from actions "consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures." *Bestfoods*, 524 U.S. at 72 (quotation omitted). Such general oversight "should not give rise to direct liability." *Id*. Similarly, "allegations of mere budgetary mismanagement alone do not give rise to the application of direct participant liability." *Forsythe*, 864 N.E.2d at 237. The critical question, then, is whether the actions directed by the parent company "are eccentric under accepted norms of parental oversight." *Id*.

The caselaw is helpful for determining what constitutes "eccentric" oversight. In *Forsythe*, the Illinois Supreme Court adopted a direct participant theory of parent company liability for the first time. *Id.* at 232. The case arose from a fire that broke out in a refinery, killing two mechanics on their lunchbreak. *Id.* at 231. Their estates

sued Clark Refining, which owned the refinery, as well as Clark USA, which was the parent company and sole shareholder of Clark Refining. *Id.* The plaintiffs argued that Clark USA had violated its duty of care by requiring the refinery to unsafely minimize operating costs and capital investments. *Id.* They further alleged that the "defendant's strategy of capital cutbacks forced Clark Refining to have unqualified employees act as maintenance mechanics which, in turn, led to the fire that killed the decedents." *Id.*

The court agreed in principle with the plaintiffs, holding that "budgetary mismanagement, accompanied by the parent's negligent direction or authorization of the manner in which the subsidiary accomplishes that budget, can lead to a valid cause of action under the direct participant theory of liability." *Id.* at 237. Applying the law to the facts, the Court stated that in so far as Clark USA "directed or authorized the manner in which the budget cuts at issue were taken, knowing that safety at the Blue Island refinery would be compromised, and did so superseding the discretion and interest of Clark Refining, direct participant liability could attach." *Id.* at 240. The case was remanded to determine whether the officer who had ordered the cuts had been an agent of the parent or subsidiary. *Id.*

The allegations in this case are strikingly similar. Golbert claims that Signature squeezed profits from Lakeshore by unsafely cutting costs, similar to how Clark USA put the refinery on budgetary "survival mode." *Id.* at 233. Golbert makes specific allegations as to where corners were cut, emphasizing the refusal to approve working cameras, unsafe limits on the number of staff, and insufficient vetting and training

of employees. Dkt. 135 ¶¶ 54-57. The plaintiffs in *Forsythe* similarly alleged that the parent company's tight budget led to insufficient investment in safety features and the employment of unqualified people in critical roles. 864 N.E.2d at 231. In both cases, these decisions foreseeably created unsafe conditions. *Id.*; Dkt. 135 ¶¶ 54-57. Signature's alleged actions thus extend beyond mere "supervision of the subsidiary's finance and capital budget decisions" to direct control which predictably lead to the plaintiffs' harms. As pled, Signature is just the sort of parent company that direct participant liability is intended to address.

The institutional defendants raise several objections. They argue that Signature refusing to install video cameras is irrelevant because parent companies cannot be held liable for supervising a subsidiary's finances. *See Bestfoods*, 524 U.S. at 72. But "supervision of finances" is not a blanket protection for parent companies. Signature directing cuts or preventing spending *knowing that it would compromise the safety* of Lakeshore is a basis for liability. *Forsythe*, 864 N.E.2d at 237. The defendants next claim that Golbert failed to allege that the plaintiffs' injuries were foreseeable consequences of Signature's actions. But the Complaint clearly states that Signature knew that its actions created "extreme safety risks for patients at the hospital, including Plaintiffs." Dkt. 135 ¶ 55. The defendants also argue that Golbert's claim that Signature required Lakeshore to operate with insufficient staff and training is speculation. It is speculative, they say, because he did not detail how Signature "required" insufficient staff. But reading the whole Complaint sensibly, it alleges that Signature required insufficient staff by refusing Lakeshore the funds needed to

properly staff the hospital. This is plausible on its face, and a plaintiff need not plead "detailed factual allegations" to survive a motion to dismiss. *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016).

Finally, the defendants attempt to distinguish *Forsythe* from the instant case. They note that the Illinois Supreme Court did not actually find Clark USA liable, instead remanding the question to the lower courts. The opinion, however, is clear that the allegations against Clark USA are enough to state a claim. The court remanded to resolve a factual question—what "hat" an employee who worked for both the parent and the subsidiary was wearing when he made certain budgetary decisions. Here, the Complaint unambiguously alleges that Signature made the relevant decisions. Consequently, Golbert has adequately alleged the company's direct participant liability.

