IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES GOLBERT, Cook County Public Guardian, on behalf of Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., <br><br> Plaintiffs, <br><br> v. <br><br> AURORA CHICAGO LAKESHORE HOSPITAL, LLC, *et al.*, <br><br> Defendants. | Case No. 19-cv-08257 <br><br> Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Golbert, acting on behalf of minors Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., brings this action against the Defendants alleging federal and state law violations arising from the children's time at Chicago Lakeshore Hospital. The defendants affiliated with the Illinois Department of Children and Family Services (DCFS) move to dismiss the Amended Complaint for failing to state a claim. For reasons stated herein, the DCFS defendants' Motion to Dismiss [163] is granted as to Count Two and denied as to all other counts.

**I.   Background**

The following factual allegations are taken from the Amended Complaint (Dkt. 135) and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

1

### A. The Lakeshore Allegations

Charles Golbert brings this suit against Aurora Chicago Lakeshore Hospital, Lakeshore's parent company Signature, several employees and executives of Lakeshore, and several officers and employees of DCFS, in their personal capacity. Golbert is the Cook County Public Guardian. Appointed by the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court, he represents children who are subjects of abuse, neglect, and dependency petitions filed in the juvenile court. Dkt. 135 ¶ 11. In this case, he represents seven children who were in DCFS custody and were involuntarily placed in the Chicago Lakeshore Hospital between 2017 and 2018. *Id.* at ¶¶ 12-18, 66.

Chicago Lakeshore Hospital is an Illinois limited liability company located in Chicago, where it also operates a "Children's Pavilion." *Id.* at ¶ 19. Lakeshore is in turn owned by Signature, a Michigan limited liability company. *Id.* Along with Lakeshore and Signature, Golbert lists ten other executives and employees of Lakeshore as defendants. *Id.* at ¶¶ 23, 31-39. He also brings suit against nine officials and employees of DCFS, the Illinois agency responsible for the care of children dependent on the state. *Id.* at ¶¶ 21-22, 24-29, 30, 40.

Golbert's allegations arise from the plaintiffs' treatment while at Lakeshore's children's hospital. DCFS is required to house children in the least restrictive setting that is in the child's best interest. *Id.* at ¶ 41. As part of this care, children sometimes needed inpatient care at a psychiatric hospital. *Id.* at ¶ 42. Due to budget constraints,

2

DCFS had developed a bad reputation among Chicago-area hospitals for keeping children in inpatient care for longer than medically beneficial and failing to promptly pay hospitals for care provided. *Id.* at ¶ 47-48. As a result, most psychiatric hospitals were hesitant to admit children in the care of DCFS. *Id.* at ¶ 49.

The one exception was Lakeshore. Due to its own financial pressures, it readily accepted children in the care of DCFS. *Id.* at ¶ 62. As a result of Lakeshore's limited funds and aggressive management by Signature, its children's psychiatric hospital lacked the proper facilities and staff to safely operate. *Id.* at ¶¶ 51-58. Lakeshore had a history of allegations of inadequate or dangerous care, including a 2011 report by the Mental Health Policy Program of the University of Illinois at Chicago finding patterns of sexual abuse. *Id.* at ¶¶ 119, 121. DCFS, however, was dependent on Lakeshore because it was one of the few hospitals that would accept its children. *Id.* at ¶ 64. As a result, DCFS wanted to ensure that Lakeshore remained in business even if it did not provide adequate care. *Id.*

During their stay at Lakeshore, the plaintiffs were subjected to serious sexual, physical, and emotional abuse. *Id.* at ¶ 67. DCFS was aware of serious complaints against Lakeshore and worked to bury and discredit the allegations. *Id.* at ¶ 104. The situation only changed in 2018 when the federal Department of Health and Human Services surveyed Lakeshore to evaluate its compliance with Medicare regulations. *Id.* at ¶ 114. The surveys found that Lakeshore's administration of the children's hospital violated federal regulations and endangered patient health and safety. *Id.* at ¶ 115. As a result, the Department terminated its provider agreement with the

3

hospital, cutting off federal funding. *Id.* at ¶ 125. DCFS removed all the children in its custody out of Lakeshore at around the same time. *Id.* at ¶ 125.

The abuse the children suffered at Lakeshore continues to cause them physical and emotional pain. *Id.* at ¶ 130. Golbert filed the instant lawsuit on December 18, 2019 to recover for the damage caused.

