IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES GOLBERT, Cook County Public Guardian, on behalf of Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., <br><br> Plaintiffs, <br><br> v. <br><br> AURORA CHICAGO LAKESHORE HOSPITAL, LLC, *et al.*, <br><br> Defendants. | Case No. 19-cv-08257 <br><br> Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Golbert, acting on behalf of minors Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., brings this action against the Defendants alleging federal and state law violations arising from the children's time at Chicago Lakeshore Hospital. Defendant Elisabeth Schei moves to dismiss the Amended Complaint for failing to state a claim. For reasons stated herein, Schei's Motion to Dismiss [146] is granted in part and denied in part. It is granted in full as to Count Two, Three, Four, and Fourteen. It is granted as to Count One and Eleven for all plaintiffs other than Trinity B. All dismissals are without prejudice.

I. Background

The following factual allegations are taken from the Amended Complaint (Dkt. 135) and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

1

### A. The Lakeshore Allegations

Charles Golbert brings this suit against Aurora Chicago Lakeshore Hospital, Lakeshore's parent company Signature, several employees and executives of Lakeshore, and several officers and employees of DCFS, in their personal capacity. Golbert is the Cook County Public Guardian. Appointed by the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court, he represents children who are subjects of abuse, neglect, and dependency petitions filed in the juvenile court. Dkt. 135 ¶ 11. In this case, he represents seven children who were in DCFS custody and were involuntarily placed in the Chicago Lakeshore Hospital between 2017 and 2018. *Id.* at ¶¶ 12-18, 66.

Chicago Lakeshore Hospital is an Illinois limited liability company located in Chicago, where it also operates a "Children's Pavilion." *Id.* at ¶ 19. Lakeshore is in turn owned by Signature, a Michigan limited liability company. *Id.* Along with Lakeshore and Signature, Golbert lists ten other executives and employees of Lakeshore as defendants. *Id.* at ¶¶ 23, 31-39. He also brings suit against nine officials and employees of DCFS, the Illinois agency responsible for the care of children dependent on the state. *Id.* at ¶¶ 21-22, 24-29, 30, 40.

Golbert's allegations arise from the plaintiffs' treatment while at Lakeshore's children's hospital. DCFS is required to house children in the least restrictive setting that is in the child's best interest. *Id.* at ¶ 41. As part of this care, children sometimes needed inpatient care at a psychiatric hospital. *Id.* at ¶ 42. Due to budget constraints,

DCFS had developed a reputation among Chicago-area hospitals for keeping children in inpatient care for longer than medically beneficial and failing to promptly pay hospitals for care provided. *Id.* at ¶ 47-48. As a result, most psychiatric hospitals were hesitant to admit children in the care of DCFS. *Id.* at ¶ 49.

The one exception was Lakeshore. Due to its own financial pressures, it readily accepted children in the care of DCFS. *Id.* at ¶ 62. As a result of Lakeshore's limited funds and aggressive management by Signature, its children's psychiatric hospital lacked the proper facilities and staff to safely operate. *Id.* at ¶¶ 51-58. Lakeshore had a history of allegations of inadequate or dangerous care, including a 2011 report by the Mental Health Policy Program of the University of Illinois at Chicago finding patterns of sexual abuse. *Id.* at ¶¶ 119, 121. DCFS, however, was dependent on Lakeshore because it was one of the few hospitals that would accept children in its charge. *Id.* at ¶ 64. As a result, DCFS wanted to ensure that Lakeshore remained in business even if it did not provide adequate care. *Id.*

During their stay at Lakeshore, the plaintiffs were subjected to serious sexual, physical, and emotional abuse. *Id.* at ¶ 67. DCFS was aware of serious complaints against Lakeshore and worked to bury and discredit the allegations. *Id.* at ¶ 104. The situation only changed in 2018 when the federal Department of Health and Human Services surveyed Lakeshore to evaluate its compliance with Medicare regulations. *Id.* at ¶ 114. The surveys found that Lakeshore's administration of the children's hospital violated federal regulations and endangered patient health and safety. *Id.* at ¶ 115. As a result, the Department terminated its provider agreement with the

hospital, cutting off federal funding. *Id.* at ¶ 125. DCFS removed all the children in its custody out of Lakeshore at around the same time. *Id.* at ¶ 125.

The abuse the children suffered at Lakeshore continues to cause them physical and emotional pain. *Id.* at ¶ 130. Golbert filed the instant lawsuit on December 18, 2019 to recover for the damage caused.

### B. Elisabeth Schei

Elisabeth Schei has filed a motion to dismiss Golbert's Complaint as it applies to her. For at least part of the time relevant to the Complaint, Elisabeth Schei worked for Lakeshore as a nurse. *Id.* at ¶ 33. Schei had a long criminal record and later was arrested for attempted murder and had her nursing license revoked. *Id.* at ¶ 72. Trinity B. was a 14-year-old minor in DCFS custody who had been placed in Lakeshore. *Id.* at ¶ 12. According to the Complaint, in 2017, Schei showed Trinity B. pornographic videos and then repeatedly sexually assaulted her and other patients at Lakeshore. *Id.* at ¶ 68. In order to gain their trust, Schei allowed them to fill out their and others medical paperwork and to use her vaping device. *Id.* at ¶ 68. After being abused, Trinity B. and other patients escaped from Lakeshore and were missing for several months. *Id.* at ¶ 73. Lakeshore then covered up the escape. *Id.* at ¶ 76.

### II. Standard

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above

4

the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.,* 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

**III.   Analysis**

In her Motion to Dismiss, Schei argues that she is not a state actor liable under § 1983; that Golbert has failed to allege her personal involvement in constitutional violations; and that the Complaint fails to state a claim against her.

5

### A. Schei Is a State Actor

Ordinarily, private actors such as Lakeshore cannot be held liable for constitutional violations under § 1983. *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). There is an exception, however, when a private party engages in "state action." *Id*. To find state action, there must be a "close nexus between the State and the challenged action" such that the challenged action "may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). The Supreme Court has recognized several different ways in which private action may become state action. These include when the action is a result of a conspiracy between the state and private party to deprive individuals of their constitutional rights; when the state practically controls or directs the private entity; and when the state has delegated a public function to the private entity. *Hallinan*, 570 F.3d at 815-16 (gathering Supreme Court cases). At the same time, the Court is aware that these examples "do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Id.* at 816. Indeed, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, (2001).

In this case, the analysis turns on whether Lakeshore was performing a "public function" by treating the children in DCFS custody. To make this determination, we ask "whether the function performed has been 'traditionally the *exclusive* prerogative

6

of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (quoting *Jackson*, 419 U.S. at 353). Schei argues that Lakeshore did not perform a function that was traditionally exclusive to Illinois. In support, she points to precedent from this district stating that "it is not the exclusive function of the State to care for and protect minors who are adjudicated to be abused and neglected by their natural parents." *Letisha A. by Murphy v. Morgan*, 855 F. Supp. 943, 949 (N.D. Ill. 1994).

Schei, however, misstates the "function" that Lakeshore allegedly undertook. The relevant issue here is not whether protecting abused minors is an exclusive state function, but whether providing medical care to children already in DCFS custody is a traditionally exclusive state function. We have found no case directly addressing this question, but our precedent in *Woods v. Maryville Academy* strongly suggests that it would qualify. No. 17 C 8273, 2018 WL 6045219 (N.D. Ill. Nov. 19, 2018). In that case, which found a residential facility that abused DCFS children to be a state actor, the court emphasized DCFS's responsibility for children in its custody, writing that "if a state has a duty to the children in its custody, that duty cannot be avoided by substituting private for public custodians." *Id.* at *7. DCFS's duty to ensure its children's safety means that a "private institution should not be able to avoid the underlying duty to protect and care for the children in its care and custody." *Id.* In effect, "the [defendants] fulfilled the State's duty to care for the children in its custody. That is what makes them state actors." *Id.* at *8. Here too, Lakeshore was fulfilling the State's duty to provide care for its children.

7

Lakeshore's status as a state actor is reinforced by considering the closely analogous case of medical care provided to state prisoners. In *Rodriguez v. Plymouth Ambulance Serv.*, the Seventh Circuit found that a hospital that treated an inmate the over the course of several days was fulfilling an exclusive state function and so could be sued as a state actor. 577 F.3d 816 (7th Cir. 2009). In its analysis, the court contrasted care that was "incidental and transitory," such as treating an ambulance arrival in need of emergency care, with that arising from an ongoing, contractual relationship. In only the latter case are a hospital and its employees "undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation." *Id.* at 827. The Seventh Circuit found the defendant hospital participated in an exclusive state function, and so was a state actor, when it treated a prisoner over the course of several days as part of an ongoing relationship between it and the prison. *Id.* at 831.

In this case, Golbert has alleged that DCFS's children made up a substantial proportion of Lakeshore's child patients during the relevant time. Dkt. 135 ¶ 63. Hospitals were free not to treat DCFS children, and many chose not to. *Id.* at ¶ 49. Lakeshore, meanwhile, actively sought out DCFS children and continued their hospitalizations for extended periods. *Id.* at ¶ 62. Plaintiffs have alleged that Lakeshore's treatment of them "was tied to the state's responsibility for [their] overall medical care." Schei, as Lakeshore's employee, similarly took on the state's responsibility. *See Rodriguez*, 577 F.3d at 827.

8

Schei argues that Lakeshore's relationship with the children was "incidental and transitory" under *Rodriguez*. But, as noted, in *Rodriguez* the "incidental" treatment was one where an ambulance arrived, unsolicited, at a hospital and the hospital provided emergency treatment and transferred the patient within an hour. *Id.* at 831. This was contrasted with the situation where the same prisoner was transferred to another hospital that had a contractual relationship to provide care to prisoners and treated for several days. *Id.* Here, Lakeshore, and by extension Schei, took on a traditionally exclusive state function in their treatment of the DCFS children. As a result, they are state actors potentially liable under § 1983.

### B. Schei's Personal Involvement

Schei next argues that Golbert has not adequately alleged her personal involvement in the constitutional violations of six of the seven plaintiffs. In order to make out a claim under § 1983, the plaintiff must show the defendant's "personal involvement" in the alleged violation. *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). Schei says the Complaint fails to allege her involvement as to any of the plaintiffs except for Trinity B., and so the four constitutional counts should be dismissed as to the other plaintiffs. Golbert, in turn, argues that the specific allegations levelled against Schei also imply a general awareness of ongoing abuse. This awareness, he contends, is sufficient to plead Schei's personal involvement as to all the plaintiffs.

The Court need not resolve this disagreement as to the counts generally. As we will see, each of the constitutional claims must be dismissed or is limited to Trinity

9

B. We consider the validity of each count, including Schei's personal involvement, separately.

### C. Only Trinity B. States a Safe-Conditions Claim

Golbert's first count is for violations of the plaintiffs' right to safe conditions of confinement. The courts have long recognized that the Fourteenth Amendment guarantees involuntarily-committed individuals a right to safe conditions of confinement. *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). In order to make out the claim, the plaintiffs must show that they "suffered a sufficiently serious deprivation" and that Schei was deliberately indifferent to their condition. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Golbert has stated a claim against Schei as to plaintiff Trinity B. Her sexual assault was serious deprivation for which Schei was allegedly directly responsible.

Schei has moved to dismiss the claim in so far as it is raised by the five other plaintiffs. Golbert did not contest this in his Response, and the Complaint makes no concrete allegations tying Schei to the other plaintiffs. In so far as the other six plaintiffs assert safe-conditions claims against Shei, they are dismissed. The claim raised by Trinity B. may proceed.

### D. Count Two Fails to State an Access-to-Court Claim

Golbert's next claim is that Schei violated the plaintiffs' constitutional right to access the courts. A backward-looking access claim may arise "'where a plaintiff alleges an underlying claim cannot be tried, or be tried with all the evidence, because official conduct caused the loss or inadequate resolution of that claim.'" *Harer v.*

10

*Casey*, 962 F.3d 299, 308 (7th Cir. 2020) (quoting *Lynch v. Barrett*, 703 F.3d 1153, 1157 (10th Cir. 2013)). In order "[t]o determine whether a plaintiff has meaningful and effective access to court, we require the plaintiff to identify: (1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement." *Id.* The third prong is particularly problematic when plaintiffs bring an access-to-court claim based on lack of evidence alongside underlying claims. This is because it is "just too early to say" whether remedy is not otherwise available. *Id.* at 309 (quotation omitted). For this reason, "an access-to-court claim ordinarily may not proceed at the same time and in the same case as a timely-filed underlying claim." *Id.*

In *Harer*, a couple alleged that their daughter's murder by a police officer had been covered up by the police department. *Id.* at 302. As a result of the cover-up, evidence that would have been helpful in a lawsuit against the police officer and department was not available. *Id.* at 308. They sued the officer and department for claims including wrongful death, intentional infliction of emotional distress, and denial of access to the court. *Id.* at 305. The Seventh Circuit dismissed the parents' access-to-court claim because "their underlying tort claims [were] timely, facially plausible, and still pending." *Id.* at 310. So long as "the ultimate resolution of their wrongful death case in doubt, the Harers' access-to-court claim [was] not ripe for judicial review." *Id.* at 310-11. With the underlying claims still pending, the court could not "determine

11

whether the police cover-up thwarted the effectiveness of any potential remedies." *Id.* at 311.

Golbert argues that the plaintiffs have been denied access to the court because of actions taken by Schei to hide or destroy relevant evidence. *Harer* is analogous to the instant case. Here too, Golbert has "timely, facially plausible" claims for relief pending before the Court, despite the lack of video evidence. As a result, he cannot show that no remedy is otherwise available. Here, as in *Harer*, "[t]he filing of [the] case undermines the argument that an individual lacks access to court." *Id.* at 309.

Golbert attempts to distinguish *Harer* by pointing to dicta mentioning that the parents could use discovery to find evidence that supports their case. *See Id.* He contrasts this with the present case, where discovery will not uncover evidence already destroyed or never created. But *Harer*'s discussion of discovery only serves to point out that the plaintiffs may well find enough information in discovery to succeed at trial, not that they have a right to any particular piece of evidence. And, of course, the same is true here. Golbert will have access to discovery and, while he may not uncover evidence that was destroyed, the Court cannot determine that he has no recourse until it reaches a ruling on the underlying claims. Count Two is dismissed.

### E. The Complaint Does Not States a Failure to Intervene Claim

We turn now to the Complaint's third claim, that Schei failed to intervene to prevent the violation of the plaintiffs' constitutional rights. State actors who fail to intervene to prevent other actor's constitutional violations may be liable under § 1983 when the individual knew that "any constitutional violation has been committed . . .;

12

*and* [he] had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The Complaint details Shei's harassment of Trinity B. but does not describe any situation where Schei would have been positioned to intervene in the misconduct of another.

The Complaint and Golbert's Response contain general statements about the "Individual Defendants" knowing of ongoing abuse or destroying evidence, but they do not allege that Schei herself knew of others' abuse nor that she destroyed any evidence. Without showing such knowledge, a failure-to-intervene claim must fail. Count Three is dismissed.

### F. Only Trinity B. States a Claim for Intentional Infliction of Emotional Distress

Golbert also brings a state law claim for intentional infliction of emotional distress. There are three elements to such a claim under Illinois law. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must . . . know that there is at least a high probability that his conduct will cause *severe* emotional distress. Third, the conduct must in fact cause severe emotional distress." *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E. 2d 806, 809 (1988). Schei has moved to dismiss the count as to all defendants except Trinity B.

The Complaint itself suggests that the claim against Schei is only brought on behalf of Trinity B., Dkt. 135 ¶ 200(c), but Schei's motion requests the count be dismissed as to the six other plaintiffs. Trinity B.'s allegations against Schei clearly rise to the level of intentional inflection of emotional distress. But, as discussed, the

13

Complaint offers no other allegations linking Schei to any of the other plaintiffs. In so far as the count is brought on behalf of the other plaintiffs, it is dismissed.

### G. The Complaint Does Not Adequately Plead Conspiracy

Schei also seeks to dismiss Golbert's federal and state law conspiracy claims. To establish liability for a § 1983 conspiracy, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Similarly, a state law claim must allege "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). A conspiracy may arise from an implied agreement, and such an agreement may be inferred from the parties' acts when such actions are unlikely without an agreement. *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

Golbert does not allege a conspiracy involving Schei. Golbert provides no specific allegations tying Schei to any of the other defendants. The Complaint contains both general allegations of a conspiracy and specific factual allegations suggesting one or several conspiracies among many of the defendants. General allegations, however, are not enough to state a claim, and the Complaint provides no information connecting Schei to any other actor. The closest Golbert comes is alleging that Lakeshore's failure to adequately monitor patients was responsible for Trinity B.'s

14

escape, which the hospital then covered up. Dkt. 135 ¶¶ 74-76. But the Complaint does not allege that Schei acted in concert with the hospital, and the facts do not support that inference. As pleaded, the Complaint does not state a conspiracy claim against Schei.

### IV. Conclusion

For the stated reasons, Schei's Motion to Dismiss [146] is granted in part and denied in part. It is granted in full as to Count Two, Three, Four, and Fourteen. It is granted as to Count One and Eleven for all plaintiffs other than Trinity B. All dismissals are without prejudice.

E N T E R:

Dated: March 11, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge