IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES GOLBERT, Cook County Public Guardian, on behalf of Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., <br><br> Plaintiffs, <br><br> v. <br><br> AURORA CHICAGO LAKESHORE HOSPITAL, LLC, *et al.*, <br><br> Defendants. | Case No. 19-cv-08257 <br><br> Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Golbert, acting on behalf of minors Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H., and Jamya B., brings this action against the Defendants alleging federal and state law violations arising from the children's time at Chicago Lakeshore Hospital. Defendants Tausha Bluitt, David Fletcher-Janzen, and Niama Malachi (the "leadership defendants") move to dismiss the Amended Complaint for failing to state a claim. Bluitt, Fletcher-Janzen, and Malachi's motions deal with similar factual allegations and legal arguments, and so are addressed jointly in this Opinion. For reasons stated herein, their Motions to Dismiss [142, 156, 184] are granted in part and denied in part. They are granted in full as to Count Two. They are denied as to Count One, Three, Four, Eleven, and Fourteen. Count Two is dismissed without prejudice.

1

## I. Background

The following factual allegations are taken from the Amended Complaint (Dkt. 135) and are accepted as true for the purposes of the motion to dismiss. *See W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

### A. The Lakeshore Allegations

Charles Golbert brings this suit against Aurora Chicago Lakeshore Hospital, Lakeshore's parent company Signature, several employees and executives of Lakeshore, and several officers and employees of DCFS, in their personal capacity. Golbert is the Cook County Public Guardian. Appointed by the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court, he represents children who are subjects of abuse, neglect, and dependency petitions filed in the juvenile court. Dkt. 135 ¶ 11. In this case, he represents seven children who were in DCFS custody and were involuntarily placed in the Chicago Lakeshore Hospital between 2017 and 2018. *Id.* at ¶¶ 12-18, 66.

Chicago Lakeshore Hospital is an Illinois limited liability company located in Chicago, where it also operates a "Children's Pavilion." *Id.* at ¶ 19. Lakeshore is in turn owned by Signature, a Michigan limited liability company. *Id.* Along with Lakeshore and Signature, Golbert lists ten other executives and employees of Lakeshore as defendants. *Id.* at ¶¶ 23, 31-39. He also brings suit against nine officials and employees of DCFS, the Illinois agency responsible for the care of children dependent on the state. *Id.* at ¶¶ 21-22, 24-29, 30, 40.

2

Golbert's allegations arise from the plaintiffs' treatment while at Lakeshore's children's hospital. DCFS is required to house children in the least restrictive setting that is in the child's best interest. *Id.* at ¶ 41. As part of this care, children sometimes needed inpatient care at a psychiatric hospital. *Id.* at ¶ 42. Due to budget constraints, DCFS had developed a reputation among Chicago-area hospitals for keeping children in inpatient care for longer than medically beneficial and failing to promptly pay hospitals for care provided. *Id.* at ¶ 47-48. As a result, most psychiatric hospitals were hesitant to admit children in the care of DCFS. *Id.* at ¶ 49.

The one exception was Lakeshore. Due to its own financial pressures, it readily accepted children in the care of DCFS. *Id.* at ¶ 62. As a result of Lakeshore's limited funds and aggressive management by Signature, its children's psychiatric hospital lacked the proper facilities and staff to safely operate. *Id.* at ¶¶ 51-58. Lakeshore had a history of allegations of inadequate or dangerous care, including a 2011 report by the Mental Health Policy Program of the University of Illinois at Chicago finding patterns of sexual abuse. *Id.* at ¶¶ 119, 121. DCFS, however, was dependent on Lakeshore because it was one of the few hospitals that would accept children in its charge. *Id.* at ¶ 64. As a result, DCFS wanted to ensure that Lakeshore remained in business even if it did not provide adequate care. *Id.*

During their stay at Lakeshore, the plaintiffs were subjected to serious sexual, physical, and emotional abuse. *Id.* at ¶ 67. DCFS was aware of serious complaints against Lakeshore and worked to bury and discredit the allegations. *Id.* at ¶ 104. The situation only changed in 2018 when the federal Department of Health and Human

3

Services surveyed Lakeshore to evaluate its compliance with Medicare regulations. *Id.* at ¶ 114. The surveys found that Lakeshore's administration of the children's hospital violated federal regulations and endangered patient health and safety. *Id.* at ¶ 115. As a result, the Department terminated its provider agreement with the hospital, cutting off federal funding. *Id.* at ¶ 125. DCFS removed all the children in its custody out of Lakeshore at around the same time. *Id.* at ¶ 125.

The abuse the children suffered at Lakeshore continues to cause them physical and emotional pain. *Id.* at ¶ 130. Golbert filed the instant lawsuit on December 18, 2019 to recover for the damage caused.

### B. The Leadership Defendants

Tausha Bluitt, David Fletcher-Janzen, and Niama Malachi have filed motions to dismiss Golbert's Complaint as it applies to them. At the time relevant to the Complaint, they each worked for Lakeshore. Bluitt was a patient advocate responsible for investigating allegations of abuse at the Hospital. *Id.* at ¶ 32. Fletcher-Janzen was the CEO of Lakeshore and Signature and a member of Lakeshore's Board of Governors.[1] *Id.* at ¶ 23. And Malachi was employed as the hospital's risk manager and as a patient advocate. *Id.* at ¶ 31. She also served on Lakeshore's Board of Governors. *Id.* at ¶ 31. Fletcher-Janzen and Malachi both participated in daily "FLASH meetings" that informed them of incidents, allegations, and accidents involving Lakeshore, including the abuse alleged by the plaintiffs. *Id.* at ¶ 98.

---

[1] In his Motion to Dismiss, Fletcher-Janzen says that he was only the CEO of Lakeshore. At the motion to dismiss stage, however, the Court accepts the plaintiff's well-pleaded allegations as true. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).

4

Tatyana H. and Jymesha S. were 7 and 12-year-old minors, respectively, in DCFS custody who had been placed in Lakeshore. *Id.* at ¶¶ 16, 17. In 2018, Tatyana H. was sexually assaulted by another patient. *Id.* at ¶ 87. Fletcher-Janzen and Malachi knew that the patient had been sexually aggressive in the past, including to Tatyana H. *Id.* at ¶ 87. Nevertheless, they failed to put any precautions in place to protect Tatyana H. *Id.* Also in 2018, Jymesha S. was sexually assaulted by a Lakeshore employee, the defendant Richard Kasyoki. *Id.* at ¶ 77. Instead of properly punishing Kasyoki, the leadership defendants transferred him to another building, where he still had access to the Children's Pavilion and the plaintiffs. *Id.* at ¶ 82.

The Complaint also alleges that Malachi and Bluitt routinely refused to provide video evidence to DCFS investigators that would have corroborated allegations of abuse. *Id.* at ¶ 106. Fletcher-Janzen, meanwhile, was aware of and approved of DCFS's sabotaging of its own investigations into Lakeshore. *Id.* at ¶ 110. Throughout the relevant period, the leadership defendants prioritized Lakeshore's profits over its patients' safety, and they demoralized the plaintiffs by making them feel their abuse was acceptable. *Id.* at ¶ 112.

**II.   Standard**

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329,

5

333 (7th Cir. 2018) (quotations and citation omitted). *See also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief."). A court deciding a Rule 12(b)(6) motion accepts plaintiff's well-pleaded factual allegations as true and draws all permissible inferences in plaintiff's favor. *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014). A plaintiff need not plead "detailed factual allegations", but "still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate under Federal Rule of Civil Procedure 8." *Bell v. City of Chi.*, 835 F.3d 736, 738 (7th Cir. 2016) (citation and internal quotation marks omitted).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966 (2007). Deciding the plausibility of the claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S. Ct. 1937, 1950 (2009)).

**III. Analysis**

In their Motions to Dismiss, the leadership defendants argue that they are not state actors liable under § 1983; that Golbert has failed to allege their personal involvement in constitutional violations; and that the Complaint fails to state a claim against them.

### A. The Leadership Defendants Are State Actors

Ordinarily, private actors such as Lakeshore cannot be held liable for constitutional violations under § 1983. *See Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 815 (7th Cir. 2009). There is an exception, however, when a private party engages in "state action." *Id*. To find state action, there must be a "close nexus between the State and the challenged action" such that the challenged action "may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). The Supreme Court has recognized several different ways in which private action may become state action. These include when the action is a result of a conspiracy between the state and private party to deprive individuals of their constitutional rights; when the state practically controls or directs the private entity; and when the state has delegated a public function to the private entity. *Hallinan*, 570 F.3d at 815-16 (gathering Supreme Court cases). At the same time, the Court is aware that these examples "do not so much enunciate a test or series of factors, but rather demonstrate examples of outcomes in a fact-based assessment." *Id.* at 816. Indeed, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, (2001).

In this case, the analysis turns on whether Lakeshore was performing a "public function" by treating the children in DCFS custody. To make this determination, we ask "whether the function performed has been 'traditionally the *exclusive* prerogative

7

of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (quoting *Jackson*, 419 U.S. at 353). Bluitt, Fletcher-Janzen, and Malachi argue that Lakeshore did not perform a function that was traditionally exclusive to Illinois. In support, they point to precedent from this district stating that "it is not the exclusive function of the State to care for and protect minors who are adjudicated to be abused and neglected by their natural parents." *Letisha A. by Murphy v. Morgan*, 855 F. Supp. 943, 949 (N.D. Ill. 1994).

The defendants, however, misstate the "function" that Lakeshore allegedly undertook. The relevant issue here is not whether protecting abused minors is an exclusive state function, but whether providing medical care to children already in DCFS custody is a traditionally exclusive state function. We have found no case directly addressing this question, but our precedent in *Woods v. Maryville Academy* strongly suggests that it would qualify. No. 17 C 8273, 2018 WL 6045219 (N.D. Ill. Nov. 19, 2018). In that case, which found a residential facility that abused DCFS children to be a state actor, the court emphasized DCFS's responsibility for children in its custody, writing that "if a state has a duty to the children in its custody, that duty cannot be avoided by substituting private for public custodians." *Id.* at *7. DCFS's duty to ensure its children's safety means that a "private institution should not be able to avoid the underlying duty to protect and care for the children in its care and custody." *Id.* In effect, "the [defendants] fulfilled the State's duty to care for the children in its custody. That is what makes them state actors." *Id.* at *8. Here too, Lakeshore was fulfilling the State's duty to provide care for its children.

8

Lakeshore's status as a state actor is reinforced by considering the closely analogous case of medical care provided to state prisoners. In *Rodriguez v. Plymouth Ambulance Serv.*, the Seventh Circuit found that a hospital that treated an inmate over the course of several days was fulfilling an exclusive state function and so could be sued as a state actor. 577 F.3d 816 (7th Cir. 2009). In its analysis, the court contrasted care that was "incidental and transitory," such as treating an ambulance arrival in need of emergency care, with that arising from an ongoing, contractual relationship. In only the latter case are a hospital and its employees "undertaking freely, and for consideration, responsibility for a specific portion of the state's overall obligation." *Id.* at 827. The Seventh Circuit found the defendant hospital participated in an exclusive state function, and so was a state actor, when it treated a prisoner over the course of several days as part of an ongoing relationship between it and the prison. *Id.* at 831.

In this case, Golbert has alleged that DCFS's children made up a substantial proportion of Lakeshore's child patients during the relevant time. Dkt. 135 ¶ 63. Hospitals were free not to treat DCFS children, and many chose not to. *Id.* at ¶ 49. Lakeshore, meanwhile, actively sought out DCFS children and continued their hospitalizations for extended periods. *Id.* at ¶ 62. Plaintiffs have alleged that Lakeshore's treatment of them "was tied to the state's responsibility for [their] overall medical care." The leadership defendants, as Lakeshore's employees, similarly took on the state's responsibility. *See Rodriguez*, 577 F.3d at 827.

9

The defendants argue that Lakeshore's relationship with the children was "incidental and transitory" under *Rodriguez*. But, as noted, in *Rodriguez* the "incidental" treatment was one where an ambulance arrived, unsolicited, at a hospital and the hospital provided emergency treatment and transferred the patient within an hour. *Id.* at 831. This was contrasted with the situation where that same prisoner was transferred to another hospital that had a contractual relationship to provide care to prisoners and treated for several days. The second hospital was deemed a state actor. *Id.* Here, Lakeshore, and by extension the defendants, took on a traditionally exclusive state function in their treatment of the DCFS children. As a result, they are state actors potentially liable under § 1983.

### B. Bluitt, Fletcher-Janzen, and Malachi's Personal Involvement

The leadership defendants next argue that Golbert has not adequately alleged their personal involvement in the constitutional violations of six of the seven plaintiffs. In order to make out a claim under § 1983, the plaintiff must show the defendant's "personal involvement" in the alleged violation. *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). The defendants say the Complaint fails to allege their involvement as to any of the plaintiffs, and so the four constitutional counts should be dismissed. Golbert, in turn, argues that the leadership defendants' specific actions to cover up abuse, as well as knowing inaction in preventing future abuse, is sufficient to plead their personal involvement.

The Court need not resolve this disagreement generally as they are more productively analyzed in the context of each count. We consider the validity of each

10

count, including Bluitt, Fletcher-Janzen, and Malachi's personal involvement, separately.

### C. The Plaintiffs State a Safe-Conditions Claim

Count One alleges violations of the plaintiffs' right to safe conditions of confinement. As an initial matter, the defendants argue that this count has been forfeited because the plaintiffs failed to address their arguments in their Response. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995), as amended (Apr. 7, 1995). However, while the Response does not have a separate section addressing the deliberate indifference count as to the leadership defendants, the Court feels that the Response's discussion of those defendants' personal involvement is sufficient to articulate the plaintiffs' legal theory and avoid forfeit.

The courts have long recognized that the Fourteenth Amendment guarantees involuntarily-committed individuals a right to safe conditions of confinement. *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). To evaluate whether the right to safe conditions has been violated, the parties agree that a deliberate indifference standard is appropriate. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference requires a defendant's awareness of a risk of harm to an involuntarily-committed individual which she then disregards with deliberate indifference. *Id*. This analysis subsumes the § 1983 personal involvement investigation discussed above because personal involvement in this claim arises from its elements—if a particular state actor's deliberate indifference is found it necessarily implies that state actor's personal involvement.

11

Golbert alleges that each of the leadership defendants was aware of the ongoing abuse that the plaintiffs were exposed to and took deliberate steps to cover up the harm. Golbert states that Fletcher-Janzen and Malachi were informed through daily meetings about Lakeshore's issues, including of all the abuse alleged in the Complaint. Dkt. 135 ¶ 98. Bluitt and Malachi, meanwhile, sought to undermine DCFS investigations by withholding video evidence of abuse at Lakeshore. *Id.* at ¶ 106. The Complaint also alleges that Fletcher-Janzen and Malachi knowingly allowed Tatyana H. to be placed with a dangerous patient. *Id.* at ¶ 87. And all three of the defendants allowed Kasyoki to retain access to children after he sexually assaulted Jymesha S. *Id.* at ¶ 82. As a result, the Complaint effectively alleges that the leadership defendants had actual knowledge of widespread abuse at Lakeshore and the substantial risk the plaintiffs faced. In response to this knowledge, the defendants focused on hiding the evidence, not rectifying or preventing the harm. The allegations, if proven, would satisfy the deliberate indifference standard required to prove a safe-conditions claim.

The defendants offer a counterargument. They contend that, in order to show the leadership defendants' personal involvement, the Complaint must allege that they knew about each specific wrongful act prior to its occurrence and then "facilitated it, approved it, condoned it, or a turned a blind eye for fear of what [they] might see." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). This awareness must be individualized—knowing that one plaintiff was abused is not enough to put the defendants on notice as to the risk facing the other plaintiffs. For support, they cite a

recent case in which a claim against a police officer for an unlawful stop was dismissed because the officer was not aware the illegal stop was about to happen and did not facilitate it in any way. *Rivera v. Town of Cicero*, No. 19 C 3728, 2020 WL 3868713, at *2 (N.D. Ill. July 9, 2020).

In a safe-conditions claim, however, the "wrongful act" at issue is the defendant's own deliberate indifference to the potential harm facing the plaintiffs. General conditions, including the experience of other confined individuals, can create awareness of said risk. In recent litigation related to prison conditions and Covid-19, for example, the Northern District and Seventh Circuit have both analyzed the awareness and alleged indifference of prison and state officials without requiring plaintiffs to plead that the officials are aware of individual prisoners' specific circumstances and particular risks. *See Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020); *Mays v. Dart*, 453 F. Supp. 3d 1074, 1090 (N.D. Ill. 2020); *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1131 (N.D. Ill. 2020). In this case, the leadership defendants' alleged deliberate indifference is sufficient to assert their personal involvement. Dismissal at this stage is inappropriate.

### D. Count Two Fails to State an Access-to-Court Claim

Golbert's next claim is that the leadership defendants violated the plaintiffs' constitutional right to access the courts. A backward-looking access claim may arise "'where a plaintiff alleges an underlying claim cannot be tried, or be tried with all the evidence, because official conduct caused the loss or inadequate resolution of that claim.'" *Harer v. Casey*, 962 F.3d 299, 308 (7th Cir. 2020) (quoting *Lynch v. Barrett*,

13

703 F.3d 1153, 1157 (10th Cir. 2013)). In order "[t]o determine whether a plaintiff has meaningful and effective access to court, we require the plaintiff to identify: (1) a nonfrivolous, underlying claim; (2) the official acts frustrating the litigation; and (3) a remedy that may be awarded as recompense but that is not otherwise available in a suit or settlement." *Id.* The third prong is particularly problematic when plaintiffs bring an access-to-court claim based on lack of evidence alongside underlying claims. This is because it is "just too early to say" whether remedy is not otherwise available. *Id.* at 309 (quotation omitted). For this reason, "an access-to-court claim ordinarily may not proceed at the same time and in the same case as a timely-filed underlying claim." *Id.*

In *Harer*, a couple alleged that their daughter's murder by a police officer had been covered up by the police department. *Id.* at 302. As a result of the cover-up, evidence that would have been helpful in a lawsuit against the police officer and department was not available. *Id.* at 308. They sued the officer and department for claims including wrongful death, intentional infliction of emotional distress, and denial of access to the court. *Id.* at 305. The Seventh Circuit dismissed the parents' access-to-court claim because "their underlying tort claims [were] timely, facially plausible, and still pending." *Id.* at 310. So long as "the ultimate resolution of their wrongful death case in doubt, the Harers' access-to-court claim [was] not ripe for judicial review." *Id.* at 310-11. With the underlying claims still pending, the court could not "determine whether the police cover-up thwarted the effectiveness of any potential remedies." *Id.* at 311.

Golbert argues that the plaintiffs have been denied access to the court because of actions taken by the defendants to hide or destroy relevant evidence. The Court finds *Harer* is analogous to the instant case. Here too, Golbert has "timely, facially plausible" claims for relief pending before the Court, despite the lack of video evidence. As a result, he cannot show that no remedy is otherwise available. Here, as in *Harer*, "[t]he filing of [the] case undermines the argument that an individual lacks access to court." *Id.* at 309.

Golbert attempts to distinguish *Harer* by pointing to dicta mentioning that the parents could use discovery to find evidence that supports their case. *See Id.* He contrasts this with the present case, where discovery will not uncover evidence already destroyed or never created. But *Harer*'s discussion of discovery only serves to point out that the plaintiffs may well find enough information in discovery to succeed at trial, not that they have a right to any particular piece of evidence. And, of course, the same is true here. Golbert will have access to discovery and, while he will not uncover evidence that was destroyed, the Court cannot determine that he has no recourse until it reaches a ruling on the underlying claims. Count Two is dismissed.

### E. The Complaint States a Failure to Intervene Claim

The leadership defendants also move to dismiss the third claim—that they failed to intervene to prevent the violation of the plaintiffs' constitutional rights. A state actor who fail to intervene may be liable under § 1983 when the officer knew that "any constitutional violation has been committed by a [state actor]; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v.*

15

*Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). In this case, the Complaint's allegations suggest that the leadership defendants knew of the abuse taking place at Lakeshore. If they had improved conditions or reported the danger to state authorities, the children would have been removed from harm's way. Instead, they covered it up.

The defendants argue that they did not have an opportunity to intervene because they were not physically present for the actual abuse and, by the time they learned of a particular incident, it had already occurred. But the Complaint alleges abuse that took place over the course of two years and was a predictable consequence of the unsafe conditions at Lakeshore. It is likely true that the defendants could not have retroactively prevented the first assault that came to their attention. But given their position and knowledge, the leadership defendants had a realistic opportunity to improve conditions at Lakeshore or initiate the removal of children. Doing so would have prevented the subsequent abuse that the plaintiffs suffered. This is enough to state a claim.

### F. The Complaint States a Claim for Intentional Infliction of Emotional Distress

Golbert also brings a state law claim for intentional infliction of emotional distress. There are three elements to such a claim under Illinois law. "First, the conduct involved must be truly extreme and outrageous. Second, the actor must . . . know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause severe emotional distress." *McGrath v. Fahey,* 126 Ill. 2d 78, 86, 533 N.E. 2d 806, 809 (1988).

Contrary to the leadership defendants' assertions, actively hiding ongoing abuse at Lakeshore and knowingly exposing children to possible sexual assault would clearly be extreme and outrageous conduct. As discussed, the Complaint alleges that Malachi and Bluitt hid corroborative evidence from investigators; that Malachi and Fletcher-Janzen were regularly informed of assaults taking place and of children at particular risk; and that Fletcher-Janzen was aware of and approved the efforts by DCFS leadership to sabotage its investigation.

A reasonable inference from these allegations is that the defendants knew that their actions could result in the children's severe emotional distress. And the Complaint alleges that the children did, in fact, suffer emotional trauma, particularly from the demoralization caused by the leadership defendants. Dkt. 135 ¶¶ 6, 112. So, the Complaint satisfies all elements of the law, and the claim survives the Motion to Dismiss.

### G. The Complaint Adequately Pleads Conspiracy

The leadership defendants also seek to dismiss Golbert's federal and state law conspiracy claims. To establish liability for a § 1983 conspiracy, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Similarly, a state law claim must allege "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators

17

committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). A conspiracy may arise from an implied agreement, and such an agreement may be inferred from the parties' acts when such actions are unlikely without an agreement. *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

Reading the Complaint "sensibly and as a whole," Golbert alleges that the leadership defendants conspired together to cover up the abuse taking place at Lakeshore. *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013). The Complaint describes how Bluitt, Fletcher-Janzen, and Malachi acted in concert in several different situations in order to avoid scrutiny and hide abuse. This cover-up facilitated the violation of the plaintiffs' constitutional rights and the infliction of emotional distress. Golbert also alleges that individual defendants at Lakeshore conspired to hide evidence of ongoing abuse. *Id.* at ¶ 154. Drawing reasonable inferences for the plaintiffs, these allegations suggest an implied agreement between the leadership defendants. *See Engel*, 710 F.3d at 709.

The defendants argue that the Complaint asserts a conspiracy but fails to provide enough detail to state a claim, such as who they each conspired with, the dates of the conspiracy, and its purpose. But as described above, such details are provided in the factual allegations. The leadership defendants thus depend on a blinkered reading of the Complaint, artificially separating the assertions of the conspiracy count from the preceding detailed allegations. Read as a whole, the Complaint adequately pleads constitutional and state law conspiracy claims against the leadership defendants.

## IV. Conclusion

For the stated reasons, Bluitt, Fletcher-Janzen, and Malachi's Motions to Dismiss [142, 156, 184] are granted in part and denied in part. They are granted as to Count Two. They are denied as to Count One, Three, Four, Eleven, and Fourteen. Count Two is dismissed without prejudice.

E N T E R:

Dated: March 11, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge