IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES GOLBERT, Cook County Public Guardian, on behalf of Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H. and Jamya B., | ) ) ) ) |
| | ) Case No. 19-cv-08257 |
| Plaintiffs, | ) ) |
| | ) Judge Mary M. Rowland |
| v. | ) |
| | ) Magistrate Judge Maria Valdez |
| AURORA CHICAGO LAKESHORE HOSPITAL, LLC, doing business as Chicago Lakeshore Hospital; SIGNATURE HEALTHCARE SERVICES, LLC; SOON K. KIM; BEVERLY J. WALKER; BETH I. SOLOMON, as special representative for GEORGE SHELDON (deceased); DAVID FLETCHER-JANZEN; NEIL SKENE; MICHAEL C. JONES; TIERNEY STUTZ; BEVERLY MIMS; MARCO LEONARDO; DENISE ELLIS; BROOKE SLOAN; NIAMA MALACHI; TAUSHA BLUITT; ELISABETH SCHEI; RICHARD KASYOKI; DION DILL; NICKOLAY KATSAROV; ANDEBOLA ("DEBBIE") MAJEKODUNMI; and SHANE MICHAELS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

## SECOND AMENDED COMPLAINT

PLAINTIFF CHARLES GOLBERT, Cook County Public Guardian, by and through his

attorneys, LOEVY & LOEVY, and on behalf of TRINITY B., ROMEO S., CONNOR H.,

JADIENE T., JYMESHA S., TATYANA H. and JAMYA B., complains of Defendants AURORA

CHICAGO LAKESHORE HOSPITAL, LLC, doing business as Chicago Lakeshore Hospital

("Chicago Lakeshore Hospital"); SIGNATURE HEALTHCARE SERVICES, LLC ("Signature");

SOON K. KIM; BEVERLY J. WALKER; BETH I. SOLOMON, as special representative for

1

GEORGE SHELDON (deceased); DAVID FLETCHER-JANZEN; NEIL SKENE; MICHAEL C. JONES; TIERNEY STUTZ; BEVERLY MIMS; MARCO LEONARDO; DENISE ELLIS; BROOKE SLOAN; NIAMA MALACHI; TAUSHA BLUITT; ELISABETH SCHEI; RICHARD KASYOKI; DION DILL; NICKOLAY KATSAROV; ANDEBOLA ("DEBBIE") MAJEKODUNMI; and SHANE MICHAELS and states as follows:

## INTRODUCTION

1. Plaintiffs are among the most vulnerable children in Illinois. Between 2017 and 2018, among other times, not only were Plaintiffs in the custody of the Illinois Department of Children and Family Services ("DCFS") – a beleaguered Illinois state agency infamous for its inability to protect those within its care – but they also required psychiatric hospitalization. Plaintiffs bring this lawsuit against Defendants Chicago Lakeshore Hospital and Signature (collectively, the "Signature Corporate Defendants"); Defendants Beverly J. Walker; Beth I. Solomon, as special representative for George Sheldon (deceased); Neil Skene; Michael C. Jones; Beverly Mims; Tierney Stutz; Marco Leonardo; Denise Ellis and Brooke Sloan, (collectively, the "DCFS Defendants"); Defendant Soon K. Kim; and Defendants David Fletcher-Janzen, Niama Malachi, Tausha Bluitt, Elisabeth Schei, Richard Kasyoki, Dion Dill, Nickolay Katsarov, Andebola ("Debbie") Majekodumni, and Shane Michaels (collectively, the "Chicago Lakeshore Individual Defendants") (the Signature Corporate Defendants, Defendant Kim and the Chicago Lakeshore Individual Defendants, collectively, the "Signature Defendants") (the Chicago Lakeshore Individual Defendants, DCFS Defendants and Defendant Kim, collectively, the "Individual Defendants") (all defendants, collectively, "Defendants") to seek redress for the egregious violations of their civil rights while hospitalized at the Children's Pavilion at Chicago Lakeshore Hospital (the "Children's Hospital"), among other injuries.

2.    Given Plaintiffs' vulnerabilities, Defendants should have made every effort to ensure Plaintiffs received the care necessary for their long-term well-being.  Instead, Defendants did the opposite.  Rather than Plaintiffs being placed at a psychiatric hospital dedicated to treating vulnerable children, Plaintiffs were placed at the Children's Hospital in Chicago, Illinois for the sole reason that it was willing to take them.  DCFS had worn out its welcome at other Chicagoland psychiatric hospitals due to the State of Illinois' failure to make timely payments to vendors, and DCFS' historic inability to place children in a less restrictive setting once they completed their psychiatric treatment.

3.    DCFS' desperation to have a psychiatric hospital that would accept children in DCFS custody, combined with the Chicago Lakeshore Defendants' knowledge of this desperation, created the toxic and dangerous situation whereby the Chicago Lakeshore Defendants could operate the Children's Hospital with virtually no accountability.  This toxic situation led to the life-changing injuries Plaintiffs sustained while at the Children's Hospital.

4.    While the lack of accountability created a toxic and dangerous situation for children admitted to the Children's Hospital, it created an ideal situation for Defendants Signature and Kim. Collectively, Signature and Kim owned, operated, directed, controlled and managed a network of psychiatric hospitals – including the Children's Hospital – that through Defendant Signature's network-wide policies and practices failed to provide a safe setting for patients and allowed for the abuse alleged herein, as well as numerous other egregious patient injuries and even death.  Indeed, as alleged in more detail below, Defendants Signature and Kim prioritized their financial well-being over patient safety and treatment and achieved this goal by bleeding dry the psychiatric hospitals in the network – including the Children's Hospital.

5.     While at the Children's Hospital, Plaintiffs – some as young as 7 years old – were subjected to and/or witnessed unspeakable acts of sexual abuse by staff and peers.  Moreover, Plaintiffs were forced to live under the constant threat of involuntary sedation at the hands of vindictive, mean-spirited and improperly trained staff that, in some instances, should never have been allowed to work with or near children.

6.     Defendants continued to victimize Plaintiffs after they revealed the abuse.  Instead of conducting a proper investigation, Defendants sought to cover up the misconduct and discredit Plaintiffs.  Defendants knew that any serious investigation into the allegations would result in the Children's Hospital being precluded from accepting children in DCFS custody – a result none of the Defendants wanted.

7.     Defendants' misconduct continued unabated until news of it became public in the fall of 2018.  Finally, in or around December 2018, due to the horrific treatment of patients at the Children's Hospital, the federal government cut off the hospital's funding, and DCFS was forced by outside groups to cease using the Children's Hospital.  By that time, the irreversible emotional and physical damage had already been inflicted upon Plaintiffs.

8.     Plaintiffs now seek to recover damages from Defendants for the physical and emotional trauma inflicted upon them.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, as Plaintiffs assert claims under federal law, and the state law claims arise out of the same facts as the federal claims.

10.     This Court has personal jurisdiction over Defendant Chicago Lakeshore Hospital as it is an Illinois limited liability company that regularly conducts business in this District.

11.     This Court has personal jurisdiction over Defendant Signature because it is authorized to do business in this District and regularly conducts business in this District, has sufficient minimum contacts with this state and/or sufficiently avails itself of the markets of this state.

12.     This Court has personal jurisdiction over the DCFS Defendants and Chicago Lakeshore Individual Defendants as their actions giving rise to Plaintiffs' claims took place in this District and, on information and belief, they are physically situated in this District.

13.     This Court has personal jurisdiction over Defendant Kim as his contacts with Illinois are directly related to the conduct alleged herein.  As alleged in more detail below, at relevant times, Defendant Kim: (a) was the sole member of Defendant Signature, and held himself out as its president and chief executive officer; and (b) directed the activities of Defendant Signature.  Further, Defendant Kim is the: (a) president of Clarendon Properties Inc., an Illinois corporation with a registered agent in Springfield, Illinois; and (b) sole member of Illinois Life Properties, LLC, an Illinois limited liability company with a principal office at 4840 N. Marine Drive, Chicago, Illinois.  Clarendon Properties Inc. and Illinois Life Properties, LLC are the managers of Clarendon Venture, LLC, an Illinois limited liability company, that, on information and belief: (a) owns the building and property on which the Children's Hospital is located; and (b) leases that building to Defendant Chicago Lakeshore Hospital.  As alleged further below, Defendant Kim, directly and indirectly, placed financial pressures on Defendant Chicago Lakeshore Hospital that resulted in the abuse alleged herein.

14.     Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

15.     Plaintiff Charles Golbert is the Cook County Public Guardian.  By orders of the Chief Judge of the Cook County Circuit Court and the Presiding Judge of the Juvenile Justice and Child Protection Division of the Circuit Court ("Juvenile Court"), Mr. Golbert is appointed attorney and guardian *ad litem* for the children who are the subjects of abuse, neglect and dependency petitions filed in Juvenile Court.  Mr. Golbert has extensive experience in child welfare and civil rights litigation.  Mr. Golbert brings this suit as next friend on behalf of his child clients.

16.     At relevant times, Plaintiff Trinity B. was a 14-year-old minor in the custody of DCFS.  While in DCFS custody, Trinity B. was involuntarily placed at the Children's Hospital.

17.     At relevant times, Plaintiff Romeo S. was a 7-year-old minor in the custody of DCFS.  While in DCFS custody, Romeo S. was involuntarily placed at the Children's Hospital.

18.     At relevant times, Plaintiff Connor H. was a 12-year-old minor in the custody of DCFS.  While in DCFS custody, Connor H. was involuntarily placed at the Children's Hospital.

19.     At relevant times, Plaintiff Jadiene T. was a 16-year-old minor in the custody of DCFS.  While in DCFS custody, Jadiene T. was involuntarily placed at the Children's Hospital.

20.     At relevant times, Plaintiff Jymesha S. was a 12-year-old minor in the custody of DCFS.  While in DCFS custody, Jymesha S. was involuntarily placed at the Children's Hospital.

21.     At relevant times, Plaintiff Tatyana H. was a 7-year-old a minor in the custody of DCFS.  While in DCFS custody, Tatyana H. was involuntarily placed at the Children's Hospital.

22.     At relevant times, Plaintiff Jamya B. was an 11-year-old minor in the custody of DCFS.  While in DCFS custody, Jamya B. was involuntarily placed at the Children's Hospital.

23.     Defendant Chicago Lakeshore Hospital is an Illinois limited liability company with a principal place of business located at 4840 N. Marine Drive, Chicago, Illinois and a "Children's Pavilion" located at 4720 N. Clarendon, Chicago, Illinois.  At relevant times, Chicago Lakeshore Hospital was an agent of DCFS, cloaked with the authority of DCFS and acting on DCFS' behalf to fulfill DCFS' duty to care for children in its custody.  Defendant Signature owns Chicago Lakeshore Hospital.

24.     Defendant Signature is a single-member Michigan limited liability company. At relevant times, Signature's sole member was Defendant Kim.  At relevant times, Signature was the 100% owner of a network of psychiatric hospitals throughout the United States, including Defendant Chicago Lakeshore Hospital, Aurora Las Encinas Hospital and Recovery Center, Aurora Behavioral Healthcare – San Diego, Aurora Charter Oaks Hospital, Aurora Vista Del Mar, Aurora Behavioral Health System Arizona – Glendale, Aurora Behavioral Health System Arizona – Tempe and, on information and belief, Georgetown Behavioral Healthcare Hospital, Dallas Behavioral Healthcare Hospital, Houston Behavioral Healthcare Hospital, San Antonio Behavioral Healthcare Hospital, Bakersfield Behavioral Healthcare Hospital, Aurora Santa Rosa Hospital, Desert Parkway Behavioral Healthcare Hospital, Reno Behavioral Healthcare Hospital and Westborough Behavioral Healthcare Hospital (collectively, the "Signature Psychiatric Hospital Network").  At relevant times, Signature, at the direction of and in concert with Defendant Kim, operated, managed, controlled and directed the activity of each of the hospitals in the Signature Psychiatric Hospital Network, including each hospital's daily operations.  On information and belief, at relevant times, the chief executive officer and chief financial officer of each hospital in the Signature Psychiatric Hospital Network – including Defendant Chicago Lakeshore Hospital – reported to Blair Stam, Signature's Executive Vice President.  At relevant times, Signature was an

agent of DCFS, cloaked with the authority of DCFS and acting on DCFS' behalf to fulfill DCFS' duty to care for children in its custody.

25.     Defendant Soon K. Kim is a doctor who founded Defendant Signature in or around 2000.  Defendant Kim is Signature's sole member, and has held himself out as Signature's president and chief executive officer.  At relevant times, Defendant Kim, through Signature, directed, controlled and managed the activities and operations of the hospitals in the Signature Psychiatric Hospital Network, including Defendant Chicago Lakeshore Hospital.  At relevant times, Defendant Kim reported Signature's income through his personal income tax returns. Further, Defendant Kim has personally loaned money to Signature many times.  Defendant Kim also is the: (a) president of Clarendon Properties Inc., an Illinois corporation with a registered agent in Springfield, Illinois; and (b) sole member of Illinois Life Properties, LLC, an Illinois limited liability company with a principal office at 4840 N. Marine Drive, Chicago, Illinois.  On information and belief, Kim controls and directs the activities of Clarendon Properties Inc. and Illinois Life Properties, LLC.  Clarendon Properties Inc. and Illinois Life Properties, LLC are the managers of Clarendon Venture, LLC, an Illinois limited liability company, that, on information and belief: (a) owns the building and property on which the Children's Hospital is located; and (b) leases that building to Defendant Chicago Lakeshore Hospital.  Defendant Kim has created similar entities to own and lease buildings to various other hospitals in the Signature Psychiatric Hospital Network.  On at least one occasion, Defendant Kim has personally guaranteed a loan for one of those entities to purchase the building and property that was then leased to one of the hospitals in the Signature Psychiatric Hospital Network.  At relevant times, Defendant Kim acted under color of law in connection with children in DCFS custody and within the scope of his employment. Plaintiffs bring suit against Kim in his individual capacity.

26. Defendant Beverly J. Walker was the Acting Director of DCFS between approximately June 26, 2017 and February 15, 2019. As DCFS Acting Director, Defendant Walker supervised the activities of DCFS and its employees and was responsible for ensuring that: (a) all programs complied with state and federal law and the United States Constitution; and (b) all children in DCFS custody or under its guardianship were safe, appropriately placed and received appropriate and timely care and treatment. At relevant times, Defendant Walker was acting under color of law and within the scope of her employment. Plaintiffs bring suit against Defendant Walker in her individual capacity.

27. Defendant George Sheldon (deceased and for whose actions the Estate of George Sheldon is liable) was the Director of DCFS between approximately February 2015 and June 25, 2017. As DCFS Director, Defendant Sheldon supervised the activities of DCFS and its employees and was responsible for ensuring that: (a) all programs complied with state and federal law and the United States Constitution; and (b) all children in DCFS custody or under its guardianship were safe, appropriately placed and received appropriate and timely care and treatment. At relevant times, Defendant Sheldon was acting under color of law and within the scope of his employment. Plaintiffs bring suit against Defendant Sheldon in his individual capacity.

28. At relevant times, Defendant David Fletcher-Janzen held himself out to the State of Illinois and DCFS as the Chief Executive Officer of Defendants Signature and Chicago Lakeshore Hospital. At relevant times, Defendant Fletcher-Janzen had overall supervisory responsibility for the Children's Hospital and its employees and was a member of Chicago Lakeshore Hospital's Board of Governors. At relevant times, Defendant Fletcher-Janzen acted under color of law in connection with children in DCFS custody and within the scope of his employment. Plaintiffs bring suit against Defendant Fletcher-Janzen in his individual capacity.

9

29.     At relevant times, Defendant Neil Skene was the special assistant to Defendant Walker.  In that role, he supervised DCFS employees and was responsible for helping to ensure that children in DCFS custody who were placed at the Children's Hospital were safe and received appropriate and timely care and treatment.  At relevant times, Defendant Skene was acting under color of law and within the scope of his employment.  Plaintiffs bring suit against Defendant Skene in his individual capacity.

30.     At relevant times, Defendant Michael C. Jones was the Senior Deputy Director for Clinical and Child Services at DCFS.  In that role, he supervised DCFS employees and was responsible for helping to ensure that children in DCFS custody who were placed at the Children's Hospital were safe and received appropriate and timely care and treatment.  At relevant times, Defendant Jones was acting under color of law and within the scope of his employment.  Plaintiffs bring suit against Defendant Jones in his individual capacity.

31.     At relevant times, Defendant Tierney Stutz was a DCFS Area Administrator.  In that role, Defendant Stutz supervised DCFS' investigative staff and was responsible for reviewing investigations and conclusions made by DCFS child protection investigators and their supervisors.  At relevant times, Defendant Stutz was acting under color of law and within the scope of her employment.  Plaintiffs bring suit against Defendant Stutz in her individual capacity.

32.     At relevant times, Defendant Beverly Mims was a DCFS supervisor of child protection investigators and was acting under color of law and within the scope of her employment.  Plaintiffs bring suit against Defendant Mims in her individual capacity.

33.     At relevant times, Defendant Marco Leonardo was a DCFS supervisor of child protection investigators and was acting under color of law and within the scope of his employment.  Plaintiffs bring suit against Defendant Leonardo in his individual capacity.

10

34.     At relevant times, Defendant Denise Ellis was a DCFS supervisor of child protection investigators and was acting under color of law and within the scope of her employment. Plaintiffs bring suit against Defendant Ellis in her individual capacity.

35.     At relevant times, Defendant Brooke Sloan was a DCFS child protection investigator and was acting under color of law and within the scope of her employment.  Plaintiffs bring suit against Defendant Sloan in her individual capacity.

36.     At relevant times, Defendant Niama Malachi was employed by Defendant Chicago Lakeshore Hospital as its risk manager and patient advocate and was a member of Chicago Lakeshore Hospital's Board of Governors.  Defendant Malachi had overall responsibility for investigating, *inter alia*, allegations of physical and sexual abuse within the Children's Hospital. At relevant times, Defendant Malachi was acting under color of law in connection with children in DCFS custody and within the scope of her employment.  Plaintiffs bring suit against Defendant Malachi in her individual capacity.

37.     At relevant times, Defendant Tausha Bluitt was a patient advocate employed by Defendant Chicago Lakeshore Hospital and was responsible for, *inter alia*, responding to and investigating allegations of physical and sexual abuse within the Children's Hospital.  At relevant times, Defendant Bluitt was acting under color of law in connection with children in DCFS custody and within the scope of her employment.  Plaintiffs bring suit against Defendant Bluitt in her individual capacity.

38.     At relevant times, Defendant Elisabeth Schei was a nurse employed by Defendant Chicago Lakeshore Hospital and was acting under color of law in connection with children in DCFS custody and within the scope of her employment.  Plaintiffs bring suit against Defendant Schei in her individual capacity.

11

39.     At relevant times, Defendant Richard Kasyoki was an employee of Defendant Chicago Lakeshore Hospital who assisted with overseeing patients, including patients in DCFS custody.  At relevant times, Defendant Kasyoki was acting under color of law in connection with children in DCFS custody and within the scope of his employment.  Plaintiffs bring suit against Defendant Kasyoki in his individual capacity.

40.     At relevant times, Defendant Dion Dill was an employee of Defendant Chicago Lakeshore Hospital who assisted with overseeing patients, including patients in DCFS custody.  At relevant times, Defendant Dill was acting under color of law in connection with children in DCFS custody and within the scope of his employment.  Plaintiffs bring suit against Defendant Dill in his individual capacity.

41.     At relevant times, Defendant Nikolay Katsarov was employed as a nurse by Defendant Chicago Lakeshore Hospital.  Defendant Katsarov was responsible for caring for patients in DCFS custody.  At relevant times, Defendant Katsarov was acting under color of law in connection with children in DCFS custody and within the scope of his employment.  Plaintiffs bring suit against Defendant Katsarov in his individual capacity.

42.     At relevant times, Defendant Andebola ("Debbie") Majekodunmi was an employee of Defendant Chicago Lakeshore Hospital who assisted with overseeing patients, including patients in DCFS custody.  At relevant times, Defendant Majekodunmi was acting under color of law in connection with children in DCFS custody and within the scope of her employment.  Plaintiffs bring suit against Defendant Majekodunmi in her individual capacity.

43.     At relevant times, Defendant Shane Michaels was an employee of Defendant Chicago Lakeshore Hospital who assisted with overseeing patients, including patients in DCFS custody.  At relevant times, Defendant Michaels was acting under color of law in connection with

children in DCFS custody and within the scope of his employment. Plaintiffs bring suit against Defendant Michaels in his individual capacity.

## FACTUAL ALLEGATIONS

### I. Background on DCFS

44. DCFS is the Illinois state agency designated to administer and supervise the administration of child welfare services within the State. Approximately one-third of its annual budget is obtained from federal funds, primarily through Title IV-E of the Social Security Act, which matches money for state spending on foster care.

45. DCFS assumes responsibility for the placement and care of a child after a court has determined there is sufficient evidence that the child is abused, neglected or otherwise dependent on the State for care. Based on Illinois law, DCFS has the responsibility to house each child in the least restrictive (most family-like) setting that is in the child's best interest.

46. On occasion, some of the children in DCFS' care manifest acute psychiatric symptoms that require inpatient care at a psychiatric hospital.

47. When necessary, a child in the care of DCFS may be admitted to a psychiatric hospital.

48. Children requiring admission to a psychiatric hospital are among the most vulnerable in DCFS' care as they likely present a danger to themselves or others and likely have experienced significant trauma or abuse in the past.

49. Children who are psychiatrically hospitalized are only meant to stay in the hospital for the short amount of time it takes them to be stabilized.

50. At relevant times, DCFS routinely kept children at psychiatric hospitals long after they should have been discharged which: (a) prevented hospital beds from being used for patients

who needed psychiatric care; and (b) had negative consequences on the patients who were required to stay at the hospital after they completed treatment.

51.     At relevant times, Chicagoland psychiatric hospitals also knew that due to budgetary constraints within the State of Illinois, they likely would not receive payment for services provided to children in DCFS care in a timely manner.

52.     Due to the above-described issues, at relevant times, Chicagoland psychiatric hospitals generally were reluctant to admit children in DCFS care.

**II.     Defendants Signature and Kim**

53.     As alleged above, at relevant times, Defendants Signature and Kim, operated, managed, controlled and directed the activities of each of the hospitals in the Signature Psychiatric Hospital Network – including Defendant Chicago Lakeshore Hospital.

54.     On information and belief, prior to 2017, each of the hospitals in the Signature Psychiatric Hospital Network, at the direction of Defendants Signature and Kim, leased its building or buildings from entities managed and controlled, in whole or in part, by Defendant Kim.  With respect to Defendant Chicago Lakeshore Hospital, as alleged above, it leased the Children's Pavilion – located at 4720 N. Clarendon, Chicago, Illinois – from Clarendon Ventures, LLC, an entity managed by Clarendon Properties Inc. and Illinois Life Properties, LLC.  As alleged above, on information and belief, at relevant times, Kim controlled and directed the activities of Clarendon Properties Inc. and Illinois Life Properties, LLC.

55.     Clarendon Ventures, LLC's principal office is located at 1450 W. Long Lake Road, Suite 340, Troy, Michigan, the same address that public records list for Defendants Signature and Kim, as well as for Illinois Life Properties, LLC.

14

56.     On information and belief, at relevant times, Defendants Signature and Kim required Defendant Chicago Lakeshore Hospital, as well as the other hospitals in the Signature Psychiatric Hospital Network, to obtain management services from Signature.  On information and belief, as part of the management services, Defendant Signature provided Defendant Chicago Lakeshore Hospital, as well as the other hospitals in the Signature Psychiatric Hospital Network, with their chief executive and chief financial officers.  Further, on information and belief, as part of the management services, Defendants Signature and Kim required Defendant Chicago Lakeshore Hospital, as well as each of the other hospitals in the Signature Psychiatric Hospital Network, to pay Signature a bonus of 2.5% of its gross revenue payable from the hospital's net income, up to 25% of net income.

57.     On information and belief, at relevant times, Defendants Signature and Kim required Defendant Chicago Lakeshore Hospital to obtain information technology ("IT") services through Signature.  Signature obtained the IT services through Kebok Co., LLC ("Kebok"), a company owned by Defendant Kim and his family members.

58.      On information and belief, the lease agreements, management services agreements – including the bonus requirement and vendor requirements – placed extraordinary financial pressure on each of the nominal owners of the hospitals in the Signature Psychiatric Hospital Network, including on Defendant Chicago Lakeshore Hospital.

59.     Defendants Signature and Kim were more concerned about bleeding the various hospitals in the Signature Psychiatric Hospital Network (including Defendant Chicago Lakeshore Hospital) for every lease and management payment than they were about the quality of patient care.

60. As a result, hospitals in the Signature Psychiatric Hospital Network: (a) would sometimes be forced to operate at a loss in order to make their required payments to Defendant Signature for the benefit of Defendant Kim; and/or (b) would not be able to hire qualified staff, hire sufficient staff to properly monitor patients, properly train staff, pay staff sufficient wages to retain them, properly maintain the hospital facilities or make other necessary expenditures to keep patients safe – all to the severe detriment of the health and safety of patients, including Plaintiffs.

61. For instance, until faced with imminent shutdown by government authorities, Defendants Signature and Kim refused to allow Defendant Chicago Lakeshore Hospital to install functional video surveillance cameras within the Children's Hospital despite Defendant Signature repeatedly being told that the cameras did not function. Defendants Signature and Kim knew that the failure to have functioning video surveillance cameras within the Children's Hospital created extreme safety risks for patients at the hospital, including Plaintiffs.

62. Similarly, because of the financial obligations Defendants Signature and Kim created for Defendant Chicago Lakeshore Hospital, the Children's Hospital was forced to operate with insufficient staff to properly monitor patients, including Plaintiffs, thereby allowing the abuse alleged herein to occur.

63. Relatedly, because of the financial obligations Defendants Signature and Kim created for Defendant Chicago Lakeshore Hospital, the Children's Hospital was forced to hire unqualified staff and forego proper employee background checks, resulting in unqualified and dangerous individuals being placed into positions of authority over vulnerable children, including Plaintiffs.

64. Moreover, despite receiving regular reports of abuse at the Children's Hospital, and despite having employees and officers of Defendant Signature onsite at the Children's Hospital on

a regular basis, Defendants Signature and Kim did not take or authorize the actions necessary to stop the abuse alleged herein and, instead, chose to operate the Children's Hospital in a manner that prioritized payments to them over patient care and safety.

### III. The State Action of Defendants Signature, Chicago Lakeshore Hospital and Kim

65. As the entity responsible for the overall care of children in its custody, DCFS had the exclusive prerogative of providing appropriate and necessary mental and behavioral healthcare services to children in its custody.

66. At relevant times, DCFS contracted with Defendant Chicago Lakeshore Hospital, whose conduct and activities were controlled by Defendants Signature and Kim, to provide the above-described mental and behavioral healthcare services to children in DCFS custody.

67. In so doing, Defendant Kim, along with Defendants Chicago Lakeshore Hospital and Signature, through their employees, performed a function that traditionally was the prerogative of DCFS. As such, at relevant times, the Signature Defendants acted under color of law when providing mental and behavioral healthcare services to children in DCFS custody, including Plaintiffs.

68. Unlike most Chicagoland psychiatric hospital operators, Defendant Chicago Lakeshore Hospital, whose conduct and activities were controlled by Defendants Signature and Kim, embraced the opportunity to fulfill DCFS' role of providing mental and behavioral healthcare to children in DCFS' custody as it allowed Chicago Lakeshore Hospital to have a steady stream of patients that it hoped would allow it to meet its obligations to the various entities controlled by Defendant Kim.

69. In 2017 and 2018, respectively, 41% and 29% of child and adolescent admissions to the Children's Hospital were in DCFS custody.

70.     Well aware of the Signature Corporate Defendants' willingness to accept children in DCFS custody, Defendants Walker, Sheldon, Skene and Jones relied on Defendant Chicago Lakeshore Hospital keeping the Children's Hospital open for business, regardless of whether children received appropriate care.

## IV.     Plaintiffs' Abuse While at the Children's Hospital

71.     Between early 2017 and late 2018, each Plaintiff, while in the custody and care of DCFS, was involuntarily admitted to the Children's Hospital to receive mental and behavioral health services that DCFS was required to provide.

72.     Prior to each Plaintiff entering DCFS custody, a court determined there was sufficient evidence that the child had been abused, neglected or was otherwise dependent on the State for care.

73.     Instead of being placed in a safe environment where they could focus on their treatment, each Plaintiff found himself or herself in a hospital of horrors where they were subjected to sexual, physical and emotional abuse and otherwise not properly supervised or monitored.

### A.     Plaintiff Trinity B.

74.     In 2017, Plaintiff Trinity B., among other minor girls, was repeatedly sexually assaulted by Defendant Schei, after Schei first showed Trinity B. pornographic videos of women engaging in sexual activity with each other.  To earn the trust of Trinity B. and the other girls she assaulted, Schei allowed Trinity B. and the other girls to: (a) fill out their own medical paperwork, as well as the confidential and highly-sensitive paperwork of other patients; and (b) use Schei's vaping device.

75.     Defendant Schei's conduct was extreme and outrageous, especially given that Schei targeted such vulnerable victims and Schei's power and control over those victims.

18

76.     Defendant Schei engaged in the above-described conduct while employed by Defendant Chicago Lakeshore Hospital and on-duty at the Children's Hospital and, therefore, under color of law.

77.     Defendant Schei was not fit to be a nurse at the Children's Hospital or any other psychiatric hospital, which a singular glance at her lengthy criminal history confirms.  Defendant Chicago Lakeshore Hospital, whose conduct and activities were controlled by Defendants Signature and Kim, did not conduct a proper background check, which resulted in a violent and unqualified nurse being employed to work with children, including Plaintiff Trinity B.

78.     Defendant Schei's conduct subsequent to her heinous acts at the Children's Hospital are illustrative of her dangerous behavior.  In early 2019, Schei was charged with attempted murder and aggravated battery.  According to a police report, Schei stabbed a housemate in the face with a dental tool.  In April 2019, the Illinois Department of Professional and Financial Regulation revoked Schei's nursing license.

79.     After Defendant Schei's sexual abuse of Plaintiff Trinity B., Trinity B. and others escaped from the Children's Hospital and were missing for several months.

80.     The above-described escape was made possible by: (a) the failure of Defendant Chicago Lakeshore Hospital to have proper and adequate systems in place to alert staff to the escape; and (b) Chicago Lakeshore Hospital's failure to properly monitor and supervise the children in its care.

81.     As alleged above, Defendants Signature and Kim were directly responsible for Defendant Chicago Lakeshore Hospital's lack of adequate security systems, which they failed to upgrade or provide due to their desire to prioritize their financial wellbeing over that of patient safety.

19

82. Defendant Chicago Lakeshore Hospital did not report Plaintiff Trinity B.'s escape and, instead, opted to cover it up and otherwise conceal it.

**B.    Plaintiffs Jymesha S. and Jadiene T.**

83. Plaintiff Trinity B. was not the only child sexually assaulted by an on-duty employee of Defendant Chicago Lakeshore Hospital. In 2018, Plaintiff Jymesha S. was sexually assaulted by Defendant Kasyoki, who entered her room and forced her hand on his genitals and grabbed her breasts.

84. Defendant Katsarov was Defendant Kasyoki's supervisor and was on-duty at the Children's Hospital at the time Kasyoki sexually assaulted Plaintiff Jymesha S. In his position as supervisor, Katsarov was required to review and sign off on "round logs" that showed the activity of Kasyoki at relevant times. Kasyoki falsified the "round logs" to conceal his sexual assault of Jymesha S., and Katsarov signed off on the false "round logs," on information and belief, to assist with Kasyoki's effort to conceal his misconduct. Katsarov did not report Kasyoki to staff at Defendant Chicago Lakeshore Hospital, DCFS or the police, despite a duty to do so. As an employee of Defendant Chicago Lakeshore Hospital who was on-duty at the Children's Hospital, Katsarov acted under color of law.

85. Prior to Defendant Kasyoki's sexual assault of Plaintiff Jymesha S., on separate occasions, Kasyoki made sexually inappropriate and explicit comments to Plaintiffs Jadiene T. and Jymesha S.

86. At the time of Defendant Kasyoki's sexual assault and inappropriate sexual comments, Kasyoki was employed by Defendant Chicago Lakeshore Hospital and on-duty at the Children's Hospital and, therefore, acted under color of law.

20

87.     Defendant Kasyoki suffered no consequence after the incident with Plaintiff Jadiene T.  In contrast, after Jadiene T. reported Kasyoki's conduct, employees of Defendant Chicago Lakeshore Hospital retaliated against her.

88.     After Plaintiff Jymesha S. reported Defendant Kasyoki's sexual assault and improper sexual comments, Defendants Fletcher-Janzen, Malachi and Bluitt, among others, failed to take proper action against Kasyoki and merely transferred him to a different building.  Kasyoki still had access to the Children's Hospital and the ability to harm child patients, including Plaintiffs.

89.     Eve Brownstone, who worked the Children's Hospital, was present when Defendant Kasyoki made his inappropriate sexual comments to Plaintiff Jymesha S. and, on information and belief, heard the comments.  Yet, Brownstone failed to report Kasyoki to proper staff at Defendant Chicago Lakeshore Hospital, to DCFS or to the police, and  Kasyoki remained free to later sexually assault Jymesha S.

90.     The conduct of Defendant Kasyoki with respect to Plaintiffs Jymesha S. and Jadiene T. was extreme and outrageous, especially given the vulnerability of the victims and his power and control over them.

91.     The conduct of Defendant Katsarov in failing to intervene to stop Defendant Kasyoki's conduct and in concealing and covering up that conduct was extreme and outrageous, especially given the vulnerability of the victims, Katsarov's duty to truthfully report the misconduct in order to protect the health and safety of the victims and future victims, and the victims' dependence on hospital staff to keep them safe.

### C.   Plaintiff Romeo S.

92.   Tragically, Plaintiff Romeo S., who was just 7 years old when he was admitted to the Children's Hospital, was forced to perform oral sex on his older roommate in 2017. The roommate also rubbed his genitals on Romeo S.' buttocks. Prior to the sexual assault, the roommate physically abused Romeo S., resulting in Romeo S. receiving facial lacerations. Only after Romeo S. became upset, began to cry and refused to go back to his room did on-duty staff at Defendant Chicago Lakeshore Hospital allow him to sleep in a different room. However, staff failed to have Romeo S. medically examined for sexual assault and did not timely notify his foster parents of the assault.

### D.   Plaintiff Tatyana H.

93.   In 2018, Plaintiff Tatyana H., a 7-year-old girl, was also sexually assaulted at the Children's Hospital by another patient, among others. Notably, Defendants Chicago Lakeshore Hospital, Signature, Fletcher-Janzen and Malachi, among others, knew that the patient who sexually assaulted Tatyana H. previously had sexually acted out against other patients in the Children's Hospital, including Tatyana H. Notwithstanding the patient's prior sexually aggressive and improper conduct, the Signature Defendants described above, among others, failed to put proper precautions in place to prevent the patient from sexually assaulting Tatyana H.

94.   Despite learning about Plaintiff Tatyana H.'s sexual assault at or near the time it occurred, Defendants Katsarov and Majekodunmi did not report it to proper staff within Defendant Chicago Lakeshore Hospital, DCFS or the police, despite a duty to do so. Further, Katsarov and Majekodunmi did not have medical personnel examine Tatyana H. and did not take precautions to preserve any evidence of the assault that may have existed, despite a duty to do so. At all relevant

times, Katsarov and Majekodunmi were employed by Chicago Lakeshore Hospital and on-duty at the Children's Hospital and, therefore, were acting under color of law.

95. Defendants Dill and Michaels were also employed by Defendant Chicago Lakeshore Hospital and on-duty at the time Plaintiff Tatyana H. was sexually assaulted by the other hospital patient. At all relevant times, they were responsible for supervising Tatyana H. and were acting under color of law. On information and belief, Dill and Michaels knew about Tatyana H.'s sexual assault but, instead of reporting it as they were required to do, they took steps to conceal and cover it up by, among other things, providing information to investigators that made it appear as if the sexual assault had not occurred.

96. After Plaintiff Tatyana H. reported the sexual assault, it took days before anyone within Defendant Chicago Lakeshore Hospital allowed Tatyana H. to go to a hospital for a sexual assault examination. Even after Tatyana H. was taken to the hospital, it took Defendant Malachi another day to finally report the sexual assault to the police. At all relevant times, Defendant Malachi was employed by Chicago Lakeshore Hospital and was on-duty at the Children's Hospital and, therefore, acting under color of law.

97. The conduct of the above described defendants was extreme and outrageous, especially given Plaintiff Tatyana H.'s young age, overall vulnerability and dependence on those defendants, among others, to keep her safe.

**E.    Plaintiff Connor H.**

98. In 2017, without justification, Plaintiff Connor H., who was just 12 years old, was improperly assigned by Defendant Chicago Lakeshore Hospital to a unit with boys much older than him. While in that improper placement, Connor H. was one of several boys sexually assaulted by an older patient with a criminal background.

23

99.     Plaintiff Connor H.'s sexual assault was able to occur because Defendant Chicago Lakeshore Hospital, whose activities and conduct were controlled by Defendants Signature and Kim, failed to take the precautions necessary to keep Connor H. safe from predators.

### F.     Plaintiff Jamya B.

100.     The above-described assaults did not only impact the direct victims. Other vulnerable hospital patients, including Plaintiff Jamya B., were emotionally scarred by being forced to live in and witness such a violent environment at such a young age.

101.     The harm Plaintiff Jamya B. suffered while at the Children's Hospital was not relegated to what she witnessed. Hospital staff also physically assaulted her by injecting her with a powerful sedative both when she had done nothing wrong and after staff had taunted her in an effort to get her to misbehave so they could inject her with the sedative.

102.     The abuse and harm suffered by Plaintiffs, as alleged above, resulted from the policies and practices of the Signature Corporate Defendants, including policies and practices that did not require strict monitoring of patients, allowed for fabricated reports and paperwork to be placed in the file, allowed for the suppression of evidence and allowed staff and peers to assault patients with impunity. Moreover, the abuse and harm resulted from the Signature Corporate Defendants' failure to train, supervise, monitor and discipline staff.

## V.     Defendants' Knowledge of and Efforts to Cover Up the Abuse

103.     At relevant times, the DCFS and Signature Defendants knew of: (a) the abuse to which Plaintiffs were subjected; and (b) the fact that the Chicago Lakeshore Individual Defendants actively engaged in the abuse and/or the concealment thereof, as well as conduct that they knew allowed the abuse to take place.

104.     As members of Defendant Chicago Lakeshore Hospital's leadership, Defendants Fletcher-Janzen and Malachi regularly attended daily "FLASH meetings" in which they reviewed incidents, allegations and accidents that took place at the Children's Hospital, such as the incidents of abuse alleged herein.  The purpose of the FLASH meetings was to keep leadership apprised of the incidents, allegations and accidents and give them the opportunity to prevent similar occurrences from taking place in the future.

105.     Based on the FLASH meetings, regulatory surveys (as described in more detail below), and Defendant Fletcher-Janzen's direct involvement in the operations of the Children's Hospital, Fletcher-Janzen, while employed by Defendant Chicago Lakeshore Hospital and acting under color of law, knew about the sexual and physical abuse alleged herein and facilitated it, approved it and condoned it by not taking appropriate actions to put an end to it.  Instead, Fletcher-Janzen prioritized keeping the Children's Hospital open over the health and safety of Plaintiffs and other patients.

106.     Leadership within Defendant Chicago Lakeshore Hospital, including Defendants Fletcher-Janzen and Malachi, routinely informed Defendant Signature of the incidents, allegations and accidents that took place at the Children's Hospital, including the incidents of abuse alleged herein.  Moreover, because Defendant Kim regularly had Signature staff onsite at the Children's Hospital, it had direct knowledge of the abuse alleged herein and direct responsibility for the fact that: (a) the abuse was allowed to happen; (b) the abuse was improperly investigated and reported; and (c) proper and necessary action was not taken to prevent future abuse.  On information and belief, based on Defendant Kim's control over Signature and involvement in the hospitals in the Signature Psychiatric Hospital Network, including Chicago Lakeshore Hospital, Defendant Kim had the same direct knowledge as that of Defendant Signature.

107.    At relevant times, neither the DCFS Defendants nor the Signature Defendants properly investigated allegations of abuse or other misconduct at the Children's Hospital.

108.    Rather than attempting to protect Plaintiffs and prevent future abuse, both the DCFS Defendants and Signature Defendants engaged in concerted efforts to cover-up or discredit the allegations of abuse.

109.    Leadership within DCFS, including Defendants Walker, Sheldon, Skene, Jones, Stutz, Mims and Leonardo knew about the sexual, physical and emotional abuse alleged herein and facilitated it, approved it and condoned it by directing and/or allowing those they supervised to conduct improper and inadequate investigations into the abuse with the goal of not being able to substantiate the allegations.  Alternatively, these defendants turned a blind eye to the systemic abuse at the Children's Hospital for fear of what they might see.  The actions alleged in this paragraph allowed the Children's Hospital to remain open which, in turn, allowed DCFS to continue to send children in its custody, including Plaintiffs, to that hospital and subject them to the horrors that occurred within.

110.    In an effort to ensure uniformity of the bogus investigations DCFS conducted into Plaintiffs' abuse allegations, Defendants Walker, Sheldon, Skene, Jones, Stutz, Mims and Leonardo limited the number of investigators who could work on the investigations.  By late 2018, those defendants pulled the reigns even tighter and reassigned numerous existing investigations to Defendant Sloan so that Sloan could ensure there was consistency in the way in which DCFS determined the allegations to be unfounded.  Sloan carried out the orders.

111.    Further, on information and belief, in an effort to ensure that negative findings were not made against the Children's Hospital, itself, in connection with Plaintiffs' abuse allegations, and to prevent an investigation that looked into the combined allegations of abuse, Defendants

26

Walker, Sheldon, Skene, Jones, Stutz, Mims and Leonardo refused to allow an investigation or investigations of the Children's Hospital.

112.    In a proactive effort to avoid the existence of evidence that could corroborate abuse allegations, including Plaintiffs' allegations, Defendants Chicago Lakeshore Hospital, Signature and Kim failed to fix malfunctioning or non-operational video surveillance cameras within the Children's Hospital and allowed video that did exist to be destroyed.  Signature and, on information and belief, Kim had direct knowledge of the problems with the video surveillance cameras at the Children's Hospital and refused to authorize the installation of new equipment until faced with the imminent possibility of the hospital being shut down by the government and after the conduct alleged herein already had occurred.

113.    Relatedly, Defendants Malachi and Bluitt, while employed by Defendant Chicago Lakeshore Hospital and while on-duty and acting under color of law, routinely refused or otherwise failed to provide DCFS investigators with video footage that could have corroborated a Plaintiff's allegation.

114.    The DCFS Defendants encouraged the Signature Defendants' failure to install functioning video surveillance cameras by treating the lack of corroborating video evidence or Defendant Chicago Lakeshore Hospital's inability to provide a copy of the video as a basis for finding Plaintiffs' abuse allegations to be unsubstantiated.  On information and belief, DCFS investigators and their supervisors, including Defendants Stutz, Mims, Leonardo, Ellis and Sloan, were directed by DCFS leadership, including Defendants Walker, Sheldon, Skene and Jones, to treat the lack of available video evidence as a factor counting against the validity of an abuse allegation.

115.    Additional improper conduct engaged in by the Signature and DCFS Defendants included failing to: (a) allow post-sexual assault medical examinations to take place in a timely manner, if at all; (b) follow DCFS' rules and regulations for conducting investigations; (c) discipline staff who engaged in misconduct and abuse while working for Chicago Lakeshore Hospital; and (d) place appropriate restrictions on patients who exhibited sexually aggressive behavior or otherwise sexually acted out.

116.    At relevant times, Defendant Malachi, in an effort to not substantiate abuse allegations, required a standard of proof that was designed to achieve that result – namely, Malachi required 100% certainty that an allegation of abuse occurred in order to substantiate the allegation.

117.    In a further effort to not substantiate valid allegations of abuse, including allegations made by Plaintiffs, Defendant Malachi and Defendants Stutz, Mims, Leonardo, Ellis and Sloan placed improper weight on verbal denials of misconduct given by staff of Defendant Chicago Lakeshore Hospital – while largely ignoring Plaintiffs' statements, even if those statements were consistent over time.  Defendants Chicago Lakeshore Hospital, Signature, Kim, Fletcher-Janzen, Walker and Sheldon approved and condoned this conduct because it served their self-interests by allowing the Children's Hospital to remain open.

118.    Beginning in or about October 2018, news of the violence taking place inside the Children's Hospital became public.  Instead of seeking to rectify the problems, Defendants continued their efforts to conceal the horrific conduct.  For instance, shortly after the news broke, Defendant Leonardo with, on information and belief, the knowledge and consent of Defendants Walker, Sheldon, Skene, Jones, Mims and Ellis, reassigned pending investigations into the violent acts to a new investigator – namely, Brooke Sloan – who subsequently determined that the

allegations were "unfounded." Prior to reassignment, the child protection investigators who had been working on the investigations planned to "indicate" them in several instances.

119. The conduct of Defendants Kim, Fletcher-Janzen, Malachi, Bluitt and the DCFS Defendants, in connection with how they responded to and investigated allegations of abuse – including allegations made by Plaintiffs – was extreme and outrageous in that it: (a) prioritized the needs of a State agency and for-profit corporations over the health and safety of Plaintiffs; and (b) sought to demoralize and distress Plaintiffs by making them feel as if the abuse they suffered was acceptable or something they should just live with.

## VI. Federal Compliance Surveys

120. Because Defendant Chicago Lakeshore Hospital participated in the federal Medicare program, its activities and conduct were regulated by the federal Department of Health and Human Services – Centers for Medicare and Medicaid Services ("CMS"). CMS had responsibility for ensuring Chicago Lakeshore Hospital's compliance with Medicare regulations.

121. To accomplish its compliance responsibilities, at relevant times, CMS sent surveyors to Defendant Chicago Lakeshore Hospital's facilities, including the Children's Hospital, to determine whether it was in compliance with applicable regulations.

122. Various 2018 surveys conducted by CMS through the Illinois Department of Public Health ("IDPH"), found that Defendant Chicago Lakeshore Hospital committed gross violations of federal regulations that posed an immediate threat to the health and safety of patients at the Children's Hospital. Some of the violations resulted directly from conduct related to Plaintiffs Tatyana H., Connor H., Jymesha S., Jadienne T. and Jamya B.

123. As a result of Defendant Chicago Lakeshore Hospital's gross violations of federal regulations, CMS terminated its provider agreement with Chicago Lakeshore Hospital, finding

that Chicago Lakeshore Hospital, whose conduct and activities were controlled by Defendants Signature and Kim, failed: (a) to promote and protect its patients' right to be free from abuse because it did not conduct timely and/or complete investigations into multiple patient abuse allegations over a lengthy period of time; and (b) to track and use data concerning those allegations to improve the quality of the care it provided to its patients.

124.    While Defendant Chicago Lakeshore Hospital, under the direction and control of Defendants Signature and Kim, attempted to preclude CMS from moving forward with the termination, the efforts were unsuccessful.

## VII.    The Signature Corporate Defendants' Policies and Practices of Failing to Keep Patients Safe, Which Led to Patient Abuse, Injury and Even Death

125.    The constitutional violations that resulted in Plaintiffs' injuries were not isolated events.  To the contrary, the constitutional violations resulted from the Signature Corporate Defendants' policies and practices of failing to keep patients safe, which led to their abuse, injury and even death.

### *The Michigan Hospital*

126.    In 2006, Defendant Kim and various entities with which Defendant Kim was affiliated and that he controlled, among others, settled a federal False Claims Act lawsuit brought by the United States Department of Justice.  The lawsuit arose out of allegations of fraud involving a Michigan psychiatric hospital that Defendant Kim controlled.

127.    At issue were lease and management payments made by the Michigan psychiatric hospital to: (a) a management company of which Defendant Kim was the president and part owner; and (b) another entity controlled by Defendant Kim that leased facilities to the hospital.

128.    Defendant Kim and the entities agreed to pay approximately $1.73 million to settle the false claims lawsuit.  Another party to the lawsuit and settlement was Carol Peart – the chief

financial officer of the hospital at issue. At relevant times, Peart was the chief financial officer of Defendant Chicago Lakeshore.

129. Prior to that hospital closing, between approximately 2001 and 2003, CMS conducted a series of reviews of the hospital in which it found serious problems related to patient care and safety. According to a CMS official who oversaw the reviews, while it was not atypical to find problems at a hospital, "[w]hat is unusual is for there to be major issues and not have the problems fixed." According to the official, at the hospital at issue, "you had a situation where they were repeatedly failing to fix deficiencies. In fact, they had even more problems in August than in January. Then a survey in October still found problems."

130. As at the Children's Hospital, the problems at the Michigan hospital included a failure to ensure patients were safe, understaffing, injuries among patients (either inflicted by other patients or staff) being on the rise, and improper use of chemical restraints.

### The UIC Report

131. In 2011, the Mental Health Policy Program within the Department of Psychiatry at the University of Illinois at Chicago published a Review of Chicago Lakeshore Hospital (the "UIC Report") that detailed its investigation of DCFS children in care admitted to the Children's Hospital between January 2008 and June 2010. The UIC Report found that the same type of sexual abuse that is alleged in this Second Amended Complaint existed at that time. The UIC Report further found that the abuse was able to occur due to improperly trained and improperly supervised staff.

132. The UIC report found that the abuse described therein was not isolated to the Children's Hospital.

133.     Specifically, the UIC report highlighted various incidents in which a hospital within the Signature Psychiatric Hospital Network – namely, Las Encinas Hospital and Recovery Center ("Las Encinas") – failed to keep patients safe.  Among the highlighted incidents was one that occurred in 2008 in which a 14-year-old girl was raped in her bedroom by a 16-year-old patient while on-duty facility staff slept.  The UIC report also detailed the significant problems at the Michigan hospital, as alleged above.

134.     According to the UIC Report, the information about the other hospitals was "directly relevant to the current evaluation – that is, insofar as such background information sheds light on the corporate context in which [Chicago Lakeshore Hospital] officials make decisions and structure the delivery of services to DCFS wards."

135.     The UIC Report also found "remarkable" the tone of various comments attributed to a CMS official who oversaw the above-described reviews of the Michigan hospital.  According to the UIC Report:

> Generally speaking, mid-level regional officials in Federal agencies do not give news media interviews – certainly not using the sort of blistering terms this official chose to describe a sense of frustration that CMS staff apparently felt in dealing with a repeated pattern of non-compliance, harm to patients and failure to ensure quality of care standards.

136.     Instead of viewing the UIC Report as a helpful roadmap to improve their policies and practices, the Signature Corporate Defendants attacked the report and remained steadfast in maintaining the status quo – a status quo that continued at least through the time of Plaintiffs' stays at the Children's Hospital.

### *Other Incidents at the Children's Hospital*

137.     The incidents of abuse and patients not being safe at the Children's Hospital were not unique to Plaintiffs.

32

138. More recently than the incidents described in the UIC Report, but prior to the alleged abuse inflicted upon Plaintiffs, an employee of Defendant Chicago Lakeshore Hospital who worked at the Children's Hospital repeatedly punched a patient.

139. In another instance, the Signature Corporate Defendants failed to ensure a safe setting for a 15-year-old patient who was able to cut herself to the point of needing 18 stitches.

140. In April 2018, a 17-year-old boy diagnosed with bipolar disorder ended up with a bloody mouth and bruising after two male Chicago Lakeshore Hospital employees dragged the boy to his room and pinned him down over a bedrail.

141. Furthermore, at various times, IDPH surveyors acting as agents for CMS found several instances of individual and structural misconduct, concluding, among other things, that Defendant Chicago Lakeshore Hospital: (a) failed to ensure allegations of sexual behavior and physical assault were tracked and trended for improvement; (b) failed to establish any corrective action to reduce sexual assaults of minors at the facility; and (c) failed to perform complete investigations into allegations of sexual abuse made by minors.

142. In September 2018, DCFS' Inspector General wrote to Defendant Walker to urge that actions be taken to protect children in DCFS custody who were placed at the Children's Hospital due to the fact that the children's health and safety were in immediate jeopardy.

143. Despite all of these allegations of abuse and improper monitoring, the Signature Corporate Defendants did not adjust their ways or implement new policies and practices.

144. The policies and practices implemented by the Signature Corporate Defendants were so egregious that, as alleged above, the federal government cut off federal funding to Defendant Chicago Lakeshore Hospital, finding that it was unable to keep its patients safe. At or

near that same time, DCFS pulled all of the children in its custody out of the Children's Hospital and ceased using the hospital's services.

### The Signature Psychiatric Hospital Network

145.    The policies and practices that resulted in Plaintiffs' abuse and injuries were not unique to Defendant Chicago Lakeshore Hospital. Rather, Defendant Signature implemented and enforced those policies and practices throughout the Signature Psychiatric Hospital Network.

### Las Encinas

146.    Signature's policies and practices of failing to keep patients safe have resulted in a prolonged and disturbing history of patient abuse, death and injury at Las Encinas, including abuse of and injury to minor patients who were receiving public assistance.

147.    In 2014, the United States, State of California and an employee whistleblower settled a False Claims Act case against Las Encinas and Defendant Signature, among others, arising out of fraudulent Medicare and Medicaid billing that resulted from the defendants billing for high-quality care, while delivering minimal substandard care. The complaint detailed numerous instances of abuse and injury, including death, to patients. The case settled on the eve of trial for an undisclosed amount.

148.    As alleged above, in 2008, a 14-year-old patient was raped in her bedroom at Las Encinas by a 16-year-old patient while facility staff slept on the job. The 16-year-old was a robbery suspect in juvenile custody.

149.    In 2013, staff at Las Encinas did not properly monitor a patient who was on a 15-minute watch, allowing the patient to hang and kill himself. State investigators issued an immediate jeopardy citation.

150.    In 2018, a patient died after improperly trained staff restrained him and pushed him to the ground, stopping his breathing.

151.    In 2009, a 16-year-old female and Medi-Cal recipient was admitted to Las Encinas after trying to harm herself by swallowing a battery. Within days of her admission, the patient again swallowed a battery and had to be taken to the emergency room. After returning to Las Encinas, staff again failed to properly supervise the patient. The patient broke off pieces of glass from a bathroom mirror and swallowed them which, again, required emergency room treatment.

152.    In 2009, a 17-year-old female and Medi-Cal recipient was admitted to Las Encinas after slicing open her neck and trying to cut her carotid artery. Less than twenty-four hours after her admission, the patient was found unconscious after trying to hang herself from a bathroom faucet with the cord from a hospital gown.

153.    In 2009, a female adolescent and Medi-Cal recipient was left unattended despite being placed on 1-to-1 supervision. The patient had to be transported to the emergency room on numerous occasions after placing contraband items inside her vagina.

154.    In 2004, an 18-year-old patient died after employees at Las Encinas restrained him for two days, not 3.5 hours as ordered.

### *Dallas Behavioral Healthcare Hospital*

155.    Signature's policies and practices of failing to keep patients safe have also resulted in systemic abuse and injury at its Dallas Behavioral Healthcare Hospital ("Dallas Behavioral").

156.    In or about 2019, CMS threatened to revoke Dallas Behavioral's federal funding as a result of underage patients having sex, among other things.

157.    In 2018, CMS determined that conditions at Dallas Behavioral posed immediate jeopardy to patient health and safety and placed all patients at risk for the likelihood of harm,

serious injury and possibly death.  Among the conditions at issue were: (a) the failure to protect patients from sexual predators and victims of sexual abuse; (b) the failure to provide a safe setting for patients – namely, ligature risks were observed and identified; and (c) the failure to have tracking in place to monitor, assess or identify who at the hospital was on sexually acting out precautions, who was a sexual predator or whether patients were safe in the facility.  Further, according to CMS, after a patient in the children's unit was found engaging in sexually inappropriate behavior with his roommate, the hospital prepared no documentation of the sexual abuse and did not implement any sexually acting precautions.  Moreover, hospital staff failed to investigate if the victim had been injured or needed further examination.

158.    In 2018, a minor patient who had been sexually abused by his sister was originally assigned to a room where he was choked by his roommate.  After being reassigned to another room, hospital staff found the minor patient on the floor with his roommate on top of him attempting to have anal intercourse.  CMS surveyors did not find any documentation of the hospital notifying the minor patient's parents or obtaining a medical assessment.  Further, records did not show that the patient had been reassigned to a different room.

159.    In 2016, a 9-year-old patient was choked and thrown into a wall after wrongly being placed in the adolescent unit.

### Aurora Vista Del Mar

160.    Signature's policies and practices of failing to keep patients safe have also resulted in patient abuse, death and injury at the Aurora Vista Del Mar ("Vista Del Mar").

161.    In 2019, a jury awarded a $13.25 million verdict to three Vista Del Mar patients who were raped by a Vista Del Mar employee.

36

162.    In 2015, a 17-year-old patient at risk for suicide killed herself after Vista Del Mar did not take away equipment that could be used for self-harm and failed to properly monitor her. Vista Del Mar was issued an immediate jeopardy citation and fined $75,000.

163.    In 2011, staff at Vista Del Mar failed to report a patient's allegations of rape.

164.    In 2019, staff at Vista Del Mar failed to keep a patient safe when it allowed the patient to jump onto a nearby roof and run away.

165.    In 2016, Vista Del Mar staff failed to monitor a patient who was supposed to have constant supervision.  As a result, the patient was injured after leaving the hospital and jumping off of a roof.

### Georgetown Behavioral Healthcare Hospital

166.    Signature's policies and practices of failing to keep patients safe have also resulted in systemic abuse and injury at its Georgetown Behavioral Healthcare Hospital ("Georgetown Behavioral").

167.    In 2016, Georgetown Behavioral was fined $62,500 by state regulators for failing to protect patients from sexual and physical assault and not properly monitoring a suicidal person, among other things.

168.    In 2019, state regulators fined Georgetown Behavioral $180,000 for failing to properly monitor patients, which resulted in two patients having sex after not being monitored for two hours.  Investigation of the incident revealed that staff prepared false observation reports.

169.    In 2019, CMS issued an immediate jeopardy determination after finding that Georgetown Behavioral failed to protect patients' rights by failing to effectively monitor patients (including child and adolescent patients) at the level ordered which placed the patients at risk of increased opportunities for aggression and self-injurious behavior.  CMS found specific examples

of a child and an adolescent not being properly monitored and patients causing physical harm to each other.

170.     In June 2018, a Georgetown Behavioral employee punched a teen in the face. Only after the state investigated the incident did Georgetown Behavioral terminate the employee.

### Other Hospitals in the Signature Psychiatric Hospital Network

171.     Various other incidents provide further evidence of Defendant Signature's policies and practices of failing to keep patients safe, which resulted in abuse, injury and death to hospital patients.

172.     According to a 2018 CMS report, staff at San Antonio Behavioral Healthcare Hospital failed to report to state regulators allegations of sexual abuse involving two minor patients.  Further, according to a 2019 CMS report, the hospital failed to consistently and effectively ensure a patient's right to care in a safe setting.  CMS found, *inter alia,* that a patient in the female adolescent area possessed two blades, and another adolescent in the area was able to cut herself with a metal ceiling tile.  According to a staff member at the hospital, the facility was "always perpetually understaffed."

173.     In 2012, a 13-year-old patient at Aurora Behavioral Health Care – San Diego ("Aurora – San Diego") hung herself with a bedsheet after staff failed to check on her every 15 minutes as directed.  Staff failed to check on the patient for forty minutes.  The hospital was issued an immediate jeopardy citation and fined $75,000.

174.     In 2014, a patient at Aurora San Diego alleged that another patient sexually assaulted her.  Hospital staff failed to report the incident as required by law.

175.     Similarly, in 2016, a patient at Aurora Santa Rosa Hospital alleged that she was sexually abused by another patient.  Hospital staff failed to report the alleged abuse.

## VIII.  The Harm to Plaintiffs

176.    Each Plaintiff was admitted to the Children's Hospital in order to receive acute care in a protected and safe environment.

177.    Instead of receiving the necessary treatment, Plaintiffs were subjected to egregious sexual, physical and emotional trauma that should not happen in any setting, let alone at a psychiatric hospital.

178.    Compounding the harm inflicted on Plaintiffs is the fact that after they reported the misconduct, Defendants worked to discredit Plaintiffs, further victimizing them and forcing them to internalize the shame and emotions they felt as a result of the assaults.

179.    Defendants' misconduct continues to cause Plaintiffs physical and emotional pain and suffering, humiliation, fear, anxiety, deep depression, despair and other physical and psychological effects.

180.    Moreover, Defendants' conduct has frustrated Plaintiffs' efforts to prosecute their claims against Defendants.   Defendants' failure to preserve evidence, conduct proper investigations and properly document their investigations has created a "he said/she said" scenario. Because of the trauma to which Plaintiffs have been subjected throughout their young lives and the fact that memories fade over time, Defendants have caused concrete injury to Plaintiffs, as Defendants have made it eminently more difficult for Plaintiffs to prove their claims.

## CLAIMS FOR RELIEF

### COUNT ONE – 42 U.S.C. § 1983
### Violations of the Fourteenth Amendment

181.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

182.    This Count is alleged by the following Plaintiffs against the following Defendants:

      a.    All Plaintiffs against Defendants Kim, Fletcher-Janzen, Malachi, Bluitt and the DCFS Defendants;

      b.    Plaintiff Trinity B. against Defendant Schei;

      c.    Plaintiff Tatyana H. against Defendants Katsarov, Michaels, Dill and Majekodunmi;

      d.    Plaintiff Jymesha S. against Defendants Kasyoki and Katsarov; and

      e.    Plaintiff Jadiene T. against Defendant Kasyoki.

183.    At all relevant times, Plaintiffs had a right to, and historic liberty interest in, reasonably safe conditions of confinement and to be free from unreasonable and unnecessary intrusions on their physical and emotional well-being.

184.    The Individual Defendants, cloaked under color of law, had a duty to protect Plaintiffs from sexual assaults, physical attacks and emotional harm but, instead, engaged in arbitrary government action that deprived Plaintiffs of their liberty and violated their right to bodily integrity and safe conditions of confinement.

185.    Specifically, as described above, the Individual Defendants: (a) subjected Plaintiffs to physical and emotional abuse and other unsafe conditions; (b) failed to provide Plaintiffs reasonable care and safe conditions of confinement; and (c) failed to provide Plaintiffs protection from harm.

186. The Individual Defendants knew that the conditions that existed at the Children's Hospital to which Plaintiffs were subjected created a risk that Plaintiffs would suffer physical and severe emotional harm and would preclude them from enjoying their right to reasonably safe conditions of confinement.

187. As trained professionals, the Individual Defendants were required to exercise professional judgment in safeguarding Plaintiffs' right to reasonable safety and to be free from intrusions on their physical and emotional well-being, whereas in fact, the decisions the Individual Defendants made constituted such a substantial departure from accepted professional judgment, practice and standards as to demonstrate that they did not actually base their decisions on such a judgment.

188. In the alternative, to the extent any of the Individual Defendants was not a trained professional, he or she was deliberately indifferent to the risks posed to Plaintiffs by their confinement at the Children's Hospital, in that such Individual Defendants were subjectively aware of the conditions and dangers complained of herein, but consciously disregarded them. Moreover, at all relevant times, the Individual Defendants possessed actual knowledge of the impending harm to Plaintiffs, easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from their failure to prevent it.

189. The Individual Defendants' misconduct described in this Count was undertaken intentionally, with malice and with deliberate and reckless indifference to Plaintiffs' clearly established constitutional rights.

190. As a consequence of the Individual Defendants' failure to exercise professional judgment or, alternatively, their deliberate indifference, Plaintiffs suffered physical and emotional

harm, including but not limited to severe emotional distress, great mental anguish, humiliation, physical pain and suffering and other grievous and continuing injuries and damages.

191.    The conduct of the Chicago Lakeshore Individual Defendants was undertaken pursuant to the policies and practices of the Signature Corporate Defendants, in the manner more fully described in Counts Four and Five, below.

## COUNT TWO – 42 U.S.C. § 1983
## Failure to Intervene

192.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

193.    This Count is alleged by the following Plaintiffs against the following Defendants:

      a.      All Plaintiffs against Defendants Kim, Fletcher-Janzen, Malachi, Bluitt and the DCFS Defendants;

      b.      Plaintiff Tatyana H. against Defendants Katsarov, Michaels, Dill and Majekodunmi;

      c.      Plaintiff Jymesha S. against Defendants Kasyoki and Katsarov; and

      d.      Plaintiff Jadiene T. against Defendant Kasyoki.

194.    In the manner described more fully above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Individual Defendants described in the preceding paragraph stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity and duty to do so.

195.    The misconduct described in this Count was objectively unreasonable and undertaken intentionally and with malice and reckless indifference to Plaintiffs' constitutional rights.

196.     The actions and omissions of the Individual Defendants against whom this Count is alleged, in the face of a constitutional duty to intervene, were the direct and proximate cause of Plaintiffs' constitutional violations and injuries, including but not limited to, physical harm and emotional distress.

197.     The Chicago Lakeshore Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of the Signature Corporate Defendants, in the manner more fully described in Counts Four and Five, below.

**COUNT THREE – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

198.     Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

199.     This Count is alleged by the following Plaintiffs against the following Defendants:

a.     All Plaintiffs against Defendants Kim, Fletcher-Janzen, Malachi, Bluitt and the DCFS Defendants;

b.     Plaintiff Tatyana H. against Defendants Katsarov, Michaels, Dill and Majekodunmi; and

c.     Plaintiff Jymesha S. against Defendants Kasyoki and Katsarov.

200.     Prior to Plaintiffs being harmed, the Individual Defendants described in the preceding paragraph agreed among themselves and with other individuals to deprive Plaintiffs of their constitutional rights, guaranteed by the Fourteenth Amendment, as described in the various paragraphs of this Complaint.  The Individual Defendants against whom this Count is alleged conspired to deprive Plaintiffs of their right to safe confinement, their right to be protected from physical and emotional harm and their right of access to the courts.

201.    In furtherance of the conspiracy, each of the coconspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as covering up and concealing acts of abuse, rigging abuse investigations to achieve a desired outcome, giving improper weight to the statements of those alleged to have abused Plaintiffs, not properly supervising Plaintiffs and others with whom Plaintiffs interacted, not preserving evidence, failing to intervene, creating false evidence, failing to conduct proper investigations of abuse allegations, hiring staff who were unfit to work in a children's psychiatric hospital, failing to properly train and supervise staff, and failing to perform background checks on staff – and was an otherwise willful participant in joint activity.

202.    Each of the Individual Defendants against him this Count is alleged was a voluntary participant in the common venture to deprive Plaintiffs of their Fourteenth Amendment rights. Each of the Individual Defendants against whom this Count is alleged personally participated in the unconstitutional conduct or acted jointly with other Defendants who participated or acquiesced in the unconstitutional conduct, or was at least aware of the conduct or plan, and failed to take action to prevent such conduct from occurring.

203.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiffs' rights were violated, and they suffered injuries, including but not limited to physical harm and emotional distress.

204.    The Chicago Lakeshore Individual Defendants' misconduct described in this Count was undertaken pursuant to the policies and practices of the Signature Corporate Defendants, in the manner more fully described in Counts Four and Five, below.

## COUNT FOUR – 42 U.S.C. § 1983
### Policy and Practice Claim Against Chicago Lakeshore Hospital

205.     Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

206.     As described more fully herein, Defendant Chicago Lakeshore Hospital is liable for the violation of Plaintiffs' constitutional rights by virtue of its policies and practices, which policies and practices included: (a) not keeping patients at the Children's Hospital safe; (b) not properly supervising or monitoring patients at the Children's Hospital; (c) not preserving evidence; (d) fabricating evidence; (e) not obtaining in a timely manner medical examinations for patients who have been assaulted; (f) not conducting proper investigations of patient allegations of assault; (g) not conducting proper background checks on staff; (h) not properly training, supervising, monitoring and disciplining staff; and (h) not tracking allegations and instances of abuse to prevent future occurrences.

207.     The actions of the Chicago Lakeshore Individual Defendants were undertaken pursuant to policies and practices of Defendant Chicago Lakeshore Hospital which were approved, encouraged and/or ratified by policymakers for Defendant Chicago Lakeshore Hospital with final policymaking authority.

208.     One or more of the policies and practices described in this Count was maintained and implemented by Defendant Chicago Lakeshore Hospital with deliberate indifference to and reckless disregard for Plaintiffs' constitutional rights and was a moving force behind the violations of those rights.

209.     As a direct and proximate result of Defendant Chicago Lakeshore Hospital's actions and inactions, Plaintiffs' constitutional rights were violated, and they suffered injuries and damages, as set forth in this Second Amended Complaint.

## COUNT FIVE – 42 U.S.C. § 1983
## Policy and Practice Claim Against Signature

210.     Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

211.     As described more fully herein, Defendant Signature is liable for the violation of Plaintiffs' constitutional rights by virtue of its policies and practices that applied network wide to the various hospitals within the Signature Psychiatric Hospital Network.  The network-wide policies and practices included: (a) not keeping patients safe; (b) not properly supervising or monitoring patients; (c) not preserving evidence; (d) fabricating evidence; (e) not obtaining in a timely manner medical examinations for patients who have been assaulted; (f) not conducting proper investigations of patient allegations of assault; (g) not conducting proper background checks on staff; (h) not allowing hospitals within the Signature Psychiatric Hospital Network – including the Children's Hospital – to make necessary expenditures to protect the health and safety of patients; (i) not tracking allegations and instances of abuse to prevent future occurrences; and (j) not properly training, supervising, monitoring and disciplining staff.

212.     The actions of the Chicago Lakeshore Individual Defendants were undertaken pursuant to policies and practices of Defendant Signature which were approved, encouraged and/or ratified by policymakers for Signature with final policymaking authority.

213.     One or more of the policies and practices described in this Count was maintained and implemented by Defendant Signature with deliberate indifference to and reckless disregard for Plaintiffs' constitutional rights and was a moving force behind the violations of those rights.

214.     As a direct and proximate result of Defendant Signature's actions and inactions, Plaintiffs' constitutional rights were violated, and they suffered injuries and damages, as set forth in this Second Amended Complaint.

**COUNT SIX – State Law Claim**
**Negligence: Unsafe Environment and Failure to Report Against**
**Chicago Lakeshore Hospital**

215.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

216.    At relevant times, Plaintiffs were lawfully confined patients at the Children's Hospital.

217.    At relevant times, each Plaintiff was in the care of Defendant Chicago Lakeshore Hospital as a patient until each Plaintiff's respective discharge from the Children's Hospital.

218.    It was the duty of Defendant Chicago Lakeshore Hospital, by and through its duly authorized agents and/or employees, to exercise reasonable care to make certain that the premises were safe for Plaintiffs.

219.    While confined at the Children's Hospital, and while in the care of Defendant Chicago Lakeshore Hospital and its employees and agents, Plaintiffs suffered the physical and emotional harm described herein.

220.    In breach of its duty, Defendant Chicago Lakeshore Hospital, acting by and through its agents and employees, was negligent in committing one or more of the following acts and/or omissions:

      a.    Failing to keep Plaintiffs safe;

      b.    Failing to ensure that proper security systems and procedures were in place to protect Plaintiffs' health and safety

      c.    Failing to monitor and supervise Plaintiffs to ensure they were safe and not being physically abused and/or neglected;

d.      Failing to use proper skill and knowledge in the examination, monitoring and treatment of Plaintiffs;

e.      Failing to promptly and properly follow all applicable hospital policies, procedures, rules and regulations in the care and treatment of Plaintiffs;

f.      Failing to monitor and supervise Plaintiffs to ensure that they were safe and not being physically abused and/or neglected;

g.      Failing to properly monitor and supervise staff at the Children's Hospital;

h.      Failing to protect Plaintiffs from physical abuse and neglect;

i.      Failing to exercise the requisite degree of care and supervision to ensure the safety and well-being of Plaintiffs;

j.      Failing to ensure that proper background checks were performed on all staff working at the Children's Hospital;

k.      Failing to investigate Plaintiffs' complaints of sexual, physical and/or emotional abuse by Defendant Kasyoki and/or Defendant Schei, both of whom were employees and/or agents of Defendant Chicago Lakeshore Hospital;

l.      Failing to properly investigate Plaintiffs' complaints of sexual, physical and/or emotional abuse by other patients confined at the Children's Hospital;

m.     Failing to timely report Plaintiffs' complaints of abuse;

n.     Failing to properly investigate known sexual assaults;

o.     Failing to take proper action in response to known sexual assaults;

p.    Failing to protect Plaintiffs' right to be free from all forms of abuse or harassment, in violation of 42 C.F.R. § 482.13(c)(3);

q.    Failing to remove the employee-assailants from the facility pending a requisite investigation of the reported sexual assault and harassment, in violation of 405 ILCS 5/3-210;

r.    Failing to protect Plaintiffs' right to freedom from abuse and neglect, in violation of 405 ILCS 5/2-112;

s.    Failing to provide trained, experienced and educated staff to patients, including Plaintiffs;

t.    Failing to institute and/or follow a proper protocol to ensure that patient sexual and physical abuse was immediately reported to both the facility and to the appropriate authorities; and

u.    Was otherwise careless and/or negligent.

221.    As a direct and proximate result of the above-described negligent and careless acts and omissions of Defendant Chicago Lakeshore Hospital by and through its agents and/or employees, Plaintiffs suffered severe injuries of an emotional and permanent nature, including but not limited to physical abuse, emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

**COUNT SEVEN – State Law Claim**
**Negligence: Unsafe Environment and Failure to**
**Report Against Signature**

222.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

223.    At relevant times, Plaintiffs were lawfully confined patients at the Children's Hospital, a hospital within the Signature Psychiatric Hospital Network.

224.    At relevant times, each Plaintiff was in the care of Defendant Signature as a patient until each Plaintiff's respective discharge from the hospital.

225.    It was the duty of Defendant Signature, by and through its duly authorized agents and/or employees, to exercise reasonable care to make certain that the premises were safe for Plaintiffs.

226.    While confined at the Children's Hospital, and while in the care of Defendant Signature and its employees and agents, Plaintiffs suffered the physical and emotional harm described herein.

227.    In breach of its duty, Defendant Signature, acting by and through its agents and employees, was negligent in committing one or more of the following acts and/or omissions:

    a.    Failing to keep Plaintiffs' safe;

    b.    Failing to ensure that proper security systems and procedures were in place to protect Plaintiffs' health and safety;

    c.    Failing to monitor and supervise Plaintiffs to ensure they were safe and not being physically abused and/or neglected;

    d.    Failing to ensure that proper background checks were performed on all staff working at the Children's Hospital;

e.   Failing to use proper skill and knowledge in the examination, monitoring and treatment of Plaintiffs;

f.   Failing to promptly and properly follow all applicable hospital policies, procedures, rules and regulations in the care and treatment of Plaintiffs;

g.   Failing to monitor and supervise Plaintiffs to ensure that they were safe and not being physically abused and/or neglected;

h.   Failing to properly monitor and supervise staff at the Children's Hospital;

i.   Failing to protect Plaintiffs from physical abuse and neglect;

j.   Failing to exercise the requisite degree of care and supervision to ensure the safety and well-being of Plaintiffs;

k.   Failing to investigate Plaintiffs' complaints of sexual, physical and/or emotional abuse by Defendant Kasyoki and/or Defendant Schei;

l.   Failing to properly investigate Plaintiffs' complaints of sexual, physical and/or emotional abuse by other patients confined at the Children's Hospital;

m.   Failing to timely report Plaintiffs' complaints of abuse;

n.   Failing to properly investigate known sexual assaults;

o.   Failing to take proper action in response to known sexual assaults;

p.   Failing to protect Plaintiffs' right to be free from all forms of abuse or harassment, in violation of 42 C.F.R. 482.13(c)(3);

q.   Failing to remove the employee-assailants from the Children's Hospital pending a requisite investigation of the reported sexual assault and harassment, in violation of 405 ILCS 5/3-210;

r.    Failing to protect Plaintiffs' right to freedom from abuse and neglect, in violation of 405 ILCS 5/2-112;

s.    Failing to provide trained, experienced and educated staff to patients, including Plaintiffs;

t.    Failing to institute and/or follow a proper protocol to ensure that patient sexual and physical abuse was immediately reported to both the facility and to the appropriate authorities; and

u.    Was otherwise careless and/or negligent.

228.    As a direct and proximate result of the above-described negligent and careless acts and omissions of Defendant Signature by and through its agents and/or employees, Plaintiffs suffered severe injuries of an emotional and permanent nature, including but not limited to physical abuse, emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

### COUNT EIGHT – State Law Claim
### Negligence: Negligent Hiring, Training and Retention Against
### Chicago Lakeshore Hospital

229.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

230.    Defendant Chicago Lakeshore Hospital had a duty to hire qualified and sufficient staff for the tasks said employees would perform.

231.    Notwithstanding the foregoing duty, Defendant Chicago Lakeshore Hospital did not hire qualified and sufficient staff to perform tasks required so as to not expose patients to an increased risk of harm and not commit any such harm against patients.

232.    Defendant Chicago Lakeshore Hospital had a duty to properly train staff, including the Chicago Lakeshore Individual Defendants, for the individual monitoring of patients' safety.

233.    Notwithstanding its duty to properly train staff for the individual monitoring of patients' safety, Defendant Chicago Lakeshore Hospital failed to do so.

234.    Defendant Chicago Lakeshore Hospital had a duty to retain sufficient staff so as not to expose patients, including Plaintiffs, to an increased risk of harm and to ensure that patients, including Plaintiffs, were properly monitored.

235.    Notwithstanding the foregoing duty, Defendant Chicago Lakeshore Hospital did not retain sufficient staff so as to not expose patients, including Plaintiffs, to an increased risk of harm and to ensure that patients, including Plaintiffs, were properly monitored.

236.    As a direct and proximate result of the above-described negligent and careless acts and omissions, Plaintiffs suffered injuries of an emotional and permanent nature, including but not limited to physical abuse, emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

### COUNT NINE – State Law Claim
### Negligence: Negligent Hiring, Training and Retention
### Against Signature

237.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

238.    Defendant Signature had a duty to hire qualified and sufficient staff for the tasks said employees would perform.

239.    Notwithstanding the foregoing duty, Defendant Signature, who directly controlled the conduct and activities of Defendant Chicago Lakeshore Hospital, did not hire qualified and

sufficient staff to perform tasks required so as to not expose patients to an increased risk of harm and not commit any such harm against patients.

240.    Defendant Signature had a duty to properly train staff, including the Chicago Lakeshore Individual Defendants, for the individual monitoring of patients' safety.

241.    Notwithstanding its duty to properly train staff for the individual monitoring of patients' safety, Defendant Signature failed to do so.

242.    Defendant Signature had a duty to retain sufficient staff so as not to expose patients at the Children's Hospital, including Plaintiffs, to an increased risk of harm and to ensure that patients, including Plaintiffs, were properly monitored.

243.    Notwithstanding the foregoing duty, Defendant Signature did not retain sufficient staff so as to not expose patients, including Plaintiffs, to an increased risk of harm and to ensure that patients, including Plaintiffs, were properly monitored.

244.    As a direct and proximate result of the above-described negligent and careless acts and omissions, Plaintiffs suffered injuries of an emotional and permanent nature, including but not limited to physical abuse, emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

**COUNT TEN – State Law Claim**
**Intentional Infliction of Emotional Distress**

245.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

246.    As alleged herein, the acts and conduct of the Individual Defendants were extreme and outrageous.  Specifically, the acts and conduct of:

a.   Defendant Kim, the DCFS Defendants, Defendant Fletcher-Janzen, Defendant Malachi and Defendant Bluitt were extreme and outrageous as to all Plaintiffs;

b.   Defendant Schei were extreme and outrageous as to Plaintiff Trinity B;

c.   Defendant Kasyoki were extreme and outrageous as to Plaintiffs Jymesha S. and Jadiene T;

d.   Defendant Katsarov were extreme and outrageous as to Plaintiff Jymesha S.; and

e.   Defendants Katsarov, Dill, Michaels and Majekodunmi were extreme and outrageous as to Plaintiff Tatyana H.

247.   The Individual Defendants' actions were rooted in an abuse of power and authority, and they were undertaken with an intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs, as alleged more fully above. The Individual Defendants' actions were also willful and wanton.

248.   As a direct and proximate result of the actions of the Individual Defendants, Plaintiffs suffered injuries of an emotional and permanent nature, including but not limited to severe emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

**COUNT ELEVEN – State Law Claim**
**Institutional Negligence Against**
**Chicago Lakeshore Hospital**

249.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

250.    Hospitals have a duty, independent of the duties owed by physicians and nurses to assume responsibility for the care of their patients.  This duty involves the hospital's managerial and administrative roles, along with the enforcement of its rules and regulations.

251.    A hospital must act as a reasonably careful hospital to satisfy this duty.

252.    Notwithstanding the foregoing duty, at relevant times, Defendant Chicago Lakeshore Hospital did not act as a reasonably careful hospital in the following ways:

a.    It negligently failed to adequately supervise the medical providers at the facility.

b.    It negligently failed to adequately supervise the nurses at the facility.

c.    It negligently failed to adequately supervise the staff at the facility.

d.    It negligently failed to adequately implement and enforce policies, procedures, bylaws or guidelines to adequately protect patients from sexual or physical assault.

e.    It negligently failed to implement and enforce adequate customs of patient supervision.

f.    It wrongfully permitted male staff members to staff female patients one-on-one.

g.    It negligently failed to implement adequate standards of care for the supervision of patients, including but not limited to Plaintiffs.

h.      It negligently failed to implement adequate staffing standards to ensure patient safety and proper supervision.

i.      It negligently failed to implement and enforce policy and procedure changes that were considered necessary in response to similar prior patient safety issues.

j.      It negligently failed to educate nurses, supervisors and staff about the strategies for adequately and properly monitoring patients, including Plaintiffs.

k.      It negligently failed to protect and ensure the safety of patients, including Plaintiffs.

l.      It negligently allowed breakdowns of hospital procedures to occur, thereby placing the safety of patients, including Plaintiffs' safety, in jeopardy.

m.      It was otherwise careless and negligent.

253.    As a direct and proximate result of the above-described negligent acts and omissions of Defendant Chicago Lakeshore Hospital, Plaintiffs were caused to and did become victims of physical and sexual assault, among other things, by patients, as well as staff who were acting in the scope and course of their employment at Defendant Chicago Lakeshore Hospital.

254.    As a direct and proximate result of the above-described negligent and careless acts and omissions, Plaintiffs suffered injuries of an emotional and permanent nature, including but not limited to physical abuse, emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

## COUNT TWELVE – State Law Claim
## Institutional Negligence Against Signature

255.    Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

256.    Hospitals have a duty, independent of the duties owed by physicians and nurses to assume responsibility for the care of their patients.  This duty involves the hospital's managerial and administrative roles, along with the enforcement of its rules and regulations.

257.    A hospital must act as a reasonably careful hospital to satisfy this duty.

258.    Notwithstanding the foregoing duty, at relevant times, Defendant Signature, as the entity that directly controlled the conduct and activities of Defendant Chicago Lakeshore Hospital, did not act as a reasonably careful hospital in the following ways:

    a.    It negligently failed to adequately supervise the medical providers at the facility.

    b.    It negligently failed to adequately supervise the nurses at the facility.

    c.    It negligently failed to adequately supervise the staff at the facility.

    d.    It negligently failed to adequately implement and enforce policies, procedures, bylaws or guidelines to adequately protect patients from sexual or physical assault.

    e.    It negligently failed to implement and enforce adequate customs of patient supervision.

    f.    It wrongfully permitted male staff members to staff female patients one-on-one.

    g.    It negligently failed to implement adequate standards of care for the supervision of patients, including but not limited to Plaintiffs.

h. It negligently failed to implement adequate staffing standards to ensure patient safety and proper supervision.

i. It negligently failed to implement and enforce policy and procedure changes that were considered necessary in response to similar prior patient safety issues.

j. It negligently failed to educate nurses, supervisors and staff about the strategies for adequately and properly monitoring patients, including Plaintiffs.

k. It negligently failed to protect and ensure the safety of patients, including Plaintiffs.

l. It negligently allowed breakdowns of hospital procedures to occur, thereby placing the safety of patients, including Plaintiffs' safety, in jeopardy.

m. It was otherwise careless and negligent.

259. As a direct and proximate result of the above-described negligent acts and omissions of Defendant Signature, Plaintiffs were caused to and did become victims of physical and sexual assault, among other things, by patients, as well as staff who were acting in the scope and course of their employment at Defendant Chicago Lakeshore Hospital, whose conduct and activities were directly controlled by Signature.

260. As a direct and proximate result of the above-described negligent and careless acts and omissions, Plaintiffs suffered injuries of an emotional and permanent nature, including but not limited to physical abuse, emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

## COUNT THIRTEEN – State Law Claim
## Civil Conspiracy

261.     Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

262.     This Count is alleged by the following Plaintiffs against the following Defendants:

a.     All Plaintiffs against Defendants Kim, Fletcher-Janzen, Malachi, Bluitt and the DCFS Defendants;

b.     Plaintiff Tatyana H. against Defendants Katsarov, Michaels, Dill and Majekodunmi; and

c.     Plaintiff Jymesha S. against Defendants Kasyoki and Katsarov.

263.     As more fully described in the preceding paragraphs, the Individual Defendants described in the preceding paragraph, acting in concert with other known and unknown conspirators, conspired by concerted action to intentionally inflict severe emotional distress on Plaintiffs.

264.     In furtherance of the conspiracy, the Individual Defendants against whom this Count is alleged committed the overt acts set forth above, including: (a) hiring staff that was unfit to work in a children's psychiatric hospital; (b) ensuring that proper and reasonable security precautions were not implemented; (c) covering up and concealing acts of abuse; (d) creating false evidence; (e) rigging abuse investigations to achieve a desired outcome; (f) giving improper weight to the statements of those alleged to have abused Plaintiffs; (g) not properly supervising Plaintiffs and others with whom Plaintiffs interacted; (h) not preserving evidence; (i) failing to intervene; (j) failing to conduct proper investigations of abuse allegations; (k) failing to properly train and supervise staff; and (l) and failing to perform background checks on staff.

265.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness and reckless indifference to the rights of others.   The actions of the Individual Defendants against whom this Count is alleged were also willful and wanton.

266.     As a direct and proximate result of the above-described conduct of the Individual Defendants against whom this Count is alleged, Plaintiffs suffered injuries of an emotional and permanent nature, including but not limited to severe emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

### COUNT FOURTEEN – State Law Claim
### *Respondeat Superior* as to Chicago Lakeshore Hospital

267.     Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

268.      In committing the acts alleged in the preceding paragraphs, each of the Chicago Lakeshore Individual Defendants was a member of, and agent of, Defendant Chicago Lakeshore Hospital, acting at all relevant times within the scope of his or her employment.

269.     Defendant Chicago Lakeshore Hospital is liable as principal for all torts committed by its agents.

### COUNT FIFTEEN – State Law Claim
### *Respondeat Superior* as to Signature

270.     Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

271.      In committing the acts alleged in the preceding paragraphs, each of the Chicago Lakeshore Individual Defendants was a *de facto* member of, and agent of, Defendant Signature, acting at all relevant times within the scope of his or her employment.  Alternatively, in committing the acts alleged in the preceding paragraphs, each of the Chicago Lakeshore Individual Defendants

was a member of, and agent of, Defendant Chicago Lakeshore Hospital – whose conduct and activities were directly controlled by Signature – acting at all relevant times within the scope of his or her employment.

272. Defendant Signature is liable as principal for all torts committed by its agents.

### COUNT SIXTEEN – 42 U.S.C. § 1983
### First and Fourteenth Amendment Right of Access to the Courts[1]

273. Plaintiffs restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

274. In the manner more fully described above, the Individual Defendants – acting under color of law – individually, jointly and in conspiracy with one another, engaged in conduct designed to cover up the misconduct that resulted in the physical and emotional harm suffered by Plaintiffs and their inability to enjoy their right to reasonably safe conditions of confinement.

275. By covering up their wrongful conduct, the Individual Defendants, individually, jointly and in conspiracy with one another, frustrated Plaintiffs' efforts to pursue non-frivolous claims against the Individual Defendants.

276. At relevant times, Plaintiffs were vulnerable minors whose claims arose contemporaneously with the severe trauma imposed on them by the alleged assaults and other events alleged herein. Without the video footage and other corroborating evidence Defendants' failed to preserve or document, or otherwise destroyed or altered, Plaintiffs' ability to pursue legal action for the harms suffered has been frustrated. This important evidence was denied to Plaintiffs due to the Individual Defendants' conduct.

---

[1] The Court previously dismissed Plaintiffs' First and Fourteenth Amendment Right of Access to Courts claim (Count Two of Plaintiffs' First Amended Complaint). Plaintiffs reallege the claim here for the sole purpose of preserving any appellate issues and submits that no briefing is necessary on this previously dismissed claim.

277.    Plaintiffs have been injured by the Individual Defendants' conduct because their right of access to the courts has been abridged by Defendants' efforts to conceal and obscure important facts and evidence and turn this legal proceeding into a game of "he said/she said."

278.    The Chicago Lakeshore Individual Defendants' misconduct described in this Count was undertaken pursuant to the policy and practice of the Signature Corporate Defendants, in the manner more fully described in Counts Four and Five, above.

### COUNT SEVENTEEN – 42 U.S.C. § 1983
### Failure to Intervene
### (By Plaintiff Trinity B. against Defendant Schei)[2]

279.    Plaintiff Trinity B. restates and realleges paragraphs 1 through 180, above, as though fully set forth herein.

280.    In the manner described more fully above, by her conduct and under color of law, during the constitutional violations described herein, Defendant Schei stood by without intervening to prevent the violation of Plaintiffs Trinity B.'s constitutional rights, even though Defendant Schei had the opportunity and duty to do so.

281.    The misconduct described in this Count was objectively unreasonable and undertaken intentionally and with malice and reckless indifference to Plaintiffs Trinity B.'s constitutional rights.

282.    The actions and omissions of Defendant Schei in the face of a constitutional duty to intervene were the direct and proximate cause of the constitutional violations and injuries suffered by Plaintiff Trinity B., including but not limited to, physical harm and emotional distress.

---

[2] The Court previously dismissed Plaintiff Trinty B.'s Failure to Intervene claim against Defendant Schei (Count Three of the First Amended Complaint). Plaintiff Trinity B.'s realleges the claim here for the sole purpose of preserving any appellate issues and submits that no briefing is necessary on this previously dismissed claim.

283.    The misconduct of Defendant Schei described in this Count was undertaken pursuant to the policies and practices of the Signature Corporate Defendants, in the manner more fully described in  Counts Four and Five, above.

**COUNT EIGHTEEN – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**
**(By Plaintiffs Trinity B. and Jadiene T.)[3]**

284.    Plaintiffs Trinity B. and Jadiene T. restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

285.    Prior to Plaintiffs Trinity B. and Jadiene T. being harmed, Defendants Schei and Kasyoki agreed with other known and unknown individuals, including other Defendants, to deprive Plaintiffs of their constitutional rights, guaranteed by the Fourteenth Amendment, as described in the various paragraphs of this Complaint.  Defendants Schei and Kasyoki conspired with others to deprive Plaintiffs Trinity B. and Jadiene T. of their right to safe confinement and their right to be protected from physical and emotional harm.

286.    In furtherance of the conspiracy, Defendants Schei, Kasyoki and their co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as covering up and concealing acts of abuse, rigging abuse investigations to achieve a desired outcome, not preserving evidence, creating false evidence, failing to conduct proper investigations of abuse allegations   – and were otherwise willful participants in joint activity.

287.    Defendants Schei and Kasyoki were voluntary participants in the common venture to deprive Plaintiffs Trinity B. and Jadiene T. of their Fourteenth Amendment rights.  Defendants

---

[3] The Court previously dismissed the civil rights conspiracy claims of Plaintiffs Trinity B. and Jadiene T. against Defendants Schei and Kasyoki, respectively (Count Four of the First Amended Complaint). Plaintiffs Trinity B. and Jadiene T. reallege the claim here for the sole purpose of preserving any appellate issues and submit that no briefing is necessary on this previously dismissed claim.

Schei and Kasyoki personally participated in the unconstitutional conduct or acted jointly with other Defendants who participated or acquiesced in the unconstitutional conduct, or were at least aware of the conduct or plan, and failed to take action to prevent such conduct from occurring.

288.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, the rights of Plaintiffs Trinity B. and Jadiene T. were violated, and they suffered injuries, including but not limited to physical harm and emotional distress.

289.    The misconduct of Defendants Schei and Kasyoki described in this Count was undertaken pursuant to the policies and practices of the Signature Corporate Defendants, in the manner more fully described in Counts Four and Five, above.

**COUNT NINETEEN – State Law Claim**
**Civil Conspiracy**
**(By Plaintiffs Trinty B. and Jadiene T.)[4]**

290.    Plaintiffs Trinity B. and Jadiene T. restate and reallege paragraphs 1 through 180, above, as though fully set forth herein.

291.    As more fully described in the preceding paragraphs, Defendants Schei and Kasyoki, acting in concert with other known and unknown conspirators, conspired by concerted action to intentionally inflict severe emotional distress on Plaintiffs Trinity B. and Jadiene T.

292.    In furtherance of the conspiracy, Defendants Schei and Kasyoki committed the overt acts set forth above, including: (a) ensuring that proper and reasonable security precautions were not implemented; (b) covering up and concealing acts of abuse; (c) creating false evidence;

---

[4] The Court previously dismissed the state law civil conspiracy claims of Plaintiffs Trinity B. and Jadiene T. against Defendants Schei and Kasyoki, respectively (Count Fourteen of the First Amended Complaint). Plaintiffs Trinity B. and Jadiene T. reallege the claim here for the sole purpose of preserving any appellate issues and submit that no briefing is necessary on this previously dismissed claim.

(d) not properly supervising Plaintiffs Trinity B. and Jadiene T. and others with whom those Plaintiffs interacted; (e) not preserving evidence; and (f) failing to intervene.

293. The misconduct described in this Count was undertaken intentionally, with malice, willfulness and reckless indifference to the rights of others. The actions of Defendants Schei and Kasyoki actions were also willful and wanton.

294. As a direct and proximate result of the above-described conduct of Defendants Schei and Kasyoki, Plaintiffs Trinity B. and Jadiene T. suffered injuries of an emotional and permanent nature, including but not limited to severe emotional distress, conscious pain and suffering, lifelong emotional and psychological injuries and other extensive damages.

**REQUESTS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(a) Enter judgment in Plaintiffs' favor and against all Defendants; awarding compensatory damages, punitive damages, costs, and attorneys' fees and expenses against all Defendants; and

(b) Grant any other relief that this Court considers just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: April 30, 2021

Respectfully submitted,

/s/ Scott R. Drury
SCOTT R. DRURY

Arthur Loevy
Jon Loevy
Scott R. Drury
Mariah Garcia
Julie Goodwin
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312.243.5900
drury@loevy.com

## **CERTIFICATE OF SERVICE**

      I, Scott R. Drury, an attorney, hereby certify that on April 30, 2021, I caused the foregoing document to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

                              Respectfully submitted,

                              /s/ Scott R. Drury
                              *One of Plaintiff's Attorneys*