IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES GOLBERT, Cook County Public Guardian, on behalf of Trinity B., Romeo S., Connor H., Jadiene T., Jymesha S., Tatyana H. and Jamya B., <br><br> Plaintiffs, <br><br> v. <br><br> AURORA CHICAGO LAKESHORE HOSPITAL, LLC, doing business as Chicago Lakeshore Hospital, *et al.* <br><br> Defendants. | Case No. 19-cv-08257 <br><br> Judge Mary M. Rowland <br><br> Magistrate Judge Maria Valdez |

**PLAINTIFFS' OPPOSITION TO SIGNATURE HEALTHCARE SERVICES, LLC AND AURORA CHICAGO LAKESHORE HOSPITAL, LLC'S <u>MOTION FOR PROTECTIVE ORDER</u>**

**INTRODUCTION**

Having failed in their effort to bifurcate *Monell* discovery, Defendants Signature Healthcare Services, LLC ("Signature") and Aurora Chicago Lakeshore Hospital, LLC ("Chicago Lakeshore") (collectively, "Defendants") now seek to bar Plaintiffs from engaging in specific *Monell* discovery. This Court should not permit Defendants to accomplish through the backdoor what Judge Rowland denied them the ability to do through the front.

While nominally titled a motion for protective order, Defendants seek to preclude Plaintiffs from obtaining discovery relevant to their myriad policies and practices that resulted in the horrific sexual, physical and emotional abuse inflicted upon Plaintiffs. As alleged in the Second Amended Complaint, Signature and Defendant Soon K. Kim placed extraordinary financial pressure on Chicago Lakeshore and other hospitals in Signature's network (the "Network Hospitals") by

diverting to themselves for personal gain needed money from Network Hospitals. Prior to 2017, Signature and Kim uniformly executed their scheme by requiring Chicago Lakeshore and Network Hospitals to pay Signature onerous lease fees and bonuses, among other things. In 2017, Signature and Kim altered the scheme by requiring specified Network Hospitals (including the adult patient building of Chicago Lakeshore) to make onerous lease payments to a third party in return for the third party paying *Signature* a lump sum of $380 million dollars. The transaction with the third party is the subject of Defendants' motion.

Contrary to Defendants' contention, merely because Signature and Kim changed the way in which they fleeced Network Hospitals for their personal benefit and to the detriment of vulnerable patients does not make the conduct any less relevant. The discovery at issue goes to the heart of Plaintiffs' *Monell* claim. Moreover, the information sought likely will constitute evidence admissible pursuant to Federal Rule of Evidence 404(b), as it is evidence of Defendants' motive, plan, knowledge, absence of mistake and lack of accident. Accordingly, the Court should deny the motion.

## FACTUAL BACKGROUND

*Plaintiffs' Sexual, Physical and Emotional Abuse at the Children's Hospital*

This case arises out of allegations of horrific sexual, physical and emotional abuse Plaintiffs suffered between 2017 and 2018 while involuntarily admitted to the Children's Pavilion of Chicago Lakeshore (the "Children's Hospital").[1] Dkt. 282 (Second Am. Compl.) ¶¶ 5-6, 71, 73-101. At the time, Plaintiffs ranged in age from seven to sixteen and were in the custody of the Illinois Department of Children and Family Services ("DCFS"). *Id.* ¶¶ 16-22. In 2018, the federal Department of Health and Human Services – Centers for Medicare and Medicaid Services

---

[1] Unless otherwise stated, the described facts occurred at relevant times.

2

("CMS") – the federal agency that regulated the Children's Hospital – terminated the hospital's provider agreement, finding that, among other things, the hospital failed to promote and protect patients' rights to be from abuse. *Id.* ¶¶ 7, 120-23. At or near the same time, DCFS pulled all of the children in its custody out of the Children's Hospital and ceased using its services. *Id.* ¶¶ 7, 144.

***Chicago Lakeshore Hospital***

Chicago Lakeshore was a Chicagoland psychiatric hospital consisting of an adult building and the Children's Hospital. *Id.* ¶ 23. Chicago Lakeshore was 100% owned by Signature, whose sole member was Kim. *Id.* ¶¶ 13, 25. Signature and Kim operated, managed, controlled and directed the activities of Chicago Lakeshore, including the Children's Hospital. *Id.* ¶¶ 4, 24, 53. Through various entities, Kim owned and controlled the building and the property on which the Children's Hospital was located and leased the building to Chicago Lakeshore. *Id.* ¶ 25.

***The Network Hospitals***

Signature also owned, operated, managed, controlled and directed the activities of the Network Hospitals, which consisted of psychiatric hospitals throughout the United States, including Aurora Vista Del Mar, Aurora Behavioral Healthcare – San Diego ("Aurora – San Diego"), Aurora Las Encinas Hospital and Recovery Center ("Aurora – Las Encinas"), Aurora Charter Oaks Hospital, Aurora Behavioral Health System Arizona – Glendale, Aurora Behavioral Health System Arizona – Tempe, Georgetown Behavioral Healthcare Hospital, Dallas Behavioral Healthcare Hospital and San Antonio Behavioral Healthcare Hospital. *Id.* ¶¶ 24, 53. Prior to 2017, each Network Hospital leased its buildings from entities managed and controlled by Kim. *Id.* ¶ 54. As discussed below, in 2017, Signature entered into a sale-leaseback agreement which resulted in some Network Hospitals making lease payments to a different entity.

Signature and Kim required Network Hospitals, including Chicago Lakeshore, to obtain management services and information technology services from or through Signature. *Id.* ¶¶ 56-57. Further, Signature and Kim required the hospitals to pay Signature a bonus of 2.5% of their gross revenue, payable from net income. *Id.* ¶ 56.

The lease agreements, management services agreements and bonuses required by Signature and Kim placed incredible financial pressure on each of the Network Hospitals, including the Children's Hospital, and resulted in highly dangerous atmospheres for patients. *See id.* ¶ 57, 125-175. Network Hospitals were forced to operate at a loss in order to make required payments to Signature for Kim's benefit and were not be able to hire qualified or sufficient staff, properly maintain the hospitals or make necessary expenditures to keep patients safe. *Id.* ¶¶ 60-64. But Signature and Kim did not care because they were more concerned with bleeding the Network Hospitals for every lease and management payment than they were about the quality of patient care or patient safety. *See id.* ¶ 59.

**The Sale-Leaseback Agreement**

In or about 2017, Signature entered into a sale-leaseback agreement with Care Capital Properties, Inc. ("Care Capital") – now known as Sabra Health Care REIT, Inc. ("Sabra") – pursuant to which it sold various properties housing certain Network Hospitals for a lump sum $380 million payment and then required the hospitals to enter into onerous, 10-year triple net leases with Care Capital. *See* Exhibit 1 (Apr. 17, 2017 *ReBusiness Online* News Article). A triple net lease is one in which the lessee is responsible for paying all rent *and* property expenses. *See* J. Chen, *et al.*, *Triple Net Lease*, Investopedia (8/1/2020), https://www.investopedia.com/terms/t/triple-net-lease-nnn.asp (accessed on July 12, 2021). Like the leases with Signature, the triple net leases undoubtedly continued to financially squeeze the

4

Network Hospitals. While the hospitals that were subjected to the sale-leaseback agreement were saddled with the onerous triple net leases, Signature received a windfall. *See* Ex. 1. In essence, Signature received the equivalent of a huge up-front collective lease payment, while the Network Hospitals remained under extraordinary financial pressure that jeopardized patient safety.

***Plaintiffs' Monell Claim***

The horrific abuse experienced by Plaintiffs at the Children's Hospital was not an isolated occurrence (*see* Dkt. 282 ¶¶ 126-75), but rather resulted from Defendants' policies and practices. *See id.* ¶¶ 102, 125, 205-09 (Count Four), 210-14 (Count Five). Those policies and practices included, among other things, failing to keep patients safe, not requiring strict patient monitoring, allowing fabricated reports and paperwork to be placed in patients' files and allowing staff and peers to assault patients with impunity. *Id.* Moreover, the harm and abuse resulted from the failure to train, supervise, monitor and discipline staff. *Id.* ¶ 102.

The Network Hospital abuse and patient harm dated back to at least 2001 and continued after the sale-leaseback agreement. *See id.* ¶¶ 126-75. While the Network Hospitals may have been located in different parts of the country, the uniform financial pressures placed on them resulted in uniform abuse – *e.g.*, patient injury, including death; patient sexual assault; and patient escape. *See id.* As with the Children's Hospital, CMS and state regulators cited numerous Network Hospitals for egregious safety violations. *See, e.g., id.* ¶¶ 157 (CMS determined conditions at Dallas Behavioral Healthcare Hospital posed immediate jeopardy to patient health and safety and placed all patients at risk for the likelihood of harm, serious injury and possibly death), 167-68 (state regulators imposed over $240,000 in fines on Georgetown Behavioral Healthcare Hospital between 2016 and 2019 for not properly monitoring patients and for failing to protect them from sexual and physical sexual assault), 169 (CMS issued immediate jeopardy determination to

5

Georgetown Behavioral Healthcare Hospital for failing to monitor child and adolescent patients, among others, resulting in physical harm), 172 (CMS reported that staff at San Antonio Behavioral Healthcare Hospital failed to report sexual abuse involving two minor patients). Further, as with the Children's Hospital, some of the abuse was inflicted on minor patients receiving state aid. *See, e.g., id.* ¶¶ 151, 153. Additionally, based on publicly-available information, patient-safety failures occurred at one of the sale-leaseback hospitals after the sale-leaseback agreement. *See id.* ¶ 164 (patient escape at Aurora Vista Del Mar). Importantly, Plaintiffs presently do not have all records of patient abuse and injury for all Network Hospitals. However, the information obtained clearly demonstrates that the Network Hospitals uniformly operated as patient abuse and injury factories.

*Plaintiffs' Substantive Claims*

While Plaintiffs' factual allegations have become more thorough as the litigation has progressed, their substantive claims have remained the same. *Compare* Dkt. 1, 135, 282 (Complaint, First Am. Compl. and Second Am. Compl., respectively). Throughout, Plaintiffs have alleged: (a) violations of their Fourteenth Amendment right to reasonably safe conditions of confinement; (b) failure to intervene; (c) conspiracy to deprive Plaintiffs of their constitutional rights; (d) policy and practice claims against Defendants; (e) violations of their First and Fourteenth Amendment right of access to the courts (dismissed); and (f) state law violations. *See id.*

*The Failed Motion to Bifurcate*

On April 15, 2021, Defendants moved to bifurcate and stay *Monell* discovery. Dkt. 268. Without ordering briefing, on April 22, 2021, the Court denied the motion after a short hearing. *See* Dkt. 275; 317-3 (Apr. 22, 2021 Hearing Tr.). At the same hearing, the Court offered what it

described as an "advisory opinion" regarding Plaintiffs' *Monell* discovery based on Plaintiffs' then operative First Amended Complaint:

> So you're going to have to tailor this discovery. I don't know if any of these other [Signature] hospitals are appropriate. But you're going to have to tailor the discovery to hospitals – if you want to go after pattern and practice, you think that Signature is running other hospitals in the same way, they're going to have to be comparable other hospitals. Right? They can't just be some lovely, wealthy hospital out in the middle of California because they're not going to have the same kind of economic pressures.

Dkt. 317-3 at 26:18-27:1, 27:2-4.

### *The Second Amended Complaint*

During the bifurcation hearing, the parties and the Court discussed Plaintiffs' forthcoming Second Amended Complaint. *Id.* at 29:1-30:20. On April 30, 2021, Plaintiffs filed their Second Amended Complaint without opposition from Defendants. *See* Dkt. 281 at ECF 1; 282.

As relevant here, the Second Amended Complaint: (a) added Defendant Kim; (b) contained more thorough allegations regarding the economic pressures Signature and Kim uniformly placed on Chicago Lakeshore and various other Network Hospitals; and (c) alleged in greater detail the abuse that occurred at the Children's Hospital and the other Network Hospitals. *See id.* ¶¶ 13, 24-25, 53-64, 74-102, 120-75. Unlike Plaintiffs' First Amended Complaint, the Second Amended Complaint did not contain specific allegations regarding the sale-leaseback agreement. Subsequent factual investigation had revealed that the agreement did not include the Children's Hospital, but rather the Chicago Lakeshore building that housed adult patients.

### *Plaintiffs' Discovery Requests and the Sabra Subpoena*

On April 20, 2021, Plaintiffs served their Second Set of Requests for Production on Defendants, seeking, *inter alia*, information related to sale-leaseback agreements with Signature. *See* Dkt. 317-1 (Second Set of Requests for Production). The requests sought documents regarding:

(a) the terms of any sale-leaseback transactions; (b) any sale or lease payments required pursuant to any such transactions; (c) financial statements containing information regarding any such transactions; and (d) "any impact or effect, financial or otherwise, any sale-leaseback transaction had on any entity that operated out of a facility that was involved in the transaction." *See id.* at ECF 3. The requested information is relevant to the financial pressures Signature and Kim placed on Network Hospitals and the patient harm that resulted from those pressures. Notwithstanding the relevance of the requests, on May 20, 2021, Defendants responded to Plaintiffs' Second Set of Requests for Production and refused to produce any documents. *See* Dkt. 317-4 (Responses to Second Set of Requests for Production).[2]

On or about April 22, 2021, Plaintiffs served a subpoena on Sabra that also sought documents related to any sale-leaseback transactions with Signature. *See* Dkt. 317-2 (Sabra subpoena). The subpoena was served on Sabra via Certified Mail in Irvine, California in the Central District of California with a return date of May 13, 2021. *See id.* Pursuant to Federal Rule of Civil Procedure 45, Plaintiffs properly notified Defendants, among others, of the subpoena before serving it. *See* Exhibit 2 (Notice of Subpoena). Defendants did not object to the subpoena prior to the return date. *See* Exhibit 3 (Drury Declaration) ¶ 2.

On May 6, 2021, Sabra objected to the subpoena. *See id.* ¶ 3. Sabra's counsel and Plaintiffs' counsel subsequently met and conferred on various occasions by telephone and email. *Id.* Ultimately, Sabra stated that: (a) it did not have any emails related to the transaction; and (b) Plaintiffs should obtain the sale-leaseback transaction documents from Signature. Exhibit 4 (June

---

[2] That was not the first time Defendants stonewalled with respect to discovery. Plaintiffs previously had to file a motion to compel production of Defendants' insurance policies. Dkt. 177 (Motion to Compel). Only after Plaintiffs filed their motion and the Court set a hearing did Defendants produce the documents mandated by Federal Rule of Civil Procedure 26(a)(1). *See* Dkt. 178-79.

21, 2021 Sabra email). Sabra stated that if the parties could not agree on the production of documents, the parties should litigate the issue. *Id.*

***Defendants' Motion for Protective Order***

Defendants first sought to discuss Plaintiffs' sale-leaseback discovery on June 21, 2021. *See* Dkt. 317-5 at ECF 3. Quickly thereafter, on June 28, 2021, Defendants filed the present motion.[3] Dkt. 316.

On June 30, 2021, the parties met and conferred via telephone regarding Plaintiffs' sale-leaseback discovery and Defendants' present motion. Ex. 3 ¶ 4. During the conference, Plaintiffs' counsel noted that the Court already had denied Defendants' motion for bifurcation and that Defendants' motion merely sought to re-raise the bifurcation issue. *Id.* Defendants disagreed with Plaintiffs' view of the motion. *Id.* The parties were not able to resolve the dispute. *Id.*

## ARGUMENT

**I.  Legal Standards.**

The federal notice pleading system contemplates that parties will have broad discovery to investigate the facts and help define and clarify the issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *see also Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 234 F.R.D. 447, 450 (N.D. Ill. 2006). "Plaintiffs are . . . the 'masters of their complaint' . . . . Pleadings shape the litigation, including the scope and ultimately the cost of discovery." *Generation Brands, LLC v. Decor Selections, LLC*, No. 19 C 6185, 2021 WL 780485, at *3 (N.D. Ill. Mar. 1, 2021), quoting *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760, (2016).

Federal Rule of Civil Procedure 26(b)(1) provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the

---

[3] Plaintiffs acknowledge their delay in responding to Defendants' requests for a meet and confer.

9

> parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Information is relevant if it "bears on" or "reasonably could lead to other matter that could bear on" any material facts or issue in the action. *Oppenheimer*, 437 U.S. at 351. Courts have "extremely broad discretion in controlling discovery." *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013). "The burden rests upon the objecting party to show why a particular discovery request is improper." *Parvati v. Oak Forest*, No. 08 C 702, 2010 WL 2836739, at *1 (N.D. Ill. July 19, 2010).

**II.     Documents Regarding the Sale-Leaseback Agreement Are Relevant.**

With respect to the Second Set of Requests for Production, Defendants' singularly base their motion for a protective order on the factually unsupported contention that the requests do not seek relevant information. *See* Dkt. 316 at ECF 5-6. Defendants have failed to meet their burden on the issue.

As discussed above, the Second Amended Complaint alleges that Defendants' policies and practices resulted in the horrific acts of abuse inflicted on Plaintiffs. Underlying those policies and practices was the fact that Signature and Kim prioritized personal profit over patient well-being by diverting money from Network Hospitals – including the Children's Hospital – to Signature and Kim. The Second Amended Complaint contains dozens of allegations regarding the negative consequences of those policies and practices. *See* Dkt. 282 ¶¶ 126-75 (detailing the abuse, injuries and deaths suffered by patients at the Children's Hospital and other Network Hospitals).

While prior to 2017, Signature and Kim uniformly diverted funds via lease agreements, forced bonus payments and forced vendor agreements, in 2017, they modified the scheme via the sale-leaseback agreement. The agreement put a lump-sum of money into Signature's and Kim's

pockets while continuing to subject various Network Hospitals to onerous lease payments. As with Signature's and Kim's pre-2017 scheme, the agreement continued to promote and encourage Defendants' many policies and practices that resulted in patient harm. As such, discovery regarding the sale-leaseback agreement is directly relevant to Plaintiffs' *Monell* claims.

Further, the requested discovery likely will lead to admissible evidence under Federal Rule of Evidence 404(b), as it shows Signature's and Kim's motive, plan, knowledge, absence of mistake and lack of accident in draining funds from Network Hospitals in order to benefit themselves and harm patients.[4] *See* Fed. R. Evid. 404(b). Indeed, the fact that the sale-leaseback agreement kept Network Hospitals under financial strain while allowing Signature and Kim to financially benefit, negates any contention that the dynamic arose by happenstance or without aforethought.

The Court's observations during the April 21, 2021 hearing on Defendants' failed bifurcation motion (Dkt. 316 at ECF 4) underscore the relevancy of the requested discovery. Specifically, the Court advised Plaintiffs that their pattern and practice discovery with respect to other Network Hospitals would have to be directed at "comparable other hospitals," as opposed to "some lovely, wealthy hospital out in the middle of California because they're not going to have the same kind of economic pressures." *See* Dkt. 317-3 at 26:20-27:1. The Second Amended Complaint's allegations make clear that the Network Hospitals are comparable to the Children's

---

[4] Defendants make no argument that the requested discovery is not proportional to the needs of the case. An examination of the proportionality factors demonstrates that any such argument would be futile. *See* Fed. R. Civ. P. 26(b)(1). The issues at stake – the sexual, physical and emotional abuse of vulnerable children – is extremely important. Should Defendants be found liable, the judgment likely would be in the millions or tens of millions. Defendants have far more resources than children in DCFS custody. As discussed above, the requested discovery is important to establishing Plaintiffs' *Monell* claims and is important evidence under Fed. R. Evid. 404(b). Finally, given that the requests seek documents regarding an isolated transaction, any burden of production would be slight and would not come close to outweighing the benefit of the requested discovery.

Hospital: they were subjected to the same economic pressures, they inflicted the same horrific harms on patients (including patients on state aid), and they received negative state and federal citations. Importantly, those allegations are based on publicly-available information without the benefit of discovery. Under no scenario were the Network Hospitals "lovely, wealthy hospitals."

As discussed throughout, Defendants' contention that Plaintiffs changed course between the First Amended Complaint and the Second Amended Complaint (Dkt. 316 at ECF 5) is belied by the facts. Defendants advocate for a rule that because an entity or fact is not specifically described in a complaint then any discovery related to the entity or fact cannot be relevant. Such a warped view of "relevance" is at odds with the broad scope of permissible discovery.

*City of Chi. v. Purdue Pharma, L.P.*, No. 14 CV 4361, 2020 WL 3578496 (N.D. Ill. July 1, 2020) (Dkt. 316 at ECF 5), is distinguishable. In that case, after receiving a ruling to produce certain documents in discovery, the City of Chicago amended its complaint to drop the claims to which the discovery was directed. *Id.* at *1. The City then moved for a protective order, claiming that the discovery was no longer relevant. *Id.* The court agreed, finding that, under the amended complaint, the defendant could no longer meet Rule 26's relevance and proportionality requirements. *See id.* at *3-4. The court further found that the defendant could obtain the information at issue through alternative means. *Id.* at *4. Unlike *Purdue Pharma*, Plaintiffs have not dropped any of their claims, nor could they obtain the requested information from sources other than the parties to the agreement.

### III. Defendants Are Not Entitled to a Protective Order Barring All Discovery into the Sale-Leaseback Agreement.

As discussed above, Defendants are not entitled to a protective order precluding discovery into the sale-leaseback agreement. The same rationale that precludes a protective order regarding Plaintiffs' discovery requests to Defendants precludes a protective order with respect to the subpoena.

In actuality, Defendants seek to quash Plaintiffs' subpoena to Sabra. *See* Dkt. 316 at ECF 6-7 (citing motion to quash and motion to compel cases). Defendants' motion to quash is procedurally defective and necessarily fails.

Federal Rule of Civil Procedure 45 provides that "[o]n timely motion, the court for the district where compliance is required must quash or modify a subpoena . . . . that subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3). Here, the motion is not timely, as it was made over a month after the return date on the subpoena. *See Flagstar Bank, FSB v. Freestar Bank, N.A.*, No. 09 C 1941, 2009 WL 2706965, at *3 (N.D. Ill. Aug. 25, 2009) (motion to quash must be filed at or before time of compliance). Even if the motion were timely, Defendants have filed it in the wrong court. The subpoena required compliance in the Central District of California, not the Northern District of Illinois. Pursuant to Rule 45, Defendants are required to file the motion in the Central District of California.[5]

Finally, Defendants do not have standing to challenge the third-party subpoena to Sabra. A "party generally has no standing to move to quash a subpoena issued to a third party." *Allstate Ins. Co. v. Electrolux Home Prod. Inc.*, No. 16-cv-4161, 2017 WL 5478297, at *3 (N.D. Ill. Nov.

---

[5] To the extent Defendants produce all documents responsive to Plaintiffs' Second Set of Requests for Production, Plaintiffs will withdraw the subpoena. Given Sabra's representation that it does not have communications related to sale-leaseback agreement, it does not appear that Sabra has its own unique documents.

13

15, 2017). While a party may have standing if the subpoena infringes upon the party's legitimate interests, *see id.*, here, Defendants identify no such legitimate interests. Defendants generically assert, without any support, that the subpoena seeks Signature's "highly confidential" business records. Dkt. 316 at 7. However, the business transaction was publicly reported (*see* Ex. 1), and a protective order has been entered in this case. *See* Dkt. 169. Thus, Defendants have no legitimate concern about confidentiality. Indeed, in response to the Plaintiffs' notice of subpoena, Defendants did not request that documents be returned to Defendants for a confidentiality review or that any responsive documents be marked confidential. Ex. 3 ¶ 2. Signature makes no claim of privilege or work product.

The authority cited by Defendants (Dkt. 316 at ECF 7) is distinguishable. As described above, those cases involve: (a) a party moving to compel subpoena compliance against a non-party; (b) a non-party moving to quash a subpoena; (c) a subpoena that sought irrelevant information; or (d) a subpoena seeking documents from a party's employee. *See id.* With respect to *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181 (N.D. Ill. 2013) (Dkt. 316 at ECF 7), Defendants' inaccurately summarize the Court's holding as "quashing subpoena to non-party seeking Defendants' internal business records." *See id.* In actuality, in *Parker*, the court rejected various motions to quash non-party subpoenas on standing grounds. *Parker*, 291 F.R.D. at 186-87. With respect to the one subpoena challenged by the defendant that the court agreed to quash, the court specifically based its ruling on the fact that the subpoena was directed at one of the defendant's employees. *Id.*

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion.

Dated: July 13, 2021

                                          Respectfully submitted,

                                          Charles Golbert, Cook County
                                          Public Guardian

                            By:    */s/ Scott R. Drury*
                                          One of Plaintiffs' Attorneys

Jon Loevy
Scott R. Drury
Julie Goodwin
Mariah Garcia
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
durry@loevy.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2021, I filed the foregoing document using the Court's CM/ECF system, which effected service on all counsel of record.

                                                        */s/ Scott R. Drury*
                                                        One of Plaintiffs' Attorneys