**B. Lakeshore and Signature Are State Actors**

Ordinarily, private actors such as Lakeshore and Signature cannot be held liable for constitutional violations under § 1983. *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). There is an exception, however, when a private party engages in "state action." *Id*. To find state action, there must be a "close nexus between the State and the challenged action" such that the challenged action "may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). The Supreme Court has recognized several different ways in which private action may become state action. These include when the action is a result of a conspiracy between the state and private party to deprive

individuals of their constitutional rights; when the state practically controls or directs the private entity; and when the state has delegated a public function to the private entity. *Hallinan*, 570 F.3d at 815-16 (gathering Supreme Court cases). At the same time, the Court is aware that these examples "do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Id.* at 816. Indeed, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, (2001).

In this case, the analysis turns on whether Lakeshore was performing a "public function" by treating the children in DCFS custody. To make this determination, we ask "whether the function performed has been 'traditionally the *exclusive* prerogative of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (quoting *Jackson*, 419 U.S. at 353). The institutional defendants argue that Lakeshore did not perform a function that was traditionally exclusive to Illinois. In support, they point to precedent from this district stating that "it is not the exclusive function of the State to care for and protect minors who are adjudicated to be abused and neglected by their natural parents." *Letisha A. by Murphy v. Morgan*, 855 F. Supp. 943, 949 (N.D. Ill. 1994).

The defendants, however, misstate the "function" that Lakeshore allegedly undertook. The relevant issue here is not whether protecting abused minors is an exclusive state function, but whether providing medical care to children already in

DCFS custody is a traditionally exclusive state function. We have found no case directly addressing this question, but our precedent in *Woods v. Maryville Academy* strongly suggests that it would qualify. No. 17 C 8273, 2018 WL 6045219 (N.D. Ill. Nov. 19, 2018). In that case, which found a residential facility that abused DCFS children to be a state actor, the court emphasized DCFS's responsibility for children in its custody, writing that "if a state has a duty to the children in its custody, that duty cannot be avoided by substituting private for public custodians." *Id.* at *7. DCFS's duty to ensure its children's safety means that a "private institution should not be able to avoid the underlying duty to protect and care for the children in its care and custody." *Id.* In effect, "the [defendants] fulfilled the State's duty to care for the children in its custody. That is what makes them state actors." *Id.* at *8. Here too, Lakeshore was fulfilling the State's duty to provide care for its children.

Lakeshore's status as a state actor is reinforced by considering the closely analogous case of medical care provided to state prisoners. In *Rodriguez v. Plymouth Ambulance Serv.*, the Seventh Circuit found that a hospital that treated an inmate over the course of several days was fulfilling an exclusive state function and so could be sued as a state actor. 577 F.3d 816 (7th Cir. 2009). In its analysis, the court contrasted care that was "incidental and transitory," such as treating an ambulance arrival in need of emergency care, with that arising from an ongoing, contractual relationship. In only the latter case are a hospital and its employees "undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation." *Id.* at 827. The Seventh Circuit found the defendant hospital participated

in an exclusive state function, and so was a state actor, when it treated a prisoner over the course of several days as part of an ongoing relationship between it and the prison. *Id.* at 831.

In this case, Golbert has alleged that DCFS's children made up a substantial proportion of Lakeshore's child patients during the relevant time. Dkt. 135 ¶ 63. Hospitals were free not to treat DCFS children, and many chose not to. *Id.* at ¶ 49. Lakeshore, directed and controlled by Signature, actively sought out DCFS children and continued their hospitalizations for extended periods. *Id.* at ¶ 62. Plaintiffs have alleged that the defendants' treatment of them "was tied to the state's responsibility for [their] overall medical care."

The institutional defendants argue that their relationship with the children was "incidental and transitory" under *Rodriguez*. But, as noted, in *Rodriguez* the "incidental" treatment was one where an ambulance arrived, unsolicited, at a hospital and the hospital provided emergency treatment and transferred the patient within an hour. *Id.* at 831. This was contrasted with the situation where the same prisoner was transferred to another hospital that had a contractual relationship to provide care to prisoners and treated for several days. *Id*. Here, Lakeshore, and by extension Signature¸ took on a traditionally exclusive state function in their treatment of the DCFS children.[2] As pled, they are state actors potentially liable under § 1983.

[2] The defendants argue that Signature cannot be a state actor under *Rodriguez* because the Seventh Circuit held that the "private provider must have a direct, not an attenuated, relationship with" the patient. 577 F.3d at 828. The opinion's discussion of attenuation, however, was in reference to the provider's relationship with the state. Merely advising a state agency on how to care for an individual

### C. The Plaintiffs State a *Monell* Claim

We now turn to the claims themselves. Counts Five and Six of the Complaint allege that Lakeshore and Signature are liable under a *Monell* § 1983 claim.[3] In *Monell v. Department of Social Services of the City of New York*, the Supreme Court held that a state agency cannot be held liable for constitutional violations under § 1983 "solely because it employs a tortfeasor." 436 U.S. 658, 691 (1978). Instead, the plaintiff must show that the harm was the result of "action pursuant to official municipal policy." *Id.* at 690. This policy "must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)). The Seventh Circuit has held that this protection applies with equal force to private companies when they take on the role of state actors. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

The Circuit has identified three ways a plaintiff may demonstrate the existence of an "official municipal policy:" "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or (3) through

---

was not enough to bestow state actor status, but directly treating the individual was. *See id*. Here, Lakeshore had a direct relationship with the plaintiffs and, as determined in the previous section, as pled Signature is liable for Lakeshore's actions. Signature is thus potentially liable as a state actor.

[3] In their Motion to Dismiss, the institutional defendants have also requested the dismissal of Counts One through Four, Eleven, and Fourteen as to them. Plaintiffs respond that they have not asserted these claims against Signature or Lakeshore. These counts are dismissed without prejudice against Lakeshore and Signature.

an allegation that the constitutional injury was caused by a person with 'final decision policymaking authority.'" *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

In the present case, Golbert lists a series of express policies authorized by the leadership of Lakeshore and Signature that caused the alleged constitutional harm. Dkt. 135 ¶¶ 160-61, 165-66. These include not properly monitoring patients at the hospital; not conducting proper investigations into a patient allegations of abuse; not making the expenditures necessary to ensure patient safety; and not properly screening, training, and supervising staff. *Id.* Once the existence of an official policy has been established, "one application of the offensive policy resulting in a constitutional violation is sufficient to establish . . . liability." *Calhoun*, 408 F.3d at 379-80. Read as a whole, the Complaint describes several instances where plaintiffs' harm resulted from these alleged policies. The violations include a sexual assault by an employee that was covered up by Lakeshore management; an assault by another patient who was inadequately monitored; and sexual harassment by an employee with a criminal record who had not been properly screened before hiring. Dkt. 135 ¶¶ 78, 86, 71. The Complaint also suggests that these policies were longstanding—citing a 2011 University of Illinois at Chicago review that found sexual abuse at Lakeshore arising from improper training and supervision of staff, *Id.* at ¶ 119—and that daily meetings informed the leadership of the harms caused by their policies. *Id.* at ¶ 98.

The institutional defendants argue that Golbert has failed to state a *Monell* claim. They claim that he failed to show causation, arguing he has not established that the policies were a "moving force" behind the harms suffered. But the Complaint states that these policies were direct causes of the harm, *Id.* at ¶¶ 163, 168 and, as discussed, reading the Complaint as a whole reveals several situations where the harm would not have occurred but for the policies. The defendants next argue that the policies are not described with sufficient detail. The failure to train policy, for example, must fail because Golbert does not allege who was improperly trained, in what ways, and how it lead to the plaintiffs' harm. But, again, that reads the Complaint too narrowly. The factual allegations contain numerous instances of employees acting inappropriately and subsequently receiving no or little discipline. The specific factual allegations, coupled with the counts' clear description of the policy, effectively puts the defendants on notice as to the policy alleged and how it relates to the plaintiffs' harm.

The defendants' objections to the alleged policies of not conducting background checks and not providing timely medical examinations to victims of abuse similarly fail. They argue that the Complaint fails to state a claim because it only identified one instance each where these policies resulted in harm, and one instance is insufficient to prove a widespread policy or practice. *See Taylor v. Wexford Health Sources, Inc.*, No. 15 C 5190, 2016 WL 3227310, at *4 (N.D. Ill. June 13, 2016). But the plaintiffs here have not made a "wide-spread practice" argument. Instead, they claim there was an express policy to not conduct background checks or provide

timely examinations. An express policy, if proven, need only be applied once for liability to attach. *See Calhoun*, 408 F.3d at 379-80.

Finally, the defendants argue that it is inappropriate to use the actions of employees alone to infer the existence of the alleged policies because doing so functionally holds the employer liable for its employees' actions, which is prohibited by *Monell*. For support they cite *Nowack v. Warner*, which describes the all too common scenario of a victim of police misconduct attempting to allege a *Monell* claim based on generalizing his experience. 169 F. Supp. 3d 811, 814 (N.D. Ill. 2015). Such claims usually fail because the "complaint's factual allegations do not support" the existence of the alleged policy, and so the claim relies entirely on the harm suffered by the plaintiff for plausibility. *Id.*

But in this case, the Complaint's factual allegations tell a coherent and plausible story independent of the plaintiffs' experience—financial pressure leads Signature to severely underfund Lakeshore, resulting in both companies adopting policies to save money, such as inadequately investing in safety equipment and personnel, that predictably lead to widespread constitutional violations. Under this account, the policies are not inferred solely from the harm suffered by the plaintiffs, they also arise from the institutional narrative that is central to the Complaint. This institutional narrative is bolstered by the allegation that previous investigations of Lakeshore found similar policies.[4] Whether the existence of such policies can be

[4] The institutional defendants argue that Golbert cannot use a third-party report to support a *Monell* claim. But in the in-district cases cited, the plaintiff either cited a report that was so old as to not be useful or failed to draw a connection between the report's conclusions and the complaint's allegations. *See Jones v. Barber*, No. 17-CV-07879, 2020 WL 1433811, at *7 (N.D. Ill. Mar. 24, 2020); *Carmona v.*

proved is a question for another day, but the Complaint's claim is sufficient to survive a motion to dismiss.

**D. The Plaintiffs Have Stated a Negligence Claim**

We next consider Counts Seven and Eight of the Complaint, which bring negligence claims against Lakeshore and Signature. To state a claim for negligence under Illinois law, a "plaintiff must establish that the defendant owed a duty of care, a breach of that duty, and an injury proximately caused by the breach." *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 421, 592 N.E.2d 1098, 1100 (1992). The parties do not disagree that Lakeshore owed a duty of care to the plaintiffs. But the defendants argue that Golbert did not show a breach of that duty or injury resulting.

The complaint lists eighteen ways in which Lakeshore allegedly breached its duty to the defendants. Dkt. 135 ¶ 174. If injury proximately arose from any one of these breaches, Golbert has stated a negligence claim. The first alleged breach was a failure "to monitor and supervise Plaintiffs to ensure they were safe and not being physically abused." *Id.* at ¶ 174(a). The Complaint's factual allegations describes how Lakeshore failed to invest sufficiently in staff and technology to ensure the safety of its patients. *See id.* at ¶¶ 55-56. The Complaint also provides several examples of plaintiffs being isolated and then abused by staff or other patients, abuse that likely would not have

---

*City of Chicago*, No. 15-CV-462, 2018 WL 306664, at *3 (N.D. Ill. Jan. 5, 2018). Golbert's citation to a 2011 report that specifically found sexual abuse at Lakeshore due to policies of inadequate employee training and supervision suffers neither of these failings. Barring such specific shortcomings, plaintiffs may support *Monell* allegations by referencing third-party reports. *See, e.g.*, *Shields v. City of Chicago*, No. 17 C 6689, 2018 WL 1138553, at *4 (N.D. Ill. Mar. 2, 2018).

occurred if Lakeshore more effectively monitored the plaintiffs. *See id.* at ¶¶ 77, 86. Similar exegeses can be supplied for several other, if not all, of the breaches alleged.

The defendants respond by arguing that several of the alleged breaches of duty cannot be traced to a harm. But whether or not every breach states a full claim, it is clear that at least several of them do. One breach of duty proximately causing harm is sufficient to state a claim and survive a motion to dismiss. The defendants also argue that Complaint is too vague because it states that Lakeshore acted through unnamed "agents and employees." *Id.* at ¶ 174. But the Complaint does, in fact, name specific executives and employees who Lakeshore acted through. *See, e.g.*, *id.* at ¶ 98. "Detailed factual allegations" tying specific individuals to each alleged negligent act by Lakeshore are not required at the pleading stage—the Complaint provides enough information to put the defendants on notice. *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016).

Turning to Signature, the defendants argue that Signature cannot be held liable in negligence because the it did not owe a duty to the plaintiffs and it cannot be held liable for the actions of Lakeshore. But the Court held earlier in this opinion that Signature was liable for Lakeshore's actions under a theory of direct participant liability. Counts Seven and Eight survive the Motion to Dismiss.

### E. The Complaint States Negligent Hiring and Retention and Negligent Training Claims

Counts Nine and Ten bring negligent hiring and retention and negligent training claims against Lakeshore and Signature. We consider the two claims in turn.

Under Illinois law, an employer may be held liable "for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons." *Van Horne v. Muller*, 185 Ill. 2d 299, 310, 705 N.E.2d 898, 904 (1998). To establish a claim for negligent hiring or retention, the plaintiff must show:

> (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury.

*Id.* Importantly, "[t]o successfully plead a cause of action for negligent hiring or retention, it is not enough for the plaintiff to simply allege that the employee was generally unfit for employment." *Id.* at 905. Rather, "[t]he particular unfitness of the employee must have rendered the plaintiff's injury foreseeable to a person of ordinary prudence in the employer's position." *Id.* at 906. For example, knowing that an employee was "vicious and dangerous" might make his assault of a customer foreseeable. *Young v. Lemons*, 266 Ill. App. 3d 49, 50, 639 N.E.2d 610, 611 (1994).

Here, individual defendants Elisabeth Schei and Richar Kasyoki provide the most persuasive examples of Golbert's negligent hiring and retention claim. Golbert alleges that Schei had a long criminal record that rendered her clearly unfit to work as a nurse for children. Dkt. 135 ¶ 71. Lakeshore did not conduct a proper background check and so she was hired. *Id.* Schei then repeatedly sexually assaulted the plaintiff Trinity B. *Id.* at ¶ 71.

Lakeshore should have been aware of Schei's unfitness when she was hired. In *Doe v. Coe*, the Illinois Supreme Court held that a church's failure to conduct a background check before hiring a youth minister satisfied the "should have known" requirement of a negligent hiring claim. 2019 IL 123521, ¶ 45, 135 N.E.3d 1, 14. A children's hospital surely has an at least comparable duty to screen its employees. And, once discovered, a long criminal history would put a reasonable person on notice that an employee might use a position of authority to abuse vulnerable children. The defendants say that Schei's criminal record is not pled with sufficient specificity because the Complaint only specifically identifies one charge from 2019. But the existence of a "lengthy criminal history" is a concrete factual allegation in itself—the Complaint is not required to individual identify the underlying arrests and convictions.

Meanwhile, Kasyoki's case is an example of negligent retention. Golbert alleges that he sexually harassed the plaintiffs Jymesha S. and Jadiene T. Dkt. 135 ¶ 79. Another employee witnessed Kasyoki's harassment of Jymesha S., and Jadiene T. reported Kasyoki's misconduct towards her. *Id.* at ¶¶ 81, 83. As a result, Lakeshore should have been aware that Kasyoki was not fit to supervise vulnerable children. Lakeshore nevertheless retained Kasyoki and he subsequently sexually assaulted Jymesha S. *Id.* at ¶ 77.

We now turn to the negligent training claim. Illinois law holds that a "claim for negligent training is 'best analyzed under principles generally applicable to negligence cases.'" *Nat'l R.R. Passenger Corp. v. Terracon Consultants, Inc.*, 2014 IL

App (5th) 130257, ¶ 15, 13 N.E.3d 834, 839 (quoting *Vancura v. Katris*, 238 Ill. 2d 352, 383, 939 N.E.2d 328, 347 (2010)). In other words, duty, breach, and causation. *Id*. The parties do not disagree that Lakeshore owed a duty to the plaintiffs to properly train its employees. Rather, the defendants allege that the Complaint does not provide enough factual detail as to how the employees were insufficiently trained and how the plaintiffs were harmed as a result.

But the Complaint alleges that Signature limited the funds available to Lakeshore, with the result that the Hospital hired subpar staff and then failed to train them properly. Dkt. 135 ¶ 57. What is more, Lakeshore allegedly had a policy of not properly investigating and punishing abuse, which presumably undermined any formal training employees received on proper conduct. *Id.* at ¶ 174. Drawing reasonable inferences in the plaintiffs' favor, the Complaint suggests that this failure to create an institutional culture of accountability allowed widespread abuse to take place, resulting in the harm and cover-ups described in the Complaint. While the Complaint does not identify specific training programs that were inadequate or needed, such detailed pleading is not required.

Finally, as with the previous count, Signature is liable for Lakeshore's actions in this context through direct participant liability. Counts Nine and Ten state claims for negligent hiring and retention and negligent training.

**F. The Complaint States an Institutional Negligence Claim**

The institutional defendants next raise three objections to Counts Twelve and Thirteen, which allege institutional negligence. First, they contend that the counts

are duplicative of the negligence counts, Eight and Nine, previously discussed in this opinion. The Court disagrees. In Counts Eight and Nine, Lakeshore's liability arose through its employees. Institutional negligence, on the other hand, arises from the violation of the hospital's own duty to care. *See Longnecker v. Loyola Univ. Med. Ctr.*, 383 Ill. App. 3d 874, 885, 891 N.E.2d 954, 963 (2008) (holding that "a hospital may face liability under two separate and distinct theories: (1) vicarious liability for the medical negligence of its agents or employees; and (2) liability for its own institutional negligence.")

While courts in the Northern District have held that they may dismiss duplicative counts, their application has generally been limited to a narrow set of state law claims that state courts have previously held to be duplicative, primarily negligence or breach of contract claims brought in tandem with breach of fiduciary duty claims. *See, e.g.*, *F.D.I.C. v. Saphir*, No. 10 C 7009, 2011 WL 3876918, at *9 (N.D. Ill. Sept. 1, 2011) (citing *Beringer* in support of dismissal of duplicative negligence and fiduciary duty claims); *Beringer v. Standard Parking O'HARE Joint Venture*, No. 07C5027, 2008 WL 4890501, at *4 (N.D. Ill. Nov. 12, 2008) (citing a state court case in support of the same); *DeGeer v. Gillis*, 707 F. Supp. 2d 784, 795 (N.D. Ill. 2010) (collecting examples of breach of contract and fiduciary duty counts being dismissed as duplicative). The defendants have not cited, and the Court has not found, a state court case dismissing an institutional negligence claim as duplicative. *See Lenahan v. Univ. of Chicago*, 348 Ill. App. 3d 155, 162, 808 N.E.2d 1078, 1084 (2004) (holding that a negligence and institutional negligence claim were not duplicative of each other).

Given that the institutional negligence claim is not duplicative, dismissal would be inappropriate.

The defendants next argue that the institutional negligence count should be dismissed because such claims must be accompanied by a certificate signed by a physician stating the claim is meritorious, as described in 735 ILCS § 5/2-622. Golbert has supplied no such certificate in this case. However, while an institutional negligence claim brought in state court may need a certificate, the requirement only arises when the plaintiff alleges "medical malpractice." *Ortiz v. United States*, No. 13 C 7626, 2014 WL 642426, at *2 (N.D. Ill. Feb. 19, 2014). In this case, there is no allegation of medical malpractice. Instead, the plaintiffs' harm arose from the defendants' failure to keep them safe from physical and sexual abuse unrelated to their treatment. What is more, even if a certificate were required in state court, the Seventh Circuit has concluded "that a complaint in federal court cannot properly be dismissed because it lacks an affidavit and report under § 5/2-622" because the requirement is a procedural one not binding on federal courts. *Young v. United States*, 942 F.3d 349, 351 (7th Cir. 2019), cert. denied, 141 S. Ct. 295, 208 L. Ed. 2d 49 (2020).

Finally, the defendants allege that Signature cannot be held liable for institutional negligence because it is a parent company. But, as discussed, Signature is liable for Lakeshore's actions through direct participant liability. Counts Twelve and Thirteen state a claim.

### G. The Complaint States a Claim for *Respondeat Superior* Liability

The last two counts of the Complaint, Counts Fifteen and Sixteen, claim that Lakeshore and Signature should be liable for the torts of their employees under the theory of *respondeat superior*. "Under the theory of *respondeat superior*, an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment." *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163, 862 N.E.2d 985, 991 (2007). The Complaint alleges two categories of state law torts committed by the institutional defendants' employees and asserts that they were committed within the employees' scope of employment. Dkt. 135 ¶¶ 221, 224.

The *respondeat superior* count is not duplicative of the other claims discussed in this opinion. Illinois law distinguishes between *respondeat superior*, which imputes liability vicariously, and claims of negligent hiring and training, which hold the institution directly liable. *Doe v. Coe*, 2019 IL 123521, ¶ 33, 135 N.E.3d 1, 12. A complaint may proceed with both counts. *Id.* The defendants cite *Gant v. L.U. Transp.*, which dismissed a vicarious liability claim, to argue that the claims are duplicative. 331 Ill. App. 3d 924, 928, 770 N.E.2d 1155, 1159 (2002). But that claim was dismissed only because the defendant conceded the negligent hiring claim, something the defendants in this case have not done. *Id.*

Furthermore, despite the defendant's arguments to the contrary, Signature may be liable on this count under the direct liability theory. Direct participant liability applies when a "parent company specifically directs an activity, where injury is foreseeable." *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290, 864 N.E.2d 227, 237

(2007). This district has already applied the principle to *respondeat superior* claims. *See Rumick v. Liberty Mut. Ins. Co.*, No. 17 C 2403, 2018 WL 3740645, at *4 (N.D. Ill. Aug. 6, 2018). Signature allegedly directed Lakeshore to limit oversight and safety features at the hospital, foreseeably leading to employees committing the torts described. In so far as a claim is stated against Lakeshore, it applies to Signature as well.

Of course, the defendants also contend that a claim has not been stated against Lakeshore. First, they argue that the Complaint fails to state any claim against the Lakeshore employees, and so there is no underlying tort for which Lakeshore may be liable. *Respondeat superior* cannot create liability under § 1983, and so the Complaint must state an Illinois law claim against an employee to survive this objection. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). In opinions issued concurrently with this one, this Court has held that Complaint states claims for intentional infliction of emotional distress and conspiracy against several individual defendants employed by Lakeshore.

The defendants then argue that these torts do not fall within the scope of the employee's employment. "Because scope of employment is a fact-intensive issue, Illinois courts have held that it is generally inappropriate to resolve this issue at the motion to dismiss or summary judgment stage." *Doe v. Clavijo*, 72 F. Supp. 3d 910, 914 (N.D. Ill. 2014). A servant's conduct is within the scope if: "'(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master.'"

*Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 164, 862 N.E.2d 985, 992 (2007) (quoting Restatement (Second) of Agency § 228 (1958)). Illinois courts have held that "sexual assault *by its very nature* precludes a conclusion that it occurred within the employee's scope of employment." *Doe ex rel. Doe v. Lawrence Hall Youth Servs.*, 2012 IL App (1st) 103758, ¶ 30, 966 N.E.2d 52, 62. The plaintiffs thus may not be able to sustain vicarious liability claim based on intentional infliction of emotional distress arising from sexual assaults that took place at Lakeshore.

However, Golbert has also stated a conspiracy claim. To pick one example, he has alleged that defendants Richard Kasyoki and Nickolay Katsarov conspired to hide evidence of Kasyoki's sexual assault of Jymesha S. Dkt. 135 ¶ 78. The Complaint also plausibly alleges that Lakeshore hid evidence of ongoing abuse so that the hospital could continue to benefit from government patronage. *Id.* at ¶ 102. In this reading, covering up abuse was part of the employees' responsibilities and had at least the partial purpose of benefiting Lakeshore. The fact that the employees also acted out of self-interest and that the misconduct eventually resulted in the termination of Lakeshore's government contracts does not undermine this view. At the motion to dismiss stage, this is enough to show that the torts committed were within the scope of employment. The Complaint has alleged plausible state law torts against employees of Lakeshore within the scope of their employment, and so states a *respondeat superior* claim against Lakeshore and Signature.

## IV. Conclusion

For the stated reasons, the Lakeshore and Signature's Motion to Dismiss [160] is denied.

E N T E R:

Dated: March 11, 2021

MARY M. ROWLAND
United States District Judge