### B. The DCFS Defendants

The officers and employees of DCFS have jointly filed a motion to dismiss Golbert's Complaint as it applies to them. Golbert has brought suit against nine people affiliated with DCFS, all in their individual capacities. Beverly Walker was the acting director of DCFS from roughly June 26, 2017 to February 15, 2019. *Id.* at ¶ 21. George Sheldon, now represented by his estate, was the Department's director from February 2015 to June 25, 2017. *Id.* at ¶ 22. Neil Skene was Acting Director Walker's special assistant. *Id.* at ¶ 24. Michael Jones was the Senior Deputy Director for Clinical and Child Services. *Id.* at ¶ 25. In that role, he was responsible for helping to ensure that children in DCFS custody placed at institutions like Lakeshore were given safe and appropriate care. *Id.* Tierney Stutz was a DCFS Area Administrator who supervised DCFS's investigative staff and reviewed that group's investigations and conclusions. *Id.* at ¶ 26. Beverly Mims was a DCFS supervisor of child protection investigators, as was Marco Leandro and Denise Ellis. *Id.* at ¶¶ 27-29. Finally, Brooke Sloan was a DCFS child protection investigator. *Id.* at ¶ 30.

The Complaint alleges that the DCFS leadership, Walker, Sheldon, Skene, Jones, Stutz, Mims, and Leandro, knew about the sexual, physical, and emotional abuse

4

taking place at Lakeshore, and that they engaged in a cover-up to hide the allegations. *Id.* at ¶ 103. By whitewashing Lakeshore's failings, DCFS leadership sought to ensure that the hospital would remain open and continue accepting DCFS children. *Id.* They executed the cover-up by directing DCFS staff to conduct inadequate investigations of complaints brought to the Department against Lakeshore. *Id.*

In order to ensure their desired outcome, the DCFS defendants allegedly took several steps. These included reassigning numerous investigations, including ones where the investigator was planning to substantiate the allegations, to Sloan, who then determined the allegations were unfounded. *Id.* at ¶ 111. Walker, Sheldon, Skene, and Jones also instructed the DCFS supervisors and investigators, Stutz, Mims, Leandro, Ellis, and Sloan, to improperly treat the lack of video evidence as a factor against the abuse allegations. *Id.* at ¶ 107. This order validated Lakeshore and Signature's conscious decision to not fix malfunctioning surveillance cameras, allow video evidence to be destroyed, and refuse to provide corroborating videos when requested. *Id.* at ¶ 105-06. DCFS investigators and supervisors also improperly credited the denials of Lakeshore while largely ignoring the plaintiffs' consistent statements. *Id.* at ¶ 110. These and other investigative decisions were inconsistent with DCFS's rules and regulations. *Id.* at ¶ 108. Nevertheless, Walker and Sheldon approved of them because it allowed Lakeshore to remain open. *Id.* at ¶ 110. As a result of this sustained cover-up, DCFS's relationship with Lakeshore was extended

5

and the plaintiffs remained at or were committed to the hospital, exposing them to abuse.

## II. Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court

to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

**III. Analysis**

In their Motion to Dismiss, the DCFS defendants argue that they are immune from suit under several different theories and that Golbert has failed to state a claim against them.

**A. The Complaint Cannot Be Dismissed on Immunity Grounds**

*The suit is not barred by the Eleventh Amendment*

The DCFS defendants argue that they are immunized by the Eleventh Amendment. The Eleventh Amendment bars suits for damages against states in federal court. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). This prohibition extends to suits against public officials when sued in their official capacity, where a suit would recover from the government entity. *Id.* at 166.

When an official is sued in their personal capacity, on the other hand, the plaintiff seeks "to impose individual liability upon a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). When only the individual, not the state, is potentially liable, the Eleventh Amendment presents no obstacle to recovery. *Id.* at 30-31. The Eleventh Amendment does not prevent recovery even if the state indemnifies its employees, meaning that damages will ultimately be paid out of the state treasury. *Stoner v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 50 F.3d 481, 482 (7th Cir. 1995).

7

In this case, Golbert has sued all the DCFS defendants in their personal capacity. Should the defendants be found liable, they would be personally responsible for the damages awarded. As a result, the Eleventh Amendment does not bar Golbert's suit.

The defendants point out that a suit may, in reality, be against the state even though the complaint names the officials in their personal capacity. *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001). A suit is functionally against the state "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act" *Id.* (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101 n. 11 (1984).

Recovery in the instant case is sought against the individual defendants and, as noted, indemnification is not enough to transform the nature of the suit. Furthermore, the suit is for events that occurred between 2017 and 2018—it does not seek to enjoin any current or future action, but rather to recover for past harm. As a result, the real, substantial parties in this case are the individual DCFS defendants, not the State of Illinois.

*Dismissing on qualified immunity at this stage would be inappropriate*

Next, the defendants argue that the suit should be dismissed based on qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S.

8

800, 818 (1982)). A state official is protected by qualified immunity unless the plaintiff can show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Plaintiffs most commonly show that a right is clearly established by identifying a "closely analogous case" that had found an unlawful violation. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013).

At the motion to dismiss stage, the Court must also consider that "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). This is because "the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). While litigation should not be needlessly extended, when a case "would greatly benefit from a more robust record" and qualified immunity "depends on 'particular facts'" not yet established, declining to dismiss at the pleading stage is appropriate. *Reed v. Palmer*, 906 F.3d 540, 553 (7th Cir. 2018).

In the present case, Golbert contends that the plaintiffs had a constitutional right to safe conditions of confinement. Dkt. 135 ¶ 133. The Supreme Court has long recognized that involuntarily committed individuals have such a right. *See Youngberg v. Romeo*, 457 U.S. 307, 316 (1982). The DCFS defendants allegedly enacted a cover-up of Lakeshore's abuse, deliberately exposing the plaintiffs to the risk that they would "suffer physical and severe emotional harm and would preclude them from enjoying their right to reasonably safe conditions of confinement." Dkt. 135 ¶ 136.

9

Golbert plainly alleges the violation of a clearly established right, albeit at a general level.

While the Complaint puts the defendants on notice as to the allegations, it does not detail the actions of individual defendants with the specificity needed to productively compare with existing precedent. As a result, the Court cannot determine whether each defendant's actions had been "clearly established" as unlawful. Golbert need not provide such detail to survive a motion to dismiss. *See Jacobs*, 215 F.3d at 765 n.3. Consequently, whether the DCFS defendants are entitled to qualified immunity is a question that "would greatly benefit from a more robust record." Discovery will allow for more detailed, fact-driven analysis. *See Reed*, 906 F.3d at 553. Defendants' request to dismiss the Complaint on qualified immunity grounds at this stage is denied.

*Golbert's allegations are not barred by public official immunity*

The DCFS defendants finally argue that any state law claim is barred by the common law doctrine of public official immunity. The doctrine "dictates that public officials are immune from personal liability for their performance of discretionary duties." *Currie v. Lao*, 148 Ill. 2d 151, 166 (1992). For the immunity to apply, the state official's conduct must have been "discretionary, rather than ministerial, in nature." *Michigan Ave. Nat. Bank v. Cty. of Cook*, 191 Ill. 2d 493, 520 (2000). Even when discretionary, immunity does not extend to "acts based on corrupt or malicious motives or willful and wanton acts." *McKay v. Kusper*, 252 Ill. App. 3d 450, 460 (1993). Willful and wanton acts are adequately pled when the complaint alleges that "a

10

defendant committed acts with actual or deliberate intention to harm or with an utter indifference or conscious disregard for the safety of others." *Id.*

In Golbert's Complaint, he describes a conscious practice by the DCFS defendants to undermine investigations into Lakeshore. The leadership "knew about the sexual, physical and emotional abuse" of the plaintiffs and "facilitated it, approved it and condoned it by directing and/or allowing those they supervised to conduct improper and inadequate investigations into the abuse with the goal of not being able to substantiate the allegations." Dkt. 135 ¶ 103. All the DCFS defendants allegedly took conscious steps to accomplish this goal, including by reassigning investigations to Sloan in order to "ensure there was consistency in the way in which DCFS determined the allegations to be unfounded." *Id.* at ¶ 104. This conscious undermining of accountability, if substantiated, would clearly constitute "utter indifference or conscious disregard for the safety" of the vulnerable children at Lakeshore. As a result, even if their actions were discretionary, the DCFS defendants are not entitled to public official immunity at this stage.

### B. The Complaint Adequately Pleads the DCFS Defendants' Personal Involvement

Turning to the substance of the Complaint, the defendants argue that Golbert has not adequately pled their personal involvement in the constitutional violations. It is well established that "plaintiffs may not rely on 'vague references to a group of defendants'" when alleging responsibility for a harm. *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008)). Instead, a § 1983 complaint must include "'specific allegations tying the individual

11

defendants to the alleged unconstitutional conduct.'" *Id*. This is because "each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). The need for specificity means that, for example, a blanket accusation that a large number of "defendants looted the corporation" is not sufficient to state a claim. *Id*.

At the same time, a complaint need not individually describe the particular actions of each defendant. Instead, the complaint should be read "sensibly and as a whole" to determine whether there is "genuine uncertainty regarding who is responsible for what." *Engel*, 710 F.3d at 710. A complaint may allege that multiple defendants acted "jointly," so long as the accusation does not devolve into "vague references" of collective responsibility. *Id*.

Here, there is no genuine uncertainty. Golbert's Complaint alleges specific actions taken by DCFS leadership, by certain investigation supervisors, and by the investigator Sloan that violated the plaintiffs' constitutional rights. For example, Walker, Sheldon, Skene, and Jones, the leadership of DCFS, allegedly instructed DCFS staff to put improper weight on the absence of video evidence when conducting their investigations. Dkt. 135 ¶ 107. Meanwhile, Stutz, Mims, Leandro, Ellis, and Sloan, the DCFS supervisors and investigator, allegedly violated department rules and improperly discounted the consistent testimony of children at Lakeshore. *Id*. at ¶¶ 108, 110. While these allegations are not yet so developed as to allow for a

12

productive qualified immunity analysis, they are specific enough to put the defendants on notice.

In arguing that the Complaint fails to show personal involvement, the DCFS defendants analogize the instant case to *Woods v. Maryville Acad.*, No. 17 C 8273, 2018 WL 6045219 (N.D. Ill. Nov. 19, 2018). But *Woods* is not applicable in this regard. In that case, Woods was placed by DCFS in a residential facility with a history of child abuse and he was subsequently abused there. *Id.* at *1. Woods sued, among others, the director of DCFS for placing him at the facility. *Id.* at *4. However, his claim failed because he did not allege that the director had any involvement in Woods's placement. *Id.* Indeed, his role as director meant that it was unlikely that he would be aware of such relatively low-level decisions. *Id.* Golbert, in contrast, has alleged specific actions taken by all the defendants. And while the allegations must be proven, it is much more facially plausible that DCFS leadership would be taking actions related to an important healthcare partner rather than an individual child's placement. Golbert has sufficiently pled the DCFS defendants' personal involvement.

### C. The Complaint States a Claim for Violations of the Fourteenth Amendment

Count One alleges violations of the plaintiffs' right to safe conditions of confinement. The courts have long recognized that the Fourteenth Amendment guarantees involuntarily-committed individuals a right to safe conditions of confinement. *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). The parties disagree as to the appropriate standard for evaluating a safe-conditions claim. The plaintiffs argue that the "professional judgment" standard applies here. If it does, liability

13

would be imposed if the DCFS defendants' actions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. The defendants, meanwhile, argue that "whether such a professional judgment was exercised is not the threshold determination." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003). Instead, liability turns on whether the defendants had actual "[k]nowledge or suspicion" that the children were at risk of abuse. *Id.* The Court need not choose between these tests now because, under either standard, Golbert's first count survives the Motion to Dismiss.

As discussed in the previous sections, Golbert alleges that the DCFS defendants consciously engaged in a cover-up of Lakeshore's history of abuse. Golbert states that the DCFS defendants were actually aware of the sexual, physical, and emotional abuse taking place at the hospital and purposefully buried the evidence, resulting in the plaintiffs' abuse at Lakeshore. Dkt. 135 ¶ 103. He also claims that the DCFS supervisors and investigators intentionally disobeyed department regulations in order to exonerate Lakeshore. *Id.* at § 108. As alleged, these actions were done with actual knowledge of the ongoing abuse and were clearly not the product of professional judgment.

The defendants emphasize that none of the DCFS defendants personally placed the plaintiffs in the hospital. But while this is true, it is also irrelevant. By undermining the investigations, the defendants ensured that the plaintiffs would

14

remain at Lakeshore, directly violating their right to safe conditions. Dismissal at this stage is inappropriate.

### D. Count Two Fails to State an Access-to-Court Claim

Golbert's next claim is that the DCFS defendants violated the plaintiffs' constitutional right to access the courts. A backward-looking access claim may arise "'where a plaintiff alleges an underlying claim cannot be tried, or be tried with all the evidence, because official conduct caused the loss or inadequate resolution of that claim.'" *Harer v. Casey*, 962 F.3d 299, 308 (7th Cir. 2020) (quoting *Lynch v. Barrett*, 703 F.3d 1153, 1157 (10th Cir. 2013)). In order "[t]o determine whether a plaintiff has meaningful and effective access to court, we require the plaintiff to identify: (1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement." *Id*. The third prong is particularly problematic when plaintiffs bring an access-to-court claim based on lack of evidence alongside underlying claims. This is because it is "just too early to say" whether remedy is not otherwise available. *Id*. at 309 (quotation omitted). For this reason, "an access-to-court claim ordinarily may not proceed at the same time and in the same case as a timely-filed underlying claim." *Id*.

In *Harer*, a couple alleged that their daughter's murder by a police officer had been covered up by the police department. *Id*. at 302. As a result of the cover-up, evidence that would have been helpful in a lawsuit against the police officer and department was not available. *Id*. at 308. The couple sued the officer and department for claims

including wrongful death, intentional infliction of emotional distress, and denial of access to the court. *Id.* at 305. The Seventh Circuit dismissed the parents' access-to-court claim because "their underlying tort claims [were] timely, facially plausible, and still pending." *Id.* at 310. So long as "the ultimate resolution of their wrongful death case in doubt, the Harers' access-to-court claim is not ripe for judicial review." *Id.* at 310-11. With the underlying claims still pending, the court could not "determine whether the police cover-up thwarted the effectiveness of any potential remedies." *Id.* at 311.

Golbert argues that the plaintiffs have been denied access to the court because of actions taken by the DCFS defendants to destroy or prevent the creation of video evidence of abuse at Lakeshore. *Harer* is analogous to the instant case. Here too, Golbert has "timely, facially plausible" claims for relief pending before the Court, despite the lack of video evidence. As a result, he cannot show that no remedy is otherwise available. Here, as in *Harer*, "[t]he filing of [the] case undermines the argument that an individual lacks access to court." *Id.* at 309.

Golbert attempts to distinguish *Harer* by pointing to dicta mentioning that the parents could use discovery to find evidence that supports their case. *See Id.* He contrasts this with the present case, where discovery will not uncover evidence already destroyed or never created. But *Harer*'s discussion of discovery only serves to point out that the plaintiffs may well find enough information to succeed at trial, not that they have a right to any particular piece of evidence. And, of course, the same is true here. Golbert will have access to discovery and, while he may not uncover video

16

evidence, the Court cannot determine that he has no recourse until it reaches a ruling on the underlying claims. Count Two is dismissed.

### E. The Complaint States a Failure to Intervene Claim

The DCFS defendants also move to dismiss the third claim—that they failed to intervene to prevent the violation of the plaintiffs' constitutional rights. Law enforcement officers who fail to intervene may be liable under § 1983 when the officer knew that "any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). In this case, all the DCFS defendants allegedly knew of the abuse taking place at Lakeshore. If they had conducted proper investigations, they would have uncovered it and removed the children from harm's way. Instead, they covered it up.

The defendants argue that they did not have an opportunity to intervene because they were investigating abuse that had already occurred. The investigations could not have retroactively prevented the harm that prompted the first investigation. But the Complaint alleges that abuse took place throughout and after of the course of the investigations. While an accurate investigation could not have prevented the initial harm reported, it would have prevented the subsequent abuse that the plaintiffs suffered. This is enough to state a claim.

### F. The Complaint States a Claim for Intentional Infliction of Emotional Distress

Golbert also brings a state law claim for intentional infliction of emotional distress. There are three elements to such a claim under Illinois law. "First, the

17

conduct involved must be truly extreme and outrageous. Second, the actor must . . . know that there is at least a high probability that his conduct will cause *severe* emotional distress. Third, the conduct must in fact cause severe emotional distress." *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E. 2d 806, 809 (1988). Contrary to the defendants' assertions, conspiring to hide Lakeshore's ongoing abuse would clearly be extreme and outrageous conduct. The defendants knew that children under the care of DCFS resided at Lakeshore, and so they must have known that impeding the investigation could result in the children's severe emotional distress. And the Complaint alleges that the children did, in fact, suffer emotional trauma. Dkt. 135 ¶ 6. So, the Complaint satisfies all elements of the law, and the claim survives the Motion to Dismiss.

### G. The Complaint Adequately Pleads Conspiracy

The DCFS defendants also seek to dismiss Golbert's federal and state law conspiracy claims. To establish liability for a § 1983 conspiracy, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Similarly, a state law claim must allege "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004).

In this case, Golbert has alleged a coordinated effort by the DCFS officials to cover up abuse taking place at Lakeshore. This scheme had the effect of violating the constitutional rights of the plaintiffs and inflicting intentional emotional distress upon them. The defendants cite *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal* to argue these allegations lack specificity and so are "conclusory." *See* 550 U.S. 544 (2007); 556 U.S. 662 (2009). But, as discussed in detail in this opinion, the Complaint's underlying counts are specific enough to survive the Motion to Dismiss. The defendants do not offer any argument for why the conspiracy claims are particularly deficient. They survive the Motion to Dismiss.

## IV. Conclusion

For the stated reasons, the DCFS defendants' Motion to Dismiss [163] is granted as to Count Two and denied as to all other counts. The dismissal of Count Two is without prejudice.

E N T E R:

Dated: March 11, